**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| DONALD J. TRUMP; DONALD J. TRUMP, JR.; ERIC TRUMP; IVANKA TRUMP; THE DONALD J. TRUMP REVOCABLE TRUST; THE TRUMP ORGANIZATION, INC.; TRUMP ORGANIZATION LLC; DJT HOLDINGS LLC; DJT HOLDINGS MANAGING MEMBER LLC; TRUMP ACQUISITION LLC; and TRUMP ACQUISITION, CORP., <br><br> *Plaintiffs*, <br><br> v. <br><br> DEUTSCHE BANK AG and CAPITAL ONE FINANCIAL CORP., <br><br> *Defendants*, <br><br> COMMITTEE ON FINANCIAL SERVICES OF THE U.S. HOUSE OF REPRESENTATIVES and PERMANENT SELECT COMMITTEE ON INTELLIGENCE OF THE U.S. HOUSE OF REPRESENTATIVES, <br><br> *Intervenor-Defendants.* | Case No. 1:19-cv-03826-ER |

**OPPOSITION OF INTERVENOR-DEFENDANTS COMMITTEE ON FINANCIAL SERVICES AND PERMANENT SELECT COMMITTEE ON INTELLIGENCE OF THE U.S. HOUSE OF REPRESENTATIVES TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

DOUGLAS N. LETTER
*General Counsel*
TODD B. TATELMAN
*Deputy General Counsel*
MEGAN BARBERO
*Associate General Counsel*
JOSEPHINE MORSE
*Associate General Counsel*
BROOKS M. HANNER
*Assistant General Counsel*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building
Washington, D.C.  20515
(202) 225-9700 (telephone)
douglas.letter@mail.house.gov

*Counsel for Intervenor-Defendants
Committee on Financial Services and
Permanent Select Committee on Intelligence
of the U.S. House of Representatives*

May 10, 2019

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

BACKGROUND .................................................................................................................... 2

   I.   The Committees' Investigations ................................................................................. 2

      A.   Committee on Financial Services's Investigations.................................................... 3

      B.   Committee on Intelligence's Investigations ................................................................ 5

   II.  Procedural History ....................................................................................................... 9

ARGUMENT ......................................................................................................................... 10

   PLAINTIFFS ARE NOT ENTITLED TO A PRELIMINARY INJUNCTION .............................................. 10

   I.   Mr. Trump Cannot Demonstrate a Substantial Likelihood of Success on the Merits ...... 10

      A.   The Constitution Confers Broad Investigatory Powers on Congress ........................ 10

      B.   The Power of the Committees to Investigate............................................................ 11

      C.   The Committees Have a Valid Legislative Purpose ................................................... 13

      D.   The Right to Financial Privacy Act Does Not Apply to Congress ............................ 19

   II.  Mr. Trump Has Failed to Establish a Likelihood of Irreparable Injury............................ 22

   III. The Balance of Equities Tips Heavily in Favor of the Committees ............................... 24

   IV. The Public Interest Supports Enforcement of the Subpoena ........................................ 25

CONCLUSION...................................................................................................................... 25

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**Cases**

*Barenblatt v. United States*,
    360 U.S. 109 (1959)...................................................................................11, 12, 14, 15, 19

*Barroga-Hayes v. Susan D. Settenbrino, P.C.*,
    No. 10 CV 5298, 2012 WL 1118194 (E.D.N.Y. Mar. 30, 2012) .....................................20

*Bean LLC v. John Doe Bank*,
    291 F. Supp. 3d 34 (D.D.C. 2018) ....................................................................7, 11, 13, 17

*Borey v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*,
    934 F.2d 30 (2d Cir. 1991)...............................................................................................22

*Bronx Household of Faith v. Bd. of Educ. of City of N.Y.*,
    331 F.3d 342 (2d Cir. 2003)..............................................................................................24

*Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*,
    598 F.3d 30 (2d Cir. 2010)................................................................................................10

*Dobrova v. Holder*,
    607 F.3d 297 (2d Cir. 2010)..............................................................................................21

*Elrod v. Burns*,
    427 U.S. 347 (1976)..........................................................................................................24

*Eastland v. U.S. Servicemen's Fund*,
    421 U.S. 491 (1975)..............................................................................1, 11, 13, 18, 19, 24

*Exch. Point LLC v. U.S. SEC*,
    100 F. Supp. 2d 172 (S.D.N.Y. 1999) ..............................................................................20

*Exxon Corp. v. FTC*,
    589 F.2d 582 (D.C. Cir. 1978) ..........................................................................18, 23, 24, 25

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
    559 F.3d 110 (2d Cir. 2009) ......................................................................................22, 23

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
    481 F.3d 60 (2d Cir.2007) ................................................................................................22

*Hubbard v. United States*,
    514 U.S. 695 (1995) .....................................................................................................20, 21

ii

*Hutcheson v. United States*,
    369 U.S. 599 (1962) .................................................................................18

*In re Porras*,
    191 B.R. 357 (Bankr. W.D. Tex. 1995) .........................................................20

*Lanvin Inc. v. Colonia, Inc.*,
    739 F. Supp. 182 (S.D.N.Y. 1990) ...............................................................23

*Mazurek v. Armstrong*,
    520 U.S. 968 (1997) (per curiam) ...............................................................10

*McGrain v. Daugherty*,
    273 U.S. 135 (1927) ...............................................................11, 13, 14, 15, 25

*McPhaul v. United States*,
    364 U.S. 372 (1960) .................................................................................17

*McSurely v. McClellan*,
    521 F.2d 1024 (D.C. Cir. 1975) .............................................................12, 17

*Munaf v. Geren*,
    553 U.S. 674 (2008) ...............................................................................2, 10

*N.Y. Progress & Prot. PAC v. Walsh*,
    733 F.3d 483 (2d Cir. 2013) .......................................................................10

*Senate Select Comm. v. Packwood*,
    845 F. Supp. 17 (D.D.C. 1994) ...................................................................17

*Quinn v. United States*,
    349 U.S. 155 (1955) .................................................................................15

*Trump v. Hawaii*,
    138 S. Ct. 2392 (2018) .......................................................................... 18-19

*U.S. Servicemen's Fund v. Eastland*,
    488 F.2d 1252 (D.C. Cir. 1973) .............................................................23, 24

*United States v. Bramblett*,
    348 U.S. 503 (1955) .................................................................................20

*United States v. Daccarett*,
    6 F.3d 37 (2d Cir. 1993) .........................................................................19, 20

*United States v. Josephson*,
    165 F.2d 82 (2d Cir. 1947)....................................................................................1, 14

*United States v. R. Enters., Inc.*,
    498 U.S. 292 (1991)......................................................................................16, 17, 18

*Watkins v. United States*,
    354 U.S. 178 (1957)............................................................................................13, 19

*Weaver v. Schiavo*,
    750 F. App'x 59 (2d Cir. 2019) ...............................................................................23

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)....................................................................................................10

## Court Orders

Order, *Trump v. Comm. on Oversight and Reform*,
    No. 19-cv-01136-APM (D.D.C. May 9, 2019) (ECF No. 25) ............................2

## Constitution, Statutes, and Federal Rules

U.S. Const. art. I, § 5, cl. 2...........................................................................................11

U.S. Const. art. 1, § 6, cl. 1...........................................................................................22

5 U.S.C. § 551(1)(A).....................................................................................................21

18 U.S.C. § 6.................................................................................................................21

Bank Secrecy Act, 31 U.S.C. § 5311 *et seq.*..................................................................5

Right to Financial Privacy Act, 12 U.S.C. § 3401 *et seq*............................................19

    12 U.S.C. § 3401(4) ..............................................................................................19

    12 U.S.C. § 3401(5) ..............................................................................................19

    12 U.S.C. § 3402 ..............................................................................................19, 20

    12 U.S.C. § 3405 ...................................................................................................20

    12 U.S.C. §§ 3405-07 ............................................................................................21

12 U.S.C. § 3412(d) ................................................................................21

12 U.S.C. § 3417 ....................................................................................22

Fed. R. Civ. P. 65(a)(2) .......................................................................2, 25

**Legislative Authorities**

Rules of the U.S. House of Representatives (116th Cong.)

    Rule X.1(h)(1) .................................................................3, 12

    Rule X.1(h)(5) .................................................................3, 12

    Rule X.3(m) ........................................................................12

    Rule X.11(b)(1)(B) ...........................................................6, 12

    Rule XI.1(b)(1) .............................................................. 11-12

    Rule XI.2(m)(1)(B) ..............................................................12

Rules of the Comm. on Financial Services, Rule 3(e)(1) ............................12

Rules of the Permanent Select Comm. on Intelligence, Rule 10(b) ............12

165 Cong. Rec. H2697-98 (daily ed. Mar. 13, 2019) ...............................4, 5

165 Cong. Rec. H2698 (daily ed. Mar. 13, 2019) ..................................3, 15

165 Cong. Rec. H3482 (daily ed. May 8, 2019) .........................................7

H.R. 1, 116th Cong. (2019) .......................................................................7

H.R. 1404, 116th Cong. (2019) .................................................................5

H.R. 1474, 116th Cong. (2019) .................................................................7

H.R. 1617, 116th Cong. (2019) .................................................................7

H.R. 2424, 116th Cong. (2019) .................................................................7

H.R. 2513, 116th Cong. (2019) .................................................................5

H.R. 2514, 116th Cong. (2019) .................................................................5

H. Res. 206, 116th Cong. (2019) .............................................................................3, 5

H. Res. 658, 95th Cong. (1977) ....................................................................................6

House Permanent Select Comm. on Intelligence Minority Members, *Minority Views to the Majority-Produced "Report on Russian Active Measures"* (Mar. 26, 2018).....................7

*Electronic Funds Transfer and Financial Privacy: Hearings on S. 2096, S. 2293 and S. 1460 Before the Subcomm. on Financial Institutions of the Senate Comm. on Banking, Housing and Urban Affairs*, 95th Cong., 2nd Sess. (1978) ..............................................22

*Examining the BSA/AML Regulatory Compliance Regime: Hearing Before the Subcomm. on Fin. Insts. & Consumer Credit of the H. Comm. on Fin. Servs.*, 115th Cong. (2017).......................................................................................................................5

*Implementation of FinCEN's Customer Due Diligence Rule: Hearing Before the Subcomm. on Terrorism & Illicit Fin. of the H. Comm. on Fin. Servs.*, 115th Cong. (2018) ...............5

*Putin's Playbook: The Kremlin's Use of Oligarchs, Money and Intelligence in 2016 and Beyond: Hearing Before the H. Permanent Select Comm. on Intelligence*, 116th Cong. (2019)...................................................................................................................8, 9

## Other Authorities

Bill Littlefield, *A Day (and a Cheeseburger) with President Trump*, WBUR (May 11, 2017, 12:20 PM) ................................................................................................................

Damian Paletta, *How Regulators, Republicans and Big Banks Fought for a Big Increase in Lucrative But Risky Corporate Loans*, Wash. Post (Apr. 6, 2019)..................................3

David Enrich, *Deutsche Bank and Trump: $2 Billion in Loans and a Wary Board*, N.Y. Times (Mar. 18, 2019) ...........................................................................................4, 8

Edward Robinson et al., *Was Trump SoHo Used to Hide Part of a Kazakh Bank's Missing Billions?*, Bloomberg (Dec. 11, 2017, 7:19 AM) ................................................5

Jethro Mullen, *Deutsche Bank Fined for $10 Billion Russian Money-Laundering Scheme*, CNN Business (Jan. 31, 2017, 5:32 AM) .........................................................4

Jonathan O'Connell et al., *As the 'King of Debt,' Trump Borrowed to Build His Empire. Then He Began Spending Hundreds of Millions in Cash.*, Wash. Post (May 5, 2018) ...............8

Ken Dilanian, *Congress Now Interested in That Other Trump Tower Once Planned for Russia*, NBC News (Jan. 13, 2019, 7:06 AM) ...................................................................7

Luke Harding, *Deutsche Bank Faces Action over $20 Bn Russian Money-Laundering Scheme*, Guardian (Apr. 17, 2019, 6:01 AM) ...........................................................4

Mark Mazzetti et al., *Moscow Skyscraper Talks Continued Through 'the Day I Won,' Trump Is Said to Acknowledge*, N.Y. Times (Jan. 20, 2019) .......................................8, 9

Michael Hirsch, *How Russian Money Helped Save Trump's Business*, Foreign Pol'y (Dec. 21, 2018, 1:31 PM) ...............................................................................8

Nicholas Nehamas, *Before Donald Trump Attacked Foreigners, He Helped Sell Them Condos*, Miami Herald (Oct. 14, 2016, 10:00 AM) ...............................................5

Oren Dorell, *Trump's Business Network Reached Alleged Russian Mobsters*, USA Today (Mar. 28, 2017, 5:05 PM) .....................................................................5

Intervenor-defendants the Committee on Financial Services and Permanent Select Committee on Intelligence of the U.S. House of Representatives (collectively, Committees) submit this response in opposition to the motion for a preliminary injunction, Pls.' Mem. (May 3, 2019), ECF No. 27, filed by Donald J. Trump (in his individual, not Presidential, capacity), Donald J. Trump, Jr., Eric Trump, Ivanka Trump, The Donald J. Trump Revocable Trust, The Trump Organization, Inc., Trump Organization LLC, DJT Holdings LLC, DJT Holdings Managing Member LLC, Trump Acquisition LLC, and The Trump Acquisition Corporation (collectively, Mr. Trump or plaintiffs).  Plaintiffs seek extraordinary relief that, if granted, would undermine the constitutional separation of powers and directly impede ongoing Congressional investigations implicating threats to national security and the U.S. financial system.

## INTRODUCTION

Mr. Trump's request for a preliminary injunction betrays a fundamental misunderstanding of the powers of the Legislative Branch under our constitutional scheme and is flatly inconsistent with nearly a century of Supreme Court precedent.  Congress's power to conduct oversight and investigations is firmly rooted in the constitutional separation of powers and is an essential component of Congress's Article I legislative authority.  The Supreme Court has emphasized that "the power to investigate is inherent in the power to make laws because a legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change."  *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 504 (1975) (cleaned up).

Contrary to Mr. Trump's allegation that the Committees are merely attempting to expose his finances, the Committees are investigating serious and urgent questions concerning the safety of banking practices, money laundering in the financial sector, foreign influence in the U.S. political process, and the threat of foreign financial leverage, including over the President, his

1

family, and his business.  But rather than respect the Committees' legitimate investigations into these serious issues of national importance, Mr. Trump and his companies have continually engaged in stonewalling intended to obstruct and undermine these inquiries.  This suit is Mr. Trump's latest attempt to prevent Congress from obtaining critical information needed to make informed legislative judgments and perform meaningful oversight.

Mr. Trump's disapproval of the Committees' investigations is not a legal basis for this Court to enjoin enforcement of the subpoenas.  Given the need for an expeditious resolution of the subpoenas' validity, the Committees request that the Court consolidate the May 22, 2019 hearing with a decision on the merits. Fed. R. Civ. P. 65(a)(2); Order, *Trump v. Comm. on Oversight and Reform*, No. 19-cv-01136 (D.D.C. May 9, 2019) (ECF No. 25) (consolidating preliminary injunction hearing with trial on the merits under Rule 65(a)(2) in suit challenging a Congressional subpoena).  This Court should deny the motion for a preliminary injunction and dismiss Mr. Trump's meritless complaint.  *See Munaf v. Geren*, 553 U.S. 674, 705 (2008).

## BACKGROUND

### I.   The Committees' Investigations

The Committees are conducting wide-ranging investigations of issues bearing upon the integrity of the U.S. financial system and national security, including bank fraud, money laundering, foreign influence in the U.S. political process, and the counterintelligence risks posed by foreign powers' use of financial leverage.  Although the Committees are investigating matters related to the President, his business, and his family members—some of whom are also senior Executive Branch officials—they are doing so as part of much broader investigations to inform their legislative and oversight responsibilities, which include the issuance of subpoenas seeking information from other financial institutions about their practices with respect to clients other than the plaintiffs.

### A.   Committee on Financial Services's Investigations

The Committee on Financial Services, pursuant to its broad oversight and legislative jurisdiction over "[b]anks and banking, including deposit insurance and Federal monetary policy," as well as "[i]nternational finance," Rule X.1(h)(1), (5), Rules of the U.S. House of Representatives (116th Cong.) (House Rules),[1] is investigating serious issues regarding compliance with banking regulations, loan practices, and money laundering.  As Chairwoman Maxine Waters recently explained, "[t]he movement of illicit funds throughout the global financial system raises numerous questions regarding the actors who are involved in these money laundering schemes and where the money is going."[2]  Those concerns are "precisely why the Financial Services Committee is investigating the questionable financing provided to President Trump and the Trump Organization by banks like Deutsche Bank to finance his real estate properties."[3]  The Chairwoman cautioned that "Congress must close these loopholes."[4]

Among other issues, the Committee is investigating whether existing policies and programs at financial institutions are adequate to ensure the safety and soundness of lending practices and the prevention of loan fraud.  As recently reported, over the past two years, financial institutions have issued more than $1 trillion in large corporate loans (called leveraged loans) to heavily indebted companies that may be unable to repay those loans.[5]  Relatedly, the

---

[1] *Available at* https://tinyurl.com/HouseRules116thCong.

[2] 165 Cong. Rec. H2698 (daily ed. Mar. 13, 2019) (statement of Rep. Waters); *see also* H. Res. 206, 116th Cong. (2019); Press Release, U.S. House of Representatives Comm. on Financial Servs., House Passes Waters' Resolution Supporting Strong Anti-Money Laundering Efforts (Mar. 14, 2019), https://tinyurl.com/Mar14PressRelease.

[3] *Id.*

[4] *Id.*

[5] Damian Paletta, *How Regulators, Republicans and Big Banks Fought for a Big Increase in Lucrative But Risky Corporate Loans*, Wash. Post (Apr. 6, 2019), https://tinyurl.com/Wash-Post-Risky-Loans.

Committee is investigating the lending practices of financial institutions, including Deutsche

Bank, for loans issued to the Trump family and companies controlled by Mr. Trump.  Over the

years, Deutsche Bank has reportedly provided more than $2 billion in loans to Mr. Trump,

despite concerns raised by certain senior bank officials about some of the loans.[6]

The Committee is investigating industry-wide compliance with banking statutes and

regulations, particularly anti-money laundering policies.  For example, the Committee is

investigating whether Deutsche Bank's programs are adequate to prevent the types of activities

that led regulators to fine the bank for its role in facilitating a $10 billion so-called "mirror

trading" scheme involving its Moscow, New York, and London offices[7] and its reported role as a

conduit for the laundering of over $20 billion in rubles out of Russia.[8]  This is important in

determining the volume of illicit funds that may have flowed through the bank, and whether any

touched the accounts held there by Mr. Trump, his family, or business.  A full accounting of past

failures in banking practices is critical to preventing similar illicit money flows going forward.

The Committee is also investigating the use of anonymous corporations as vehicles to

launder illicit funds through legitimate investments and enterprises, including real estate and

other investments, some of which are controlled by Mr. Trump.  Public reports indicate that

hundreds of millions of dollars in illicit funds have been used by shell companies to purchase

---

[6] David Enrich, *Deutsche Bank and Trump: $2 Billion in Loans and a Wary Board*, N.Y. Times (Mar. 18, 2019), https://tinyurl.com/NYT2BillioninLoans ($2 Billion in Loans).

[7] Jethro Mullen, *Deutsche Bank Fined for $10 Billion Russian Money-Laundering Scheme*, CNN Business (Jan. 31, 2017, 5:32 AM), https://tinyurl.com/CNNDeutscheBankFined; *see also* 165 Cong. Rec. H2697-98 (daily ed. Mar. 13, 2019) (statement of Rep. Waters).

[8] Luke Harding, *Deutsche Bank Faces Action over $20 Bn Russian Money-Laundering Scheme*, Guardian (Apr. 17, 2019, 6:01 AM), https://tinyurl.com/GuardianDeutscheFacesAction.

Trump properties.[9]  The Committee is considering legislation that would increase transparency regarding ownership of anonymous shell corporations generally.  *E.g.*, H. Res. 206, 116th Cong. (2019) (recognizing risk of money laundering and encouraging increased transparency); H.R. 2513, 116th Cong. (2019) (reforming corporate beneficial ownership disclosures); H.R. 2514, 116th Cong. (2019) (strengthening Bank Secrecy Act[10] and anti-money laundering provisions). As Chairwoman Waters has noted, "real estate is frequently used to launder dirty money.  Bad actors like Russian oligarchs and kleptocrats often use anonymous shell companies and all-cash schemes to buy and sell commercial and residential real estate to hide and clean their money. Today, these all-cash schemes are exempt from the Bank Secrecy Act."[11]

The Committee has held hearings on the adequacy of the policies and programs at financial institutions that are the subject of the Committee's investigations and has long sought legislative solutions to combat all facets of financial crime, including money laundering.[12]  *See, e.g.*, H.R. 1404, 116th Cong. (2019) (as passed by House, Mar. 12, 2019) (requiring Executive Branch agencies to submit reports to Congress regarding financial holdings of Russian President Vladimir Putin and top Kremlin-connected oligarchs).

### B.   Committee on Intelligence's Investigations

The House Permanent Select Committee on Intelligence has broad jurisdiction to inquire

---

[9] *See, e.g.*, Oren Dorell, *Trump's Business Network Reached Alleged Russian Mobsters*, USA Today (Mar. 28, 2017, 5:05 PM), https://tinyurl.com/USATodayTrumpMobsters; Edward Robinson et al., *Was Trump SoHo Used to Hide Part of a Kazakh Bank's Missing Billions?*, Bloomberg (Dec. 11, 2017, 7:19 AM), https://tinyurl.com/BloombergMissingBillions; Nicholas Nehamas, *Before Donald Trump Attacked Foreigners, He Helped Sell Them Condos*, Miami Herald (Oct. 14, 2016, 10:00 AM), https://tinyurl.com/MiamiHeraldBeforeTrumpAttacked.

[10] 31 U.S.C. § 5311 *et seq.*

[11] 165 Cong. Rec. H2697-98 (daily ed. Mar. 13, 2019) (statement of Rep. Waters).

[12] *See, e.g.*, *Examining the BSA/AML Regulatory Compliance Regime: Hearing Before the Subcomm. on Fin. Insts. & Consumer Credit of the H. Comm. on Fin. Servs.*, 115th Cong. (2017); *Implementation of FinCEN's Customer Due Diligence Rule: Hearing Before the Subcomm. on Terrorism & Illicit Fin. of the H. Comm. on Fin. Servs.*, 115th Cong. (2018).

5

into "[i]ntelligence and intelligence-related activities." House Rule X.11(b)(1)(B). The Committee is charged with oversight of the Intelligence Community and all intelligence-related activities and programs of the United States Government. *See* H. Res. 658, 95th Cong. (1977). To that end, the Committee is investigating efforts by Russia and other foreign powers to influence the U.S. political process during and since the 2016 election—including financial leverage that foreign actors may have over President Trump, his family, and his business—and the related counterintelligence, national security, and legislative implications. The Committee is also evaluating whether the structure, legal authorities, policies, and resources of the U.S. Government's intelligence, counterintelligence, and law enforcement elements are adequate to combat such threats to national security.[13]

More specifically, the Committee is investigating, among other things: (1) "[t]he extent of any links and/or coordination between the Russian government, or related foreign actors, and individuals associated with Donald Trump's campaign, transition, administration, or business interests, in furtherance of the Russian government's interests"; (2) "[w]hether any foreign actor has sought to compromise or holds leverage, financial or otherwise, over Donald Trump, his family, his business, or his associates"; and (3) "[w]hether President Trump, his family, or his associates are or were at any time at heightened risk of, or vulnerable to, foreign exploitation, inducement, manipulation, pressure, or coercion, or have sought to influence U.S. government policy in service of foreign interests."[14]

As Chairman Schiff has explained, "[t]he Committee's ongoing investigation and

---

[13] Press Release, U.S. House of Representatives Permanent Select Comm. on Intelligence, Chairman Schiff Statement on House Intelligence Committee Investigation (Feb. 6, 2019), https://tinyurl.com/Feb6PressRelease (Chairman Schiff Press Release).
[14] *Id.*

oversight—alongside other committees' investigations—will inform a wide-range of legislation and appropriations decisions."[15]  The Committee will rely on information gathered during its investigations to decide whether and how to "[s]trengthen legal authorities and capabilities for our intelligence and law enforcement agencies to better track illicit financial flows, including through shell companies, real estate and other means; to better identify counterintelligence risks; and to expose interference by foreign actors."[16]  The Committee's investigation will also inform a host of pending legislative proposals to protect the U.S. political process and strengthen national security.  *E.g.*, H.R. 2424, 116th Cong. (2019) (requiring federal campaign officials to notify law enforcement if offered assistance by agents of another government and to report all meetings with foreign agents); H.R. 1617, 116th Cong. (2019) (requiring intelligence assessment of Russian intentions relating to NATO and Western allies); H.R. 1474, 116th Cong. (2019) (requiring intelligence threat assessment prior to every federal general election); H.R. 1, 116th Cong. (2019) (improving election security and oversight and providing for national strategy and enforcement to combat foreign interference).

For decades, Mr. Trump's business interests have intersected with Russia-linked entities and individuals, including oligarchs with ties to President Vladimir Putin.[17]  Since 1998,

---

[15] 165 Cong. Rec. H3482 (daily ed. May 8, 2019) (statement of Rep. Schiff).

[16] *Id.*

[17] House Permanent Select Comm. on Intelligence Minority Members, *Minority Views to the Majority-Produced "Report on Russian Active Measures"* 23-24 (Mar. 26, 2018), https://tinyurl.com/HPSCIMinorityViews (describing in detail the factual basis for the investigation of financial compromise or leverage that Russia may hold over President Trump, his family, and his business); *see also, e.g.*, Ken Dilanian, *Congress Now Interested in That Other Trump Tower Once Planned for Russia*, NBC News (Jan. 13, 2019, 7:06 AM), https://tinyurl.com/NBCOtherTrumpTower.  The Committee's current investigations follow on the investigation conducted during the 115th Congress into "Russian interference with the 2016 Presidential election."  *Bean LLC v. John Doe Bank*, 291 F. Supp. 3d 34, 38 (D.D.C. 2018).

Deutsche Bank—which also had ties to Russian state institutions—served as a lender of last resort for Mr. Trump, extending loans totaling more than $2 billion.[18]  Around 2006, Mr. Trump embarked on a multi-year spending spree, ultimately spending more than $400 million in cash on various properties.[19]  These cash outlays occurred during a period in which the Trump Organization was reportedly experiencing significant cash inflows from Russian sources.[20]  It has also been reported that wealthy Russians and individuals from former Soviet states used Trump-branded real estate to park—and in some cases launder—large sums of money for over a decade.[21]  More recently, Mr. Trump secretly pursued a lucrative licensing deal for Trump Tower Moscow—a deal that would have required Kremlin approval—through at least June 2016, including after Mr. Trump had effectively secured the Republican presidential nomination.[22]  At the same time, Mr. Trump was advocating policies favored by Russia and praising President Putin.[23]  It is unclear whether the Trump Tower Moscow deal remains latent.[24]

---

[18] $2 Billion in Loans, https://tinyurl.com/NYT2BillioninLoans.  Mr. Trump's 2018 financial disclosure showed liabilities of at least $130 million owed to Deutsche Bank.  U.S. Office of Gov't Ethics, Form 278e, 2017 Exec. Branch Personnel Public Fin. Disclosure Report of Donald J. Trump, President 45 (signed May 15, 2018), https://tinyurl.com/TrumpForm278e2018; *infra* n.22.

[19] Jonathan O'Connell et al., *As the 'King of Debt,' Trump Borrowed to Build His Empire. Then He Began Spending Hundreds of Millions in Cash.*, Wash. Post (May 5, 2018), https://tinyurl.com/WashPostKingofDebt.

[20] *See* Michael Hirsch, *How Russian Money Helped Save Trump's Business*, Foreign Pol'y (Dec. 21, 2018, 1:31 PM), https://tinyurl.com/FPRussianMoney.

[21] *See, e.g.*, *id.*

[22] *See* Mark Mazzetti et al., *Moscow Skyscraper Talks Continued Through 'the Day I Won,' Trump Is Said to Acknowledge*, N.Y. Times (Jan. 20, 2019) (Moscow Skyscraper Talks), https://tinyurl.com/NYTMoscowSkyscraper.

[23] *See Putin's Playbook: The Kremlin's Use of Oligarchs, Money and Intelligence in 2016 and Beyond: Hearing Before the House Permanent Select Committee of Intelligence*, 116th Cong. (2019) (Committee on Intelligence Hearing: Putin's Playbook) (prepared statement of Michael McFaul, Former U.S. Ambassador to Russia, at 9-10, https://tinyurl.com/AmbMcFaul.

[24] During a discussion with reporters in 2018, Trump suggested that he would have resumed the Trump Tower Moscow deal if he did not win the presidency.  *Remarks by President*

The Committee is examining whether Mr. Trump's foreign business deals and financial

ties were part of the Russian government's efforts to entangle business and political leaders in

corrupt activity or otherwise obtain leverage over them.  On March 28, 2019, the Committee held

a hearing to "discuss how the Kremlin uses financial leverage and corruption as tools of

intelligence operations and foreign policy," including "the use of financial entanglements as a

means of compromise."[25]  Former U.S. Ambassador to Russia Michael McFaul testified that "in

parallel with Putin's use of money, corruption, and property rights as instruments for governing

inside Russia, the Russian government instructs its economic actors to make deals with foreign

entities to establish increased leverage and influence within these countries."[26]  Ultimately, the

Committee's investigation of these matters will inform its "plans to develop legislation and

policy reforms to ensure the U.S. government is better positioned to counter future efforts to

undermine our political process and national security."[27]

## II.  Procedural History

On April 15, 2019, following discussions with counsel for Deutsche Bank, the

Committees issued identical subpoenas to Deutsche Bank.  *See* Decl. of Todd B. Tatelman, Ex.

A (redacted subpoena).  On the same day, the Committee on Financial Services issued a

subpoena to Capital One.  *See* Decl. of Todd B. Tatelman, Ex. B.  The subpoenas seek financial

---

*Trump Before Marine One Departure*, White House (Nov. 29, 2018, 10:23 AM),
https://tinyurl.com/Nov29Remarks; *see also* Moscow Skyscraper Talks,
https://tinyurl.com/NYTMoscowSkyscraper.

[25] Committee on Intelligence Hearing: Putin's Playbook (opening statement of Chairman
Schiff, at 2, https://tinyurl.com/ChairmanOpeningStatement); *see also* (prepared statement of
Steven Hall, Former Chief of Russian Operations, Central Intelligence Agency at 19,
https://tinyurl.com/StevenHallTestimony).

[26] *Id.* (prepared statement of Michael McFaul, Former U.S. Ambassador to Russia at 8,
https://tinyurl.com/AmbMcFaul).

[27] Press Release, U.S. House of Representatives Permanent Select Comm. on
Intelligence, Chairman Schiff Statement on House Intelligence Committee Investigation (Feb. 6,
2019), https://tinyurl.com/Feb6PressRelease.

and account information concerning plaintiffs and various non-parties.  The return date for the

subpoenas was May 6, 2019.  On April 29, 2019, Mr. Trump filed this suit.  ECF No. 1.

## ARGUMENT

### PLAINTIFFS ARE NOT ENTITLED TO A PRELIMINARY INJUNCTION

Mr. Trump's motion for a preliminary injunction should be denied.  A preliminary

injunction is an "extraordinary and drastic remedy," *Munaf*, 553 U.S. at 689-90 (quotation marks

omitted), that "should not be granted unless the movant, by a clear showing, carries the burden of

persuasion," *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (emphasis and

quotation marks omitted).  To meet that burden, a plaintiff "must establish that he is likely to

succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary

relief, that the balance of equities tips in his favor, and that an injunction is in the public

interest."  *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013) (quoting

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).[28]

## I.    Mr. Trump Cannot Demonstrate a Substantial Likelihood of Success on the Merits

A series of Supreme Court decisions drawing on historical practice stretching back to the

earliest days of our Republic compels denial of Mr. Trump's injunction request.  These cases

support our core proposition: that Mr. Trump's lawsuit reflects a seriously uninformed and

mistaken view of the powers of Congress.

### A.    The Constitution Confers Broad Investigatory Powers on Congress

Congress has broad authority to obtain information necessary to conduct oversight and

---

[28] To the extent there is any meaningful distinction between the *Winter* standard and the
"serious questions" formulation, Pls.' Mem. 2, that has also been used by the Second Circuit in
post-*Winter* cases, *see Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund
Ltd.*, 598 F.3d 30, 36-38 (2d Cir. 2010), this Court need not consider that nuance here because
Mr. Trump has failed to meet the heavy burden required under either standard.

investigations.  *See Eastland*, 421 U.S. at 504 n.15 ("[T]he scope of [Congress's] power of inquiry . . . is as penetrating and far-reaching as the potential power to enact and appropriate under the Constitution." (quotation marks omitted)).  The power to investigate—and to issue subpoenas—is integral to Congress's Article I power to legislate.  *Id.* at 503-04 (explaining that "[t]he power to investigate and to do so through compulsory process plainly falls" within Congress's "legitimate legislative sphere" and "[i]ssuance of subpoenas . . . has long been held to be a legitimate use by Congress of its power to investigate").  Thus, Congress's "power to secure needed information by [compulsory process] has long been treated as an attribute of the power to legislate" and "is an essential and appropriate auxiliary to the legislative function."  *McGrain v. Daugherty*, 273 U.S. 135, 161, 174 (1927).[29]

The Supreme Court has explained the constitutional foundation for this principle:  "A legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change; and where the legislative body does not itself possess the requisite information—which not infrequently is true—recourse must be had to others who do possess it."  *Id.* at 175.  And because "mere requests for such information often are unavailing . . . some means of compulsion are essential to obtain what is needed."  *Id.*; *accord Eastland*, 421 U.S. at 505.

### B.   The Power of the Committees to Investigate

Pursuant to the Constitution's Rulemaking Clause, U.S. Const. art. I, § 5, cl. 2, the House has delegated extensive oversight and investigative authority to both Committees.  *See* House

---

[29] *See also, e.g.*, *Barenblatt v. United States*, 360 U.S. 109, 111 (1959) ("The power of inquiry has been employed by Congress throughout our history, over the whole range of the national interests concerning which Congress might legislate or decide upon due investigation not to legislate[.]"); *United States v. Josephson*, 165 F.2d 82, 89-90 (2d Cir. 1947) ("It is, of course, well settled that Congress may make investigations in aid of legislation."); *Bean LLC*, 291 F. Supp. 3d at 43 (similar).

Rule XI.1(b)(1).  The Committee on Financial Services has broad jurisdiction regarding "[b]anks and banking, including deposit insurance and Federal monetary policy," as well as "[i]nternational finance."  House Rule X.1(h)(1), (5).  The Committee on Intelligence has jurisdiction over "the activities of the intelligence community" and all legislative matters pertaining to the federal government's "[i]ntelligence and intelligence-related activities."  House Rules X.3(m), X.11(b)(1)(B).  Both Committees are authorized to issue subpoenas for testimony and documents.  *See* House Rule XI.2(m)(1)(B); Rules of the Comm. on Financial Services, Rule 3(e)(1);[30] Rules of the Permanent Select Comm. on Intelligence, Rule 10(b).[31]

To fulfill their legislative, investigative, and oversight responsibilities, and consistent with their jurisdiction, the Committees are conducting wide-ranging investigations into pressing issues of national importance, including ongoing reports of money laundering and of foreign influence in the U.S. political process.  *See supra* pp. 3-9.  Contrary to Mr. Trump's arguments, the Supreme Court has stressed that the role of the courts in reviewing these Congressional investigations is very limited.  *See Barenblatt*, 360 U.S. at 132 ("So long as Congress acts in pursuance of its constitutional power, the Judiciary lacks authority to intervene on the basis of the motives which spurred the exercise of that power.").  Where "a rational legislative purpose is present for investigating a particular person, organization, or institution[,] [t]here is no requirement that every piece of information gathered in such an investigation be justified before the judiciary."  *McSurely v. McClellan*, 521 F.2d 1024, 1041 (D.C. Cir. 1975), *vacated on other grounds by* 553 F.2d 1277, 1280 (D.C. Cir. 1976) (en banc) (per curiam).  A Congressional investigation may lead "up some 'blind alleys' and into nonproductive enterprises.  To be a valid

---

[30] *Available at* https://tinyurl.com/CommFinServsRules.
[31] *Available at* https://tinyurl.com/HPSCIRules.

legislative inquiry there need be no predictable end result." *Eastland*, 421 U.S. at 509.

This Court's narrow inquiry into whether there is a legitimate legislative purpose is not an occasion to adjudicate the motivations of the Committees or to second-guess the Committees' reasonable determinations regarding the need for the information sought. *Id.* at 508 (explaining that when "determining the legitimacy of a congressional act, [courts] do not look to the motives alleged to have prompted it"); *see also, e.g.*, *Bean LLC*, 291 F. Supp. 3d at 44 (holding that courts "lack[] the authority to restrict the scope of [a] Committee's investigation" and stating that they "*may not* [] engage in a line-by-line review of [a] Committee's requests" (emphasis added)).

### C.   The Committees Have a Valid Legislative Purpose

Plaintiffs incorrectly contend that the Committees lack a valid legislative purpose and instead seek merely to "'expose' Plaintiffs' finances." Pls.' Mem. at 10 (quoting *Watkins v. United States*, 354 U.S. 178, 200 (1957)). The information requested by the Committees is necessary for their investigations and will inform their ongoing oversight and legislative efforts. Only through a detailed and comprehensive understanding of the banks' implementation of the relevant banking laws and regulations, foreign governments and entities' financial activities, and Mr. Trump's finances and business deals can the Committees assess the risks to the U.S. financial system and national security presented by the loans and foreign financial ties at issue. The factual record developed through the Committees' investigations is critical to developing and refining effective legislative and policy initiatives.

The question before this Court is whether the Committees' inquiries are authorized under House Rules and "concern[] a subject on which 'legislation could be had.'" *Eastland*, 421 U.S. at 506 (quoting *McGrain*, 273 U.S. at 177); *see also Bean LLC*, 291 F. Supp. 3d at 43. The subpoenas to Deutsche Bank and Capital One are integral to the Committees' investigations, which fall comfortably within the Committees' legislative, oversight, and investigative

13

jurisdictions.  *Supra* pp. 3-12.  Mr. Trump's contrary arguments are unavailing.

**1.**  Mr. Trump contends that the subpoenas are invalid because "[t]he Committees have never identified a single piece of legislation within their respective jurisdictions that they are considering."  Pls.' Mem. at 10.  But this misunderstands the law.  The Committees have no obligation to identify specific legislation they are considering.  *See Josephson*, 165 F.2d at 89-90 (noting "it is immaterial" to the valid legislative purpose inquiry "that in the past this particular committee has proposed but little legislation").  The Supreme Court requires only that the subject matter of the investigation be "one on which legislation *could* be had."  *McGrain*, 273 U.S. at 177 (emphasis added); *see also Barenblatt*, 360 U.S. at 111 (power of inquiry "has been employed by Congress throughout our history, over the whole range of the national interests concerning which Congress might legislate or decide upon due investigation not to legislate").

In *McGrain*, for example, the Supreme Court recognized that the original resolution authorizing the Senate's investigation into the Teapot Dome Affair made no mention of a legislative purpose.  273 U.S. at 177 ("It is quite true that the resolution directing the investigation does not in terms avow that it is intended to be in aid of legislation[.]").  Nevertheless, the Court found a legitimate legislative purpose, noting that "[p]lainly the subject was one on which legislation could be had and would be materially aided by the information which the investigation was calculated to elicit."  *Id.*  The Court stressed that it was "bound to presume that the action of the legislative body was with a legitimate object, if it is capable of being so construed, and we have no right to assume that the contrary was intended."  *Id.* at 178 (quotation marks omitted).

The law cannot be otherwise, as plaintiffs erroneously suggest.  If Congress could only investigate matters where legislation is actively being drafted—but not, for example, where

legislation had already passed the House or could be developed in the future—Congress would be unable to fulfill its purpose.  It could not exercise the power to investigate as the Supreme Court envisioned, *i.e.*, in aid of Congress's legislative authority, and it would "be seriously handicapped in its efforts to exercise its constitutional function."  *Quinn v. United States*, 349 U.S. 155, 161 (1955).  Mr. Trump's view would deprive Congress of its ability to obtain the very information it needs to determine whether legislation is necessary, *e.g.*, *Barenblatt*, 360 U.S. at 111, and to then "legislate wisely [and] effectively," *McGrain*, 273 U.S. at 175.  In any event, although the Committees are not *required* to identify specific pending legislation to justify either the legitimate legislative purpose of the investigations or the subpoenas, there are several bills and pending proposals that will be informed by the information sought here.  *E.g.*, *supra* pp. 5, 7.

Setting aside Mr. Trump's speculation about Congressional motives, he has offered no legitimate basis to find that the subpoenas at issue were not designed to elicit information that will inform and aid the Committees in their legislative and oversight functions.  As the Chairpersons of both Committees have publicly stated, the investigations are specifically designed to further the Committees' legislative agendas:  Ms. Waters cautioned that "Congress must close the[] loopholes" that have allowed money laundering and unsafe banking practices,[32] and Mr. Schiff emphasized that "[t]he Committee . . . plans to develop legislation and policy reforms to ensure the U.S. government is better positioned to counter future efforts to undermine our political process and national security."[33]

**2.**  Mr. Trump asserts that "any legislative purpose is not legitimate unless it falls within that committee's jurisdiction."  Pls.' Mem. at 9.  But he makes little effort to explain this

---

[32] 165 Cong. Rec. H2698 (daily ed. Mar. 13, 2019) (statement of Rep. Waters).
[33] Chairman Schiff Press Release, https://tinyurl.com/Feb6PressRelease.

15

contention, other than to argue that the subpoenas relate to "financial conduct of private citizens years before they were anywhere near public office." Pls.' Mem. at 10. This argument fails to understand the scope of the Committees' jurisdiction and the nature of the investigations.

The Committee on Financial Services is investigating, among other things, unsafe lending practices that can have broad effects on the national economy. That investigation is not limited to Mr. Trump or even to public officials. Congress is authorized by the Constitution to legislate to address such industry-wide risks, but it can only do so if it understands the problems. The banks' lending practices—including loans made to plaintiffs—are an important piece of that investigation. The subpoenas seek records relating to individuals and entities—including plaintiffs—that may have served as conduits for illicit funds or may not have been properly underwritten. Because of his prominence, much is already known about Mr. Trump, his family, and his business, and this public record establishes that they serve as a useful case study for the broader problems being examined by the Committee. Moreover, the relevant transactions occurred, and the risky practices developed, over the course of many years. The Committee seeks documents that will enable it to identify weaknesses in laws intended to guard against these financial ills, including the Bank Secrecy Act and anti-money laundering regulations.

Simultaneously, the Committee on Intelligence is investigating, among other time-sensitive threats to national security, foreign interference in the U.S. political process and financial or other leverage that foreign powers may possess over Mr. Trump, his family, and his business. That investigation is squarely within the Committee's jurisdiction and requires an understanding of Mr. Trump's complex financial arrangements, including how those arrangements intersect with Russia and other foreign governments and entities. That inquiry is, by definition, not limited to Mr. Trump's time in office and, given the closely held nature of the

16

Trump Organization, must include his close family members. The Intelligence Community has long recognized that foreign financial ties can create potential conflicts of interest and a heightened risk of foreign influence, exploitation, and coercion. Indeed, such ties are regularly examined as part of the normal security clearance process.

Even when a subpoena is challenged on relevancy grounds, "the subpoena is to be enforced 'unless the district court determines that there is no reasonable possibility that the category of materials the Government seeks will produce information relevant to the general subject of the . . . investigation." *Senate Select Comm. v. Packwood*, 845 F. Supp. 17, 21 (D.D.C. 1994) (ellipsis in original) (quoting *United States v. R. Enters., Inc.*, 498 U.S. 292, 301 (1991)). "There is no requirement that every piece of information gathered in [a Congressional] investigation be justified before the judiciary." *McSurely*, 521 F.2d at 1041. "This is particularly true in light of the fact that, at this stage of the proceedings, the Committee is acting as the 'legislative branch equivalent of a grand jury, in furtherance of an express constitutional grant of authority.'" *Bean LLC*, 291 F. Supp. 3d at 45 (quoting *Packwood*, 845 F. Supp. at 21).

The Committees have subpoenaed plaintiffs'—and other non-parties'—financial statements that will aid the Committees in performing their oversight functions and considering and drafting legislation. The information may also shed light on other potential areas of inquiry or the locations of other relevant evidence that the Committees could obtain. Mr. Trump has not, and cannot, establish that the Committees' subpoenas are "plainly incompetent or irrelevant to any lawful purpose," *McPhaul v. United States*, 364 U.S. 372, 381 (1960), or that there is "no reasonable possibility that the category of materials the [Committee] seeks will produce information relevant to the general subject of the . . . investigation," *R. Enters.*, 498 U.S. at 301; *McSurely*, 521 F.2d at 1041.

17

**3.**  Mr. Trump erroneously contends that the Committees are engaged in "a quintessential law enforcement task."  Pls.' Mem. at 10.  The fact that an investigation is wide-ranging, however, does not convert it from a legislative to a law-enforcement task.  To the contrary, the Committees' power to investigate is in many respects broader than that of law enforcement; it "is as penetrating and far-reaching as the potential power to enact and appropriate."  *Eastland*, 421 U.S. at 504 n.15 (quotation marks omitted).  Even if the Committees' investigations were to uncover criminal conduct, there is no basis for Mr. Trump's unsupported assertion that the Committees lack the power to investigate matters within their jurisdiction or obtain the relevant financial records sought here.  *See R. Enters.*, 498 U.S. at 299 (cautioning against "[r]equiring the Government to explain in too much detail the particular reasons underlying a subpoena").

While Congressional Committees can refer suspected criminal matters to the proper Executive Branch officials, the possibility that they could find criminal activity does not mean they are engaged in law enforcement, nor does it invalidate their legitimate legislative purposes.  *Hutcheson v. United States*, 369 U.S. 599, 618 (1962) ("[S]urely a congressional committee which is engaged in a legitimate legislative investigation need not grind to a halt whenever responses to its inquiries might potentially be harmful to a witness in some distinct proceeding, or when crime or wrongdoing is disclosed." (citation omitted)).  "[C]ourts must presume that the committees of Congress will exercise their powers responsibly and with due regard for the rights of affected parties," *Exxon Corp. v. FTC*, 589 F.2d 582, 589 (D.C. Cir. 1978).

**4.**  Mr. Trump's assertion that the Committees seek merely to expose his finances, Pls.' Mem. at 10, is unsupported by anything other than political rhetoric and press statements.  Even if he had provided some basis to question the Committees' motives, the Court should not look behind the legitimate legislative purpose of the investigations.  *Cf. Trump v. Hawaii*, 138 S. Ct.

2392, 2418-20, 2423 (2018) (upholding President Trump's "travel ban" and explaining the issue "is not whether to denounce the [President's] statements," but rather to "review[] a Presidential directive, neutral on its face, addressing a matter within the core of executive responsibility").

As discussed above, and consistent with the voluminous public record, there is no basis for this Court to question the legitimacy of the legislative purpose of the Committees' investigations. *See, e.g.*, *Eastland*, 421 U.S. at 509 ("The wisdom of congressional approach or methodology is not open to judicial veto."); *Watkins*, 354 U.S. at 200 (cautioning against "testing the motives of committee members for this purpose"). And, as noted above, Supreme Court precedent establishes that Congress's power to investigate is "broad" and "encompasses inquiries concerning the administration of existing laws as well as proposed or possibly needed statutes." *Watkins*, 354 U.S. at 187; *see also Barenblatt*, 360 U.S. at 132 ("So long as Congress acts in pursuance of its constitutional power, the Judiciary lacks authority to intervene on the basis of the motives which spurred the exercise of that power.").

Accordingly, Mr. Trump's motion for a preliminary injunction should be denied and this Court should issue an order that the subpoenas to the banks are valid and enforceable.

### D.   The Right to Financial Privacy Act Does Not Apply to Congress

Mr. Trump argues that the subpoenas "violate Plaintiffs' statutory rights," Pls.' Mem. 10, under the Right to Financial Privacy Act (RFPA), 12 U.S.C. § 3401 *et seq.*[34] But RFPA does not

---

[34] Separate and apart from RFPA's inapplicability to Congress (discussed *infra*), at most only a handful of plaintiffs could conceivably avail themselves of the statute's protections. RFPA's requirements apply to the "financial records of any customer." 12 U.S.C. § 3402. The term "customer" means a "person or authorized representative of that person," and RFPA defines "person" as "*an individual or a partnership of five or fewer individuals*." 12 U.S.C. § 3401(4) & (5) (emphasis added). Because they are not "customers" within the ambit of the statute, plaintiff corporations, limited liability companies, and a trust (Compl. ¶¶ 17-23) lack any rights under RFPA. *See United States v. Daccarett*, 6 F.3d 37, 51 (2d Cir. 1993) (RFPA "is limited to individual customers and small partnerships; corporations are not protected"), *superseded on*

19

apply to Congress.  RFPA constrains the disclosure of customer financial records to federal authorities.  *Id.* §§ 3402, 3405.  "[T]he 'most salient feature of [RFPA] is the narrow scope of the entitlements it creates', because Congress wanted to 'minimize[] the risk that customers' objections to subpoenas will delay or frustrate agency investigations.'"  *Daccarett*, 6 F.3d at 51. To that end, the "Second Circuit has adopted a decidedly narrow view of the protections afforded by the RFPA."  *Barroga-Hayes v. Susan D. Settenbrino, P.C.*, No. 10 CV 5298, 2012 WL 1118194, at *4 (E.D.N.Y. Mar. 30, 2012) (collecting cases).

In *Hubbard v. United States*, the Supreme Court considered whether the very statutory terms at issue here—"any department or agency of the United States"—as used in 18 U.S.C. § 1001 referred only to the Executive Branch or more broadly to Congress, as the Court had previously held in *United States v. Bramblett*, 348 U.S. 503 (1955).[35]  In *Hubbard*, the Court overruled *Bramblett* to hold that "department or agency of the United States" refers *only* to Executive Branch entities, explaining, "while we have occasionally spoken of the three branches of our Government, including the Judiciary, as 'department[s],' that locution is not an ordinary one[,]" and "[f]ar more common is the use of 'department' to refer to a component of the Executive Branch."  514 U.S. at 699 (citation omitted); *see id.* at 699-700, 702 (calling *Bramblett* "a seriously flawed decision" that "made no attempt to reconcile its interpretation with the usual

---

other grounds by statute as recognized by *United States v. Sum of $185,336.07 Currency Seized from Citizen's Bank Account L7N01967*, 731 F.3d 189, 196 (2d Cir. 2013); *Bean*, 291 F. Supp. 3d at 48 (limited liability company "has no rights under the RFPA because it is not a 'person' who may qualify as a 'customer' for the purposes of that statute."); *Exch. Point LLC v. U.S. SEC*, 100 F. Supp. 2d 172, 175 (S.D.N.Y. 1999) (corporation and limited liability company not covered by RFPA); *In re Porras*, 191 B.R. 357, 359 (Bankr. W.D. Tex. 1995) ("Trust is not a protected entity under [RFPA].").

[35] *Hubbard*, 514 U.S. 695 (1995), *superseded on other grounds by statute as recognized by United States v. Butler*, 351 F. Supp. 2d 121, 129 (S.D.N.Y. 2004).

meaning of 'department'"). The Court invoked the same statutory provision, 18 U.S.C. § 6, that plaintiffs rely on, Pls.' Mem. at 11, as "bolster[ing]" the Court's "commonsense reading" of "department" to exclude all non-Executive Branch entities, including Congress.[36]

The text and structure of RFPA further demonstrate that Congress did not intend for the terms "agency" or "department" to apply to itself. In a section of the statute that governs the "transfer" of financial information already held by RFPA-regulated "agencies" or "departments," Congress provided that "nothing in this chapter shall authorize the withholding of information by any officer or employee of a supervisory agency from a duly authorized committee or subcommittee of Congress." 12 U.S.C. § 3412(d). Were Congress itself an "agency or department," this savings clause would have no meaning. *See Dobrova v. Holder*, 607 F.3d 297, 302 (2d Cir. 2010) ("We disfavor interpretations of statutes that render language superfluous." (quotation marks omitted)). Far from an "acknowledge[ment]" by Congress that RFPA "covered the . . . legislative branch[]," Pls.' Mem. 12, the clause shows that Congress well understood its own Committees to be distinct from "any agency or department" subject to RFPA's strictures.

Other aspects of RFPA's design reinforce this understanding. The statute, for example, exempts numerous types of investigatory instruments—*e.g.*, administrative subpoenas, grand jury subpoenas, and search warrants, *see* 12 U.S.C. §§ 3405-3407—from its disclosure prohibitions without mention of Congressional subpoenas. There is simply no reason to think that Congress, acting *sub silentio*, would so dramatically curtail the scope of its Article I

---

[36] *See* 18 U.S.C. § 6 ("The term 'department' means one of the executive departments enumerated in section 1 of Title 5, unless the context shows that such term was intended to describe the executive, legislative, or judicial branches of the government."); *Hubbard*, 514 U.S. at 701 (noting, with reference to Section 6, that "'[s]hows' is a strong word"); *see also, e.g.*, 5 U.S.C. § 551(1)(A) (the term "'agency' means each authority of the Government of the United States . . . but does not include . . . the Congress").

investigative powers to obtain confidential information.  Moreover, RFPA provides for an array

of civil penalties for those (including government actors) who violate its requirements—*see* 12

U.S.C. § 3417 (punitive damages).  It is implausible that Congress would silently subject itself

and its staff to such liability, particularly given its broad Speech or Debate and other immunities.

*See, e.g.*, U.S. Const. art. 1, § 6, cl. 1.[37]  RFPA simply has no application to this case.

## II.   Mr. Trump Has Failed to Establish a Likelihood of Irreparable Injury

Mr. Trump's failure to satisfy the stringent irreparable-injury requirement is a separate

and independent ground requiring denial of the motion.  "A showing of irreparable harm is the

single most important prerequisite for the issuance of a preliminary injunction."  *Faiveley*

*Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quotation marks

omitted).  "[A] mere possibility of irreparable harm is insufficient to justify the drastic remedy of

a preliminary injunction."  *Borey v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 934 F.2d 30, 34

(2d Cir. 1991).  Rather, a plaintiff "must demonstrate that absent a preliminary injunction they

will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that

cannot be remedied if a court waits until the end of trial to resolve the harm."  *Grand River*

*Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (quotation marks omitted).

Importantly, irreparable injury may not be shown by bare allegations or conclusory statements; a

plaintiff must provide the court with actual "evidence" of the harm that is allegedly being

---

[37] The legislative history likewise contains no indication that Congress intended for
RFPA to regulate its own subpoenas.  On the contrary, Congress declined to "extend" the
definition of "government authority" to include "Congress of the United States," after the Justice
and Treasury Departments proffered draft language that would have done so.  *See Electronic*
*Funds Transfer and Financial Privacy: Hearings on S. 2096, S. 2293 and S. 1460 Before the*
*Subcomm. on Financial Institutions of the Senate Comm. on Banking, Housing and Urban*
*Affairs*, 95th Cong., 2nd Sess. 194, 397 (1978); *id.* at 397 (defining "government authority" in
proposed, draft legislation to mean "*the Congress of the United States*, or any agency or
department of the United States or of a State or political subdivision, or any officer, employee or
agent of any of the foregoing" (emphasis added)).

22

incurred.  *E.g.*, *Weaver v. Schiavo*, 750 F. App'x 59, 60 (2d Cir. 2019) (upholding denial of preliminary injunction where plaintiff "provided no evidence that he would suffer irreparable harm absent injunctive relief"); *Faiveley*, 559 F.3d at 120 ("In the absence of evidentiary support of irreparable harm, there was no basis for the entry of a preliminary injunction . . . in this action."); *Lanvin Inc. v. Colonia, Inc.*, 739 F. Supp. 182, 193 (S.D.N.Y. 1990).

Mr. Trump falls short of this exacting standard.  Asserting that "there will be no way to unring the bell once" the subpoenas are executed, Pls.' Mem. 1, plaintiffs provide no actual evidence of their potential injury.  This lack of substantiation is reason enough to conclude that plaintiffs have not shown irreparable injury.  *Faiveley*, 559 F.3d at 119-20.  Mr. Trump's reliance on various cases, Pls.' Mem. at 6, involving *public* disclosure of confidential records is also misplaced.  "[T]he release of information to the Congress does not constitute 'public disclosure.'"  *Exxon Corp.*, 589 F.2d at 589 ("no indication" that disclosure of confidential trade secret information to a Congressional subcommittee "will in any way harm" plaintiff).  Even where trade secrets are at stake, "[t]he courts must presume that the committees of Congress will exercise their powers responsibly and with due regard for the rights of affected parties."  *Id.*

Nor does Mr. Trump's reliance on *U.S. Servicemen's Fund v. Eastland*, 488 F.2d 1252, 1256, 1257 (D.C. Cir. 1973), *rev'd*, 421 U.S. 491 (1975), Pls.' Mem. at 7, 13, rescue the inadequate irreparable harm showing.  While Mr. Trump is correct that, in staying enforcement of the subpoena, the *Eastland* Court noted the "serious constitutional questions [that] are presented by this litigation," *Eastland*, 488 F.2d at 1256, Mr. Trump neglects to mention that the *Eastland* plaintiff had claimed that the subpoena violated numerous First Amendment rights, *id.* at 164 ("threat to the right of freedom of association and assembly and protest under the First Amendment")—a grave species of injury long recognized as warranting immediate judicial

23

intervention.  *See Bronx Household of Faith v. Bd. of Educ. of City of N.Y.*, 331 F.3d 342, 349 (2d Cir. 2003) (noting "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)), *overruled in part on other grounds by Good News Club v. Milford Cent. Sch. Dist.*, 533 U.S. 98 (2001).  *Eastland* recognized these unique circumstances, distinguishing the situation from "all of the previous cases" it considered because "*[h]ere the plaintiffs have no alternative means to vindicate their [First Amendment] rights.*"  *Eastland*, 488 F.2d at 1269, 1260.[38]

Mr. Trump, who does not claim any such violation of his First Amendment rights, cannot validly contend that "the questions raised in this case [regarding release of bank records] . . . are far more serious and important than the questions in *Eastland*."  Pls.' Mem. at 13.  The failure to assert, let alone establish, irreparable injury is fatal to the preliminary injunction motion.

## III.  The Balance of Equities Tips Heavily in Favor of the Committees

The balance of the equities overwhelmingly favors the Committees.  Mr. Trump asserts that injury will flow from compliance with the subpoenas.  But there is no basis for assuming such injury if the banks produce financial records to the Committees in the same manner that numerous entities—including accounting firms, banks, and other financial institutions—routinely produce such records in response to civil discovery subpoenas, government administrative subpoenas or civil investigative demands, grand jury subpoenas, and the like.  "Given the presumption of congressional propriety discussed above, there is no risk of imminent injury to [plaintiffs]" from disclosure to Congress.  *Exxon Corp.*, 589 F.2d at 589 (citation omitted).

By contrast, the Committees are actively investigating matters of national importance,

---

[38] This special First Amendment context notwithstanding, the Supreme Court noted in overturning the D.C. Circuit years later that the "case illustrates vividly the harm that judicial interference may cause" where a valid "legislative inquiry has been frustrated for nearly five years."  *Eastland*, 421 U.S. at 511.

including live threats to the nation's financial system, election system, and security.  The

Committees' interest in prompt compliance with their subpoenas is paramount.  As the Supreme

Court has held, Congress's "power of inquiry—with process to enforce it—is an essential and

appropriate auxiliary to the legislative function."  *McGrain*, 273 U.S. at 174.  Mr. Trump's

argument that the Committees have "no urgent need for the subpoenaed documents," Pls.' Mem.

at 14, is not only wrong—given the pressing nature of the investigations—it is also an improper

usurpation of Congress's constitutional power to investigate and conduct oversight.  The

Committees' interest in obtaining relevant information necessary to ongoing investigations—

before the 116th Congress expires—would be severely harmed by any injunctive relief in this

case.  Thus, the balance of equities weighs heavily in favor of denial of Trump's motion.

## IV.  The Public Interest Supports Enforcement of the Subpoena

For the same reasons, the public interest strongly supports denial of the requested relief.

There is a "clear public interest in maximizing the effectiveness of the investigatory powers of

Congress," and "the investigatory power is one that the courts have long perceived as essential to

the successful discharge of the legislative responsibilities of Congress."  *Exxon Corp.*, 589 F.2d

at 594.  Plaintiffs' contrary argument ignores the clear and compelling public interest in

expeditious and unimpeded Congressional investigations into core aspects of the financial and

election systems that touch every member of the public.  And Mr. Trump provides no legitimate

reason why the public would be served by delaying the Committees from obtaining the records

necessary to carry out their constitutional oversight and legislative duties.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for a preliminary injunction should be

denied and the case should be dismissed with prejudice following a Rule 65(a)(2) merits hearing.

Respectfully submitted,

*/s/ Douglas N. Letter*
DOUGLAS N. LETTER (D.C. Bar No. 253492)
   *General Counsel*
TODD B. TATELMAN (VA Bar No. 66008)
   *Deputy General Counsel*
MEGAN BARBERO (MA Bar No. 668854)
   *Associate General Counsel*
JOSEPHINE MORSE (D.C. Bar No. 1531317)
   *Associate General Counsel*
BROOKS M. HANNER (D.C. Bar No. 1005346)
   *Assistant General Counsel*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES[*]
219 Cannon House Office Building
Washington, D.C.  20515
(202) 225-9700 (telephone)
(202) 226-1360 (facsimile)

May 10, 2019

---

[*] The Office of General Counsel wishes to acknowledge the assistance of law clerks Christine Coogle, Sarah Friedman, and Lily Hsu, students at The George Washington University Law School, in preparing this brief.

26

**CERTIFICATE OF SERVICE**

I certify that on May 10, 2019, I caused the foregoing document to be filed via this

Court's CM/ECF system, which I understand caused service on all registered parties.


/s/ *Douglas N. Letter*
Douglas N. Letter

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

DONALD J. TRUMP; DONALD J. TRUMP, JR.; ERIC TRUMP; IVANKA TRUMP; THE DONALD J. TRUMP REVOCABLE TRUST; THE TRUMP ORGANIZATION, INC.; TRUMP ORGANIZATION LLC; DJT HOLDINGS LLC; DJT HOLDINGS MANAGING MEMBER LLC; TRUMP ACQUISITION LLC; and TRUMP ACQUISITION, CORP.,

*Plaintiffs,*

v.

DEUTSCHE BANK AG and CAPITAL ONE FINANCIAL CORP.,

*Defendants,*

COMMITTEE ON FINANCIAL SERVICES OF THE U.S. HOUSE OF REPRESENTATIVES and PERMANENT SELECT COMMITTEE ON INTELLIGENCE OF THE U.S. HOUSE OF REPRESENTATIVES,

*Intervenor-Defendants.*

Case No. 1:19-cv-03826-ER

## DECLARATION OF TODD B. TATELMAN

I, Todd B. Tatelman, pursuant to the provisions of 28 U.S.C. § 1746 declare and say:

1.      I am the Deputy General Counsel in the Office of General Counsel of the U.S. House of Representatives.  I have served in this capacity since 2018, and have served in the Office of General Counsel since 2011.  I represent both the Committee on Financial Services and the Permanent Select Committee on Intelligence of the U.S. House of Representatives in this matter.

2.      Attached as Exhibit A is a true and correct copy of the redacted subpoena to Deutsche Bank that I prepared and provided to plaintiffs' counsel.

3.      Attached as Exhibit B is a true and correct copy of the subpoena to Capital One that I provided to plaintiffs' counsel.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on May 10, 2019, in Washington, D.C.

Todd B. Tatelman

# Exhibit A

**SCHEDULE A**

Custodian of Records
Deutsche Bank AG

The time period applicable to this subpoena is **January 1, 2010 through the present,** except for
Items 1(i) and 6(i), for which there is no time limitation.

Please provide **complete and unredacted** copies of the following documents by **May 6, 2019:**

1. With respect to:

   - ████████████
   - Donald J. Trump
   - Donald Trump, Jr.
   - Eric Trump
   - Ivanka Trump
   - ████████████
   - The Donald J. Trump Revocable Trust
   - Trump Organization Inc.
   - Trump Organization LLC
   - DJT Holdings LLC
   - DJT Holdings Managing Member LLC
   - Trump Acquisition LLC
   - Trump Acquisition Corp.
   - any other name, alias, code name, code number, or entity used in lieu of any of the
     individuals or entities named above or members of their immediate family

or any account (including, but not limited to, any money market, securities, or trading account or
any loan account or structure) in the name of any of the above-named individuals or entities (or
any other name, alias, code name, code number, or entity used in lieu of any of the named
individuals or entities) or members of their immediate family, individually or with other parties,
as well as any account in which any of the above-named individuals or entities are or were, or
have been identified as being, a trustee, settlor or grantor, beneficiary, or beneficial owner, or in
which any of the individuals or entities have or have had in any way control over, individually or
with others:

   i.   any document related to account applications, opening documents, KYC, due diligence,
        and closing documents, including, but not limited to, any document identifying:
        a.   any financial relationship, transactions, or ties between the above-named
             individuals or entities and any foreign individual, entity, or government;
        b.   any interest held by any foreign individual, entity, or government in the above-
             named accounts;
        c.   any trustee, settlor, grantor, administrator, controlling party, protector,
             beneficiary, beneficial owner, or signatory; and
        d.   any relationship manager or account manager;

1

ii.     any monthly or other periodic account statement, including, but not limited to, any such document showing any incoming or outgoing funds transfers involving the above-named individuals, entities, and accounts and any foreign individual, entity, or government;

iii.    any document related to any domestic or international transfer of funds in the amount of $10,000 or more, including, but not limited to, any wire transfer, check, cash letter, cashier's check, book entry transfer, or other such documents showing the originator, beneficiary, source of funds, and destination of such transfer, including whether any party to such transfer was a foreign individual, entity, or government;

iv.    any summary or analysis of domestic or international account deposits, withdrawals, and transfers, including, but not limited to, sources of deposits and the destination of withdrawals/transfers, including any wire transfer, check, cash letter, cashier's check, or other monetary instrument, including, but not limited to, any summary or analysis of financial relationships, transactions, or ties between the above-named individuals, entities, and accounts and any foreign individual, entity, or government;

v.    any document related to monitoring for, identifying, or evaluating possible suspicious activity, including suspicious activity identified by Deutsche Bank AG's surveillance/monitoring program or referred by any employee or third-party, including, but not limited to, suspicious activity relating to relationships, transactions, or ties between the above-named individuals, entities, and accounts and any foreign individual, entity, or government;

vi.    any document related to any investment, bond offering, line of credit, loan, mortgage, syndication, credit or loan restructuring, or any other credit arrangement or arrangement to raise or provide funding, including, but not limited to, those involving any foreign individual, entity, or government, or any other third party, including, but not limited to:

    a.   application and account opening documents, including, but not limited to, any such document showing any financial relationship, transactions, or ties between the above-named individuals or entities and any foreign individual, entity, or government;

    b.   KYC and due diligence, including, but not limited to, any such materials showing any financial relationship, transaction, or ties between the above-named individuals or entities and any foreign individual, entity, or government;

    c.   personal or third-party guarantees, including, but not limited to, any guarantee provided by a foreign individual, entity, or government;

    d.   collateral and appraisals for any underlying assets, including any asset in which a foreign individual, entity, or government has any interest and any asset located in a foreign country or jurisdiction;

    e.   any financial information provided by the borrower (or prospective borrower) or otherwise obtained by Deutsche Bank AG, including, but not limited to:

        1.   financial statements (including those showing any revenue, interest, or other income generated from, or payments made to, any foreign individuals, entities, or governments);

        2.   statements of net worth (including those showing any foreign assets and liabilities);

        3.   debt schedules (including those showing any debts owed to any foreign individuals, entities, or governments);

4. business operating statements (including, but not limited to, those showing any revenue, interest, or other income generated from, or payments made to, any foreign individuals, entities, or governments);

5. cash flow statements (including, but not limited to, those showing any revenue, interest, or other income generated from, or payments made to, any foreign individuals, entities, or governments);

6. bank and brokerage account records (including those relating to any such accounts held at foreign banks or other foreign financial institutions);

7. tax returns and schedules (including, but not limited to, those showing all foreign sources of income, all foreign debt payments, all interests held by the taxpayer in any foreign business entity or bank/brokerage account, and all interests held by any foreign individual, entity, or government in any of the taxpayer's business entities); and

8. records of any bankruptcies;

f. offering memoranda, including, but not limited to, any such document that shows any financial relationships, transactions, or ties between the above-named individuals, entities, or accounts and any foreign individual, entity, or government;

g. communications involving the underwriting or credit risk management units, credit risk committee, reputational risk committee, management and supervisory boards, or similar units or bodies, including any such communication relating to any financial relationships, transactions, or ties between the above-named individuals, entities, or accounts and any foreign individual, entity, or government; and

h. term sheets, including those showing the involvement of any foreign individual, entity, or government in the transaction;

i. risk assessments, risk ratings, and risk upgrades or downgrades, including those relating to any financial relationships, transactions, or ties between the above-named individuals, entities, or accounts and any foreign individual, entity, or government;

j. credit assessment memoranda and credit reports, including, but not limited to, those assessing any financial relationships, transactions, or ties between the above-named individuals, entities, or accounts and any foreign individual, entity, or government;

k. closing documents and loan documentation, including, but not limited to, any such document showing any role that any foreign individual, entity, or government had in the transaction; and

l. periodic loan statements, loan monitoring records, and records relating to any refinancing, restructuring, modification, repayment, forgiveness, foreclosure, or default, including any such document showing any role that any foreign individual, entity, or government had in the refinancing, restructuring, modification, repayment, forgiveness, foreclosure, or default;

vii. any document related to any request for information issued or received by Deutsche Bank AG pursuant to Sections 314(a) or 314(b) of the USA PATRIOT Act, Pub. L. 107-56, including, but not limited to, any such document relating to any financial relationships,

3

transactions, or ties between the above-named individuals, entities, or accounts and any foreign individual, entity, or government;

viii. any document possessed or generated by, or communications involving, █████████

███████████ Selected Deutsche Bank Employees ███████████

relating to any of the above-named individuals, entities, accounts, or transactions, particularly, but not limited to, any such document or communication relating to any financial relationships, transactions, or ties between the above-named individuals, entities, or accounts and any foreign individual, entity, or government;

ix. any document not otherwise kept in customary record-keeping systems (including, but not limited to, any document in any personal file or desk file), related to any of the above-named individuals, entities, or accounts and/or any issue or document identified in items i through viii above, including, but not limited to, any such document relating to any financial relationships, transactions, or ties between the above-named individuals, entities, or accounts and any foreign individual, entity, or government; and

x. any document provided to, discussed with, or generated by any member of Deutsche Bank AG's Management Board, Supervisory Board, or Reputational Risk Committee related to any of the above-named individuals, entities, or accounts and/or any issue or document identified in items i through ix above, including, but not limited to, any such document relating to any financial relationships, transactions, or ties between the above-named individuals, entities, and accounts and any foreign individual, entity, or government.

2. Any document related to Deutsche Bank AG's ████████████ program, including, but not limited to, any report or analysis related to the decision to identify an individual or entity as a ████████████; any document related to any changes in the tracking lists; any periodic review of ████████████; any internal correspondence, meeting minutes, or notes relating to ████████████; any memoranda relating to ███████████ prepared for Deutsche Bank AG's internal credit and risk committees or management and supervisory boards; and any such document or communication relating to any financial relationship, transaction, or tie between any ████████████ (or any account held by a ████████ ) and any foreign individual, entity, or government.

3. Any document related to any review or analysis performed by Deutsche Bank AG entitled ████████████ or any similar study, review, or analysis, including, but not limited to, any such document relating to any financial relationship, transaction, or tie between the relevant account holders or customers and any foreign individual, entity, or government.

4. With respect to the following events or activities:

████████████████████████████

4



i.   any document related to any review or analysis of those events or activities conducted by or possessed by Deutsche Bank AG or its agents or representatives, including, but not limited to, any document related to any Deutsche Bank AG personnel facilitating or involved in any of those events or activities, the identity of any third-party individual or entity, or the beneficial owner of any third-party entity, involved in any of those events or activities;

ii.  any record of any transaction involved in, or related to, any of those events or activities;

iii. any document related to any request for information issued or received pursuant to Sections 314(a) or 314(b) of the USA PATRIOT Act, Pub. L. 107-56; and

iv.  any document provided to, discussed with, or generated by any member of Deutsche Bank AG's management board or supervisory board related to any event or activity identified above and/or any issue or document identified in items i through iii above.

5. Any document related to any review, study, analysis, or communication to or from any U.S. federal, state, or local agency regarding any ▆▆▆▆▆▆▆ or immediate family member, including, but not limited to, any government official or entity in which such an individual has been identified as a trustee, settlor, or grantor, beneficiary, beneficial owner, or has or had in any way control over, individually or with others.

6. With respect to:



or any account (including, but not limited to, any money market, securities, or trading account or any loan account or structure) in the name of any of the above-named entities, as well as any account in which any of the entities have or have had in any way control over, individually or with others:

i.   any document related to account applications, opening documents, KYC, due diligence, and closing documents, including any document identifying:

   a.   any trustee, settlor, grantor, administrator, controlling party, protector, beneficiary, beneficial owner, or signatory; or

      b.  any relationship manager or account manager;

ii.    any monthly or other periodic account statement;

iii.   any document related to any domestic or international transfer of funds in the amount of $10,000 or more, including, but not limited to, any wire transfer, check, cash letter, cashier's check, book entry transfer, or other document indicating the originator, beneficiary, source of funds, or destination of such transfer;

iv.   any summary or analysis of domestic and international account deposits, withdrawals, and transfers, including, but not limited to, sources of deposits and the destination of withdrawals/transfers, including any wire transfer, check, cash letter, cashier's check, or other monetary instrument;

v.    any document related to monitoring for, identifying, or evaluating possible suspicious activity, including suspicious activity identified by Deutsche Bank AG's surveillance/monitoring program or referred by any employee or third-party, including, but not limited to, possible suspicious activity relating to foreign individuals and entities and international funds transfers;

vi.   any document related to any agreement, business relationship, or business venture (including, but not limited to, joint underwritings, loans, financings or securitizations such as CDOs) between Deutsche Bank AG and any of the above-named entities;

vii.  any document related to any request for information issued or received by Deutsche Bank AG pursuant to Sections 314(a) or 314(b) of the USA PATRIOT Act, Pub. L. l07-56;

viii. any document not otherwise kept in customary record-keeping systems (including, but not limited to, any document in any personal file or desk file), related to any entity identified above and/or any issue or document identified in items i through vii above; and

ix.   any document provided to, discussed with, or generated by any member of Deutsche Bank's Management Board, Supervisory Board, or Group Reputational Risk Committee related to any entity identified above and/or any issue or document identified in items i through viii above.

7. Any document related to any periodic, special, or other review conducted by or for Deutsche Bank AG of any of the individuals, entities, accounts, or transactions identified in items 1 and 6 above, including, but not limited to, any relationship or account history, exposure reports, particular transactions, management and servicing, or any other review associated with Deutsche Bank AG's policies and procedures for loan/credit risk analysis or accounts related to correspondent banking, private banking, public figures, politically prominent persons, or their family members, including, but not limited to, any such document relating to any financial relationships, transactions, or ties between the above-named individuals, entities, and accounts and any foreign individual, entity, or government.

8. Any document related to any communication sent or received by ███ Selected ███ Deutsche Bank Employees ███ concerning any individual, entity, or any issue or document identified in items 1 through 7 above, including, but not limited to, any entity in which such an individual has been identified as a trustee, settlor, or grantor, beneficiary, beneficial owner, or has or had in any way control over, individually or with others, or any government official.

## RESPONDING TO COMMITTEE SUBPOENAS

*In responding to the document request, please apply the instructions and definitions set forth below:*

## **INSTRUCTIONS**

1.      In complying with this request, you should produce all responsive documents in unredacted form that are in the possession, custody, or control or otherwise available to Deutsche Bank AG or its agents, employees, or representatives, regardless of whether the documents are possessed directly by you.

2.      Documents responsive to the request should not be destroyed, modified, removed, transferred, or otherwise made inaccessible to the Committee.

3.      In the event that any entity, organization, or individual named in the request has been, or is currently, known by any other name, the request should be read also to include such other names under that alternative identification.

4.      Each document should be produced in a form that may be copied by standard copying machines.

5.      When you produce documents, you should identify the paragraph(s) and/or clause(s) in the Committee's request to which the document responds.

6.      Documents produced pursuant to this request should be produced in the order in which they appear in your files and should not be rearranged. Any documents that are stapled, clipped, or otherwise fastened together should not be separated. Documents produced in response to this request should be produced together with copies of file labels, dividers, or identifying markers with which they were associated when this request was issued. Indicate the office or division and person from whose files each document was produced. Documents produced on paper (those from paper files that you choose to produce as such) shall not contain any permanent fasteners (i.e., staples), but shall be separated based on the divisions between documents as it is maintained in the custodian's files by non-permanent fasteners (e.g., paper clips, binder clips, rubber bands) or a non-white slip sheet.

7.      Each folder and box should be numbered, and a description of the contents of each folder and box, including the paragraph(s) and/or clause(s) of the request to which the documents are responsive, should be provided in an accompanying index.

8.      Responsive documents must be produced regardless of whether any other person or entity possesses non-identical or identical copies of the same document.

9.      The Committee requests electronic documents in addition to paper productions. If any of the requested information is available in machine-readable or electronic form (such as on a computer server, hard drive, CD, DVD, back up tape, or removable computer media such as thumb drives, flash drives, memory cards, and external hard drives), you should immediately

consult with Committee staff to determine the appropriate format in which to produce the information. Documents produced in electronic format should be organized, identified, and indexed electronically in a manner comparable to the organizational structure called for in (6) and (7) above.

10.    Documents shall be produced in accordance with the attached Data Delivery Standards. Alternatively, all documents derived from word processing programs, email applications, instant message logs, spreadsheets, and wherever else practicable, shall be produced in text searchable PDF format. Spreadsheets shall also be provided in their native form. Audio and video files shall be produced in their native format, although picture files associated with email or word processing programs shall be produced in PDF format along with the document it is contained in or to which it is attached.

11.    Other than native files produced along with TIFF images in accordance with the attached Data Delivery Standards, every page of material produced to the Committee, whether from paper files or as a text searchable PDF, must contain a unique Bates number. All files produced in PDF format shall be named according to the Bates range that the file contains (e.g. YourCo-00001 - YourCo- 00035.pdf).

12.    With respect to the requested wire transfer records, please provide such records in Excel (.xls) format that is enabled (not "read only" format), with separate columns that show each wire transfer field, including, but not limited to, the following fields: "Payment Date," "Amount," "Ordering Customer" #1 through #4, "Ordering Bank" #1 through #5, "Debiting ID," "Debiting Address" #1 through #4, "Credit ID," "Credit Address" #1 through #4, Account Party" #1 through #5, "Ultimate Beneficiary" #1 through #5, "Det_Payment" #1 through #4, and "Bank to Bank" #1 through #6.

13.    If any document responsive to this request was, but no longer is, in your possession, custody, or control, or has been placed into the possession, custody, or control of any third party and cannot be provided in response to this request, you should identify the document (stating its date, author, subject and recipients) and explain the circumstances under which the document ceased to be in your possession, custody, or control, or was placed in the possession, custody, or control of a third party.

14.    If any document responsive to this request was, but no longer is, in your possession, custody or control, state:

    a.  how the document was disposed of;
    b.  the name, current address, and telephone number of the person who currently
        has possession, custody or control over the document;
    c.  the date of disposition;
    d.  the name, current address, and telephone number of each person who authorized
        said disposition or who had or has knowledge of said disposition.

15.    If any document responsive to this request cannot be located, describe with particularity the efforts made to locate the document and the specific reason for its disappearance, destruction or unavailability.

16.    If a date or other descriptive detail set forth in this request referring to a document, communication, meeting, or other event is inaccurate, but the actual date or other descriptive detail is known to you or is otherwise apparent from the context of the request, you should produce all documents which would be responsive as if the date or other descriptive detail were correct.

17.    The request is continuing in nature and applies to any newly discovered document, regardless of the date of its creation.  Any document not produced because it has not been located or discovered by the return date should be produced immediately upon location or discovery subsequent thereto.

18.    You should consult with Committee majority staff regarding the method of delivery prior to sending any materials.

19.    In the event that a responsive document is withheld on any basis, including a claim of privilege, you should provide a log containing the following information concerning every such document: (i) the reason the document is not being produced; (ii) the type of document; (iii) the general subject matter; (iv) the date, author and addressee; (v) the relationship of the author and addressee to each other; and (vi) any other description necessary to identify the document and to explain the basis for not producing the document.  If a claimed privilege applies to only a portion of any document, that portion only should be withheld and the remainder of the document should be produced.  As used herein, "claim of privilege" includes, but is not limited to, any claim that a document either may or must be withheld from production pursuant to any statute, rule, or regulation.

(a)    Any objections or claims of privilege are waived if you fail to provide an explanation of why full compliance is not possible and a log identifying with specificity the ground(s) for withholding each withheld document prior to the request compliance date.

(b)    Any assertion by a request recipient of any such non-constitutional legal bases for withholding documents or other materials, for refusing to answer any deposition question, or for refusing to provide hearing testimony, shall be of no legal force and effect and shall not provide a justification for such withholding or refusal, unless and only to the extent that the Committee (or the chair of the Committee, if authorized) has consented to recognize the assertion as valid.

20.    If the request cannot be complied with in full, it should be complied with to the extent possible, which should include an explanation of why full compliance is not possible.

21.    Upon completion of the document production, you must submit a written certification, signed by you or your counsel, stating that: (1) a diligent search has been completed of all documents in your possession, custody, or control which reasonably could contain responsive documents; (2) documents responsive to the request have not been destroyed, modified, removed, transferred, or otherwise made inaccessible to the Committee since the date of

receiving the Committee's request or in anticipation of receiving the Committee's request; and (3) all documents identified during the search that are responsive have been produced to the Committee, identified in a log provided to the Committee, as described in (18) above, or identified as provided in (12), (13) or (14) above.

22.     When representing a witness or entity before the Committee in response to a document request or request for transcribed interview, counsel for the witness or entity must promptly submit to the Committee a notice of appearance specifying the following: (a) counsel's name, firm or organization, and contact information; and (b) each client represented by the counsel in connection with the proceeding.  Submission of a notice of appearance constitutes acknowledgement that counsel is authorized to accept service of process by the Committee on behalf of such client(s), and that counsel is bound by and agrees to comply with all applicable House and Committee rules and regulations.

## DEFINITIONS

1.      The term "Deutsche Bank AG" includes, but is not limited to each of its, subsidiaries, affiliates, branches, divisions, partnerships, properties, groups, special purpose entities, joint ventures, predecessors, successors, or any other entity in which they have or had a controlling interest, and any current or former employee, officer, director, shareholder, partner, member, consultant, senior manager, manager, senior associate, staff employee, independent contractor, agent, attorney or other representative of any of those entities.

2.      Each entities listed in items 1 and 6 above includes, but is not limited to, each of its parents, subsidiaries, affiliates, branches, divisions, partnerships, properties, groups, special purpose entities, joint ventures, predecessors, successors, or any other entity in which they have or had a controlling interest, and any current or former employee, officer, director, shareholder, partner, member, consultant, senior manager, manager, senior associate, staff employee, independent contractor, agent, attorney or other representative of any of those entities.

3.      The term "documents in your possession, custody or control" means (a) documents that are in your possession, custody, or control, whether held by you or your past or present agents, employees, or representatives acting on your behalf; (b) documents that you have a legal right to obtain, that you have a right to copy, or to which you have access; and (c) documents that have been placed in the possession, custody, or control of any third party.

4.      The term "document" means any written, recorded, or graphic matter of any nature whatsoever, regardless of how recorded, and whether original or copy, including, but not limited to, the following:  agreements; papers; memoranda; correspondence; reports; studies; reviews; analyses; graphs; diagrams; photographs; charts; tabulations; presentations; marketing materials; working papers; records; records of interviews; desk files; notes; letters; notices; confirmations; telegrams; faxes, telexes, receipts; appraisals; interoffice and intra office communications; electronic mail (e-mail) and attachments; electronic messages; text messages;  contracts; cables; recordings, notations or logs of any type of conversation, telephone call, meeting or other communication; bulletins; printed matter; computer printouts; teletype; invoices; transcripts; audio or video recordings; statistical or informational accumulations; data processing cards or worksheets; computer stored and/or generated documents; computer databases; computer disks and formats; machine readable electronic files, data or records maintained on a computer; instant messages; diaries; questionnaires and responses; data sheets; summaries; minutes; bills; accounts; estimates; projections; comparisons; messages; correspondence; electronically stored information and similar or related materials.  A document bearing any notation not a part of the original text is to be considered a separate document.  A draft or non-identical copy is a separate document within the meaning of this term.

5.      The term "immediate family" means any parent, spouse, child, step child, daughter-in-law, or son-in-law.

6.      The term "administrator or controlling party" means any individual, organization, or entity that established, managed, administered, represented, served as signatory for, or engaged in any transaction on behalf of, or in any way had control over any of, or any account or assets of, the entities identified in or responsive to any of the items above.

7.      The term "entity" means a corporation, partnership, limited partnership, limited liability company, joint venture, business trust, or any other form or organization by which business or financial transactions are carried out.

8.      The term "communication" means each manner or means of disclosure or exchange of information, regardless of means utilized, whether oral, electronic, by document or otherwise, and whether face to face, in meetings, by telephone, mail, telex, facsimile, computer, discussions, releases, delivery, or otherwise.

9.      The terms "and" and "or" shall be construed broadly and either conjunctively or disjunctively to bring within the scope of this subpoena any information which might otherwise be construed to be outside its scope.  The singular includes plural number, and vice versa.  The masculine includes the feminine and neuter genders.

10.     The terms "person" or "persons" mean natural persons, firms, partnerships, associations, limited liability corporations and companies, limited liability partnerships, corporations, subsidiaries, divisions, departments, joint ventures, proprietorships, syndicates, other legal, business or government entities, or any other organization or group of persons, and all subsidiaries, affiliates, divisions, departments, branches, and other units thereof.

11.     The terms "referring" "related" "relating" or "concerning," with respect to any given subject, mean anything that constitutes, contains, embodies, reflects, identifies, states, refers to, deals with, or is in any manner whatsoever pertinent to that subject.

12.     The term "employee" means agent, borrowed employee, casual employee, consultant, de facto employee, joint adventurer, loaned employee, part-time employee, permanent employee, provisional employee, contract employee, contractor, or any other type of service provider.

# Exhibit B

# SUBPOENA

## BY AUTHORITY OF THE HOUSE OF REPRESENTATIVES OF THE CONGRESS OF THE UNITED STATES OF AMERICA

*To* Capital One Financial Corporation
_____

You are hereby commanded to be and appear before the

Committee on Financial Services
_____

of the House of Representatives of the United States at the place, date, and time specified below.

☑ **to produce the things identified on the attached schedule** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

| | |
|---|---|
| Place of production: Committee on Financial Services, Rayburn House Office Building, Room 2129 | |
| Date: May 6, 2019 | Time: 12:00 PM |

☐ **to testify at a deposition** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

| | |
|---|---|
| Place of testimony: | |
| Date: | Time: |

☐ **to testify at a hearing** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

| | |
|---|---|
| Place of testimony: | |
| Date: | Time: |

*To* _____

_____ to serve and make return.

Witness my hand and the seal of the House of Representatives of the United States, at

the city of Washington, D.C. this _____ day of April _____, 20 19 .

_____
*Chairman or Authorized Member*

Attest:

_____

*Clerk*

# PROOF OF SERVICE

Subpoena for  Capital One Financial Corporation

Address  Capital One Financial Corporation, 1680 Capital One Drive, McLean, VA 22102-3491

before the  Committee on Financial Services

*U.S. House of Representatives*
*116th Congress*

Served by (print name)  David Abramowitz

Title  General Counsel and Parliamentarian, House Financial Services Committee

Manner of service  Electronic Mail

Date  April     , 2019

Signature of Server

Address  Rayburn House Office Building, Room 2129, Washington, D.C.  20515

## S C H E D U L E  A

Custodian of Records
Capital One

The time period applicable to this subpoena is **July 19, 2016 through the present**, except for Item "i." and "ii.", for which there is no time limitation.

Please provide **complete and unredacted** copies of the following documents by **May 6, 2019**:

1.  With respect to:

    The Donald J. Trump Revocable Trust;
    The Trump Organization Inc.;
    Trump Organization LLC;
    The Trump Corporation;
    Trump Old Post Office LLC;
    Trump Old Post Office Member Corp.;
    DJT Holdings LLC;
    DJT Holdings Managing Member LLC;
    OPO Hotel Manager LLC;
    OPO Hotel Manager Member Corp.;
    THC DC Restaurant Hospitality LLC;
    Trump Acquisition LLC;
    Trump Acquisition Corp.;
    Trump International Hotels Management LLC;
    Trump International Hotels Management Member Corp.;
    Any parent, subsidiary, affiliate, joint venture, predecessor, or successor of the foregoing;
    or
    Any principal, including directors, shareholders, or officers, or any other representatives of the foregoing;

    or any account (including, but not limited to, any securities or trading account) in the name of any of the above-named entities, as well as any account in which such entities are or were a beneficiary, or beneficial owner, or in which such entities have or have had in any way control over, individually or with others:

    i.    any document related to account opening, due diligence, or closing;
    ii.   any document that identifies, addresses or is related to the identification of any trustee, guarantor, settlor or grantor, administrator or controlling party, protector, beneficiary, beneficial owner or signatory;
    iii.  any document that identifies any relationship manager or account manager;
    iv.   any monthly or periodic statement showing line item detail for all account activity, including, but not limited to, intrabank transfers between any of the accounts, and images of all cancelled checks in excess of $5,000;

v.   any summary record or analysis of account deposits and transfers, including, but not limited to, the sources of the deposits into those accounts and the destination of the transfers from those accounts, including any wire transfer (showing all wire field information and originator-to-beneficiary and bank-to-bank information), check, cash letter or other monetary instrument involving those accounts;

vi.   any document related to any transfer of funds in excess of $10,000, including, but not limited to, any wire transfer, check, cash letter, or any document indicating the originator, beneficiary, intermediary, source of funds or destination of such transfer;

vii.   any document related to any possible suspicious activity identified by Capital One Financial Corporation's surveillance or monitoring system or program or referred by any employee or third-party;

viii.   any document relating to any annual, special, or other reviews of the accounts pursuant to Capital One Financial Corporation's policies and procedures related to the Bank Secrecy Act, anti-money-laundering, and compliance with guidance on Politically Exposed Persons and domestic or foreign public figures or their families;

ix.   any document, including, but not limited to, any personal file not otherwise kept in customary record-keeping systems, related to any loan or extension of credit requested by or provided to any of the above-named entities;

x.   any document related to any real estate transaction; and

xi.   any document related to, or provided in response to:

a.   any request, subpoena, inquiry or investigation, by any U.S. federal or state agency;

b.   any notice of administrative, civil, or criminal legal action;

c.   any subpoena, search warrant, seizure warrant, summons, or other legal writ, notice, or order or request for information, property, or material, including, but not limited to, those issued pursuant to the USA PATRIOT Act, Pub. L. 107-56; Sections 314(a) or 314(b) of that Act, or any other tax, anti-money laundering or bank statute; and

d.   any request for information made to or by a third party, including, but not limited to any government agency or financial institution.

## RESPONDING TO COMMITTEE SUBPOENAS

*In responding to the document request, please apply the instructions and definitions set forth below:*

## <u>INSTRUCTIONS</u>

1.      In complying with this request, you should produce all responsive documents in unredacted form that are in the possession, custody, or control or otherwise available to Capital One Financial Corporation or its agents, employees, or representatives, regardless of whether the documents are possessed directly by you.

2.      Documents responsive to the request should not be destroyed, modified, removed, transferred, or otherwise made inaccessible to the Committee.

3.      In the event that any entity, organization, or individual named in the request has been, or is currently, known by any other name, the request should be read also to include such other names under that alternative identification.

4.      Each document should be produced in a form that may be copied by standard copying machines.

5.      When you produce documents, you should identify the paragraph(s) and/or clause(s) in the Committee's request to which the document responds.

6.      Documents produced pursuant to this request should be produced in the order in which they appear in your files and should not be rearranged.  Any documents that are stapled, clipped, or otherwise fastened together should not be separated.  Documents produced in response to this request should be produced together with copies of file labels, dividers, or identifying markers with which they were associated when this request was issued.  Indicate the office or division and person from whose files each document was produced.  Documents produced on paper (those from paper files that you choose to produce as such) shall not contain any permanent fasteners (i.e., staples), but shall be separated based on the divisions between documents as it is maintained in the custodian's files by non-permanent fasteners (e.g., paper clips, binder clips, rubber bands) or a non-white slip sheet.

7.      Each folder and box should be numbered, and a description of the contents of each folder and box, including the paragraph(s) and/or clause(s) of the request to which the documents are responsive, should be provided in an accompanying index.

8.      Responsive documents must be produced regardless of whether any other person or entity possesses non-identical or identical copies of the same document.

9.      The Committee requests electronic documents in addition to paper productions. If any of the requested information is available in machine-readable or electronic form (such as on a computer server, hard drive, CD, DVD, back up tape, or removable computer media such as thumb drives, flash drives, memory cards, and external hard drives), you should immediately

3

consult with Committee staff to determine the appropriate format in which to produce the information. Documents produced in electronic format should be organized, identified, and indexed electronically in a manner comparable to the organizational structure called for in (6) and (7) above.

10.    Documents produced in electronic format should be produced as delimited text with images and native files in accordance with the attached Data Delivery Standards. Alternatively, all documents derived from word processing programs, email applications, instant message logs, spreadsheets, and wherever else practicable, shall be produced in text searchable PDF format. Spreadsheets shall also be provided in their native form. Audio and video files shall be produced in their native format, although picture files associated with email or word processing programs shall be produced in PDF format along with the document it is contained in or to which it is attached. The requested wire transfer records should be produced in Excel (.xls) format that is enabled (not "read only" format), with separate columns that show each wire transfer field, including, but not limited to, the following fields: "Payment Date," "Amount," "Ordering Customer" #1 through #4, "Ordering Bank" #1 through #5, "Debiting ID," "Debiting Address" #1 through #4, "Credit ID," "Credit Address" #1 through #4, Account Party" #1 through #5, "Ultimate Beneficiary" #1 through #5, "Det_Payment" #1 through #4, and "Bank to Bank" #1 through #6.

11.    Other than native files produced along with TIFF images in accordance with the attached Data Delivery Standards, every page of material produced to the Committee, whether from paper files or as a text searchable PDF, must contain a unique Bates number. All files produced in PDF format shall be named according to the Bates range that the file contains (e.g. YourCo-00001 - YourCo- 00035.pdf).

12.    If any document responsive to this request was, but no longer is, in your possession, custody, or control, or has been placed into the possession, custody, or control of any third party and cannot be provided in response to this request, you should identify the document (stating its date, author, subject and recipients) and explain the circumstances under which the document ceased to be in your possession, custody, or control, or was placed in the possession, custody, or control of a third party.

13.    If any document responsive to this request was, but no longer is, in your possession, custody or control, state:

   a.  how the document was disposed of;
   b.  the name, current address, and telephone number of the person who currently has possession, custody or control over the document;
   c.  the date of disposition;
   d.  the name, current address, and telephone number of each person who authorized said disposition or who had or has knowledge of said disposition.

14.    If any document responsive to this request cannot be located, describe with particularity the efforts made to locate the document and the specific reason for its disappearance, destruction or unavailability.

4

15.    If a date or other descriptive detail set forth in this request referring to a document, communication, meeting, or other event is inaccurate, but the actual date or other descriptive detail is known to you or is otherwise apparent from the context of the request, you should produce all documents which would be responsive as if the date or other descriptive detail were correct.

16.    The request is continuing in nature and applies to any newly discovered document, regardless of the date of its creation.  Any document not produced because it has not been located or discovered by the return date should be produced immediately upon location or discovery subsequent thereto.

17.    You should consult with Committee majority staff regarding the method of delivery prior to sending any materials.

18.    In the event that a responsive document is withheld on any basis, including a claim of privilege, you should provide a log containing the following information concerning every such document: (i) the reason the document is not being produced; (ii) the type of document; (iii) the general subject matter; (iv) the date, author and addressee; (v) the relationship of the author and addressee to each other; and (vi) any other description necessary to identify the document and to explain the basis for not producing the document.  If a claimed privilege applies to only a portion of any document, that portion only should be withheld and the remainder of the document should be produced.  As used herein, "claim of privilege" includes, but is not limited to, any claim that a document either may or must be withheld from production pursuant to any statute, rule, or regulation.

   (a) Any objections or claims of privilege are waived if you fail to provide an explanation of why full compliance is not possible and a log identifying with specificity the ground(s) for withholding each withheld document prior to the request compliance date.

   (b) Any assertion by a request recipient of any such non-constitutional legal bases for withholding documents or other materials, for refusing to answer any deposition question, or for refusing to provide hearing testimony, shall be of no legal force and effect and shall not provide a justification for such withholding or refusal, unless and only to the extent that the Committee (or the chair of the Committee, if authorized) has consented to recognize the assertion as valid.

19.    If the request cannot be complied with in full, it should be complied with to the extent possible, which should include an explanation of why full compliance is not possible.

20.    Upon completion of the document production, you must submit a written certification, signed by you or your counsel, stating that: (1) a diligent search has been completed of all documents in your possession, custody, or control which reasonably could contain responsive documents; (2) documents responsive to the request have not been destroyed, modified, removed, transferred, or otherwise made inaccessible to the Committee since the date of receiving the Committee's request or in anticipation of receiving the Committee's request;

and (3) all documents identified during the search that are responsive have been produced to the Committee, identified in a log provided to the Committee, as described in (18) above, or identified as provided in (12), (13) or (14) above.

21.    When representing a witness or entity before the Committee in response to a document request or request for transcribed interview, counsel for the witness or entity must promptly submit to the Committee a notice of appearance specifying the following: (a) counsel's name, firm or organization, and contact information; and (b) each client represented by the counsel in connection with the proceeding.  Submission of a notice of appearance constitutes acknowledgement that counsel is authorized to accept service of process by the Committee on behalf of such client(s), and that counsel is bound by and agrees to comply with all applicable House and Committee rules and regulations.

## **DEFINITIONS**

1.      The term "Capital One Financial Corporation" includes, but is not limited to Capital One Financial Corporation and each of its subsidiaries, affiliates, branches, divisions, partnerships, properties, groups, special purpose entities, joint ventures, predecessors, successors, or any other entity in which they have or had a controlling interest, and any current or former employee, officer, director, shareholder, partner, member, consultant, senior manager, manager, senior associate, staff employee, independent contractor, agent, attorney or other representative of any of those entities.

2.       Each entities listed in items 1 and 6 above includes, but is not limited to, each of its parents, subsidiaries, affiliates, branches, divisions, partnerships, properties, groups, special purpose entities, joint ventures, predecessors, successors, or any other entity in which they have or had a controlling interest, and any current or former employee, officer, director, shareholder, partner, member, consultant, senior manager, manager, senior associate, staff employee, independent contractor, agent, attorney or other representative of any of those entities.

3.      The term "documents in your possession, custody or control" means (a) documents that are in your possession, custody, or control, whether held by you or your past or present agents, employees, or representatives acting on your behalf; (b) documents that you have a legal right to obtain, that you have a right to copy, or to which you have access; and (c) documents that have been placed in the possession, custody, or control of any third party.

4.      The term "document" means any written, recorded, or graphic matter of any nature whatsoever, regardless of how recorded, and whether original or copy, including, but not limited to, the following:  agreements; papers; memoranda; correspondence; reports; studies; reviews; analyses; graphs; diagrams; photographs; charts; tabulations; presentations; marketing materials; working papers; records; records of interviews; desk files; notes; letters; notices; confirmations; telegrams; faxes; telexes; receipts; appraisals; interoffice and intra office communications; electronic mail (e-mail) and attachments; electronic messages; text messages;  contracts; cables; recordings, notations or logs of any type of conversation, telephone call, meeting or other communication; bulletins; printed matter; computer printouts; teletype; invoices; transcripts; audio or video recordings; statistical or informational accumulations; data processing cards or worksheets; computer stored and/or generated documents; computer databases; computer disks and formats; machine readable electronic files, data or records maintained on a computer; instant messages; diaries; questionnaires and responses; data sheets; summaries; minutes; bills; accounts; estimates; projections; comparisons; messages; correspondence; electronically stored information and similar or related materials.  A document bearing any notation not a part of the original text is to be considered a separate document.  A draft or non-identical copy is a separate document within the meaning of this term.

5.      The term "immediate family" means any parent, spouse, child, step child, daughter-in-law, or son-in-law.

6.      The term "administrator or controlling party" means any individual, organization, or entity that established, managed, administered, represented, served as signatory for, or engaged in any transaction on behalf of, or in any way had control over any of, or any account or assets of, the entities identified in or responsive to any of the items above.

7.     The term "entity" means a corporation, partnership, limited partnership, limited liability company, joint venture, business trust, or any other form or organization by which business or financial transactions are carried out.

8.     The term "communication" means each manner or means of disclosure or exchange of information, regardless of means utilized, whether oral, electronic, by document or otherwise, and whether face to face, in meetings, by telephone, mail, telex, facsimile, computer, discussions, releases, delivery, or otherwise.

9.     The terms "and" and "or" shall be construed broadly and either conjunctively or disjunctively to bring within the scope of this subpoena any information which might otherwise be construed to be outside its scope.  The singular includes plural number, and vice versa.  The masculine includes the feminine and neuter genders.

10.     The terms "person" or "persons" mean natural persons, firms, partnerships, associations, limited liability corporations and companies, limited liability partnerships, corporations, subsidiaries, divisions, departments, joint ventures, proprietorships, syndicates, other legal, business or government entities, or any other organization or group of persons, and all subsidiaries, affiliates, divisions, departments, branches, and other units thereof.

11.     The terms or "relating" "concerning" with respect to any given subject, mean anything that constitutes, contains, embodies, reflects, identifies, states, refers to, deals with, or is in any manner whatsoever pertinent to that subject.

12.     The term "employee" means agent, borrowed employee, casual employee, consultant, de facto employee, joint adventurer, loaned employee, part-time employee, permanent employee, provisional employee, contract employee, contractor, or any other type of service provider.

*In responding to the subpoena, please apply the instructions and definitions set forth below:*

## Instructions

The documents subpoenaed include all those that are in the custody, control or possession, or within the right of custody, control or possession, of Capital One or its agents, employees, or representatives.

If the subpoena cannot be complied with in full, it shall be complied with to the extent possible, with an explanation of why full compliance is not possible.  Any document withheld on the basis of privilege shall be identified on a privilege log submitted with the responses to this subpoena. The log shall state the date of the document, its author, his or her occupation and employer, all recipients, the occupation and employer of each recipient, the subject matter, the privilege claimed and a brief explanation of the basis of the claim of privilege.  If any document responsive to this subpoena was, but no longer is, in your possession, custody, or control, identify the

8

document and explain the circumstances by which it ceased to be in your possession, custody, or control.

Documents shall be produced as delimited text with images and native files in accordance with the attached Data Delivery Standards.

Alternatively, all documents derived from word processing programs, email applications, instant message logs, spreadsheets, and wherever else practicable, shall be produced in text searchable PDF format. Spreadsheets shall also be provided in their native form. Audio and video files shall be produced in their native format, although picture files associated with email or word processing programs shall be produced in PDF format along with the document it is contained in or to which it is attached.

Other than native files produced along with TIFF images in accordance with the attached Data Delivery Standards, every page of material produced to the Committee, whether from paper files or as a text searchable PDF, must contain a unique Bates number. All files produced in PDF format shall be named according to the Bates range that the file contains (e.g. YourCo-00001 - YourCo- 00035.pdf).

Documents produced on paper (those from paper files that you choose to produce as such) shall not contain any permanent fasteners (i.e., staples), but shall be separated based on the divisions between documents as it is maintained in the custodian's files by non-permanent fasteners (e.g., paper clips, binder clips, rubber bands) or a non-white slip sheet.

# DATA DELIVERY STANDARDS

Record productions shall be prepared according to, and strictly adhere to, the following standards:

1. Records produced shall be organized, identified, and indexed electronically.

2. Only alphanumeric characters and the underscore ("_") character are permitted in file and folder names. Special characters are not permitted.

3. Two sets of records shall be delivered, one set to the Majority Staff and one set to the Minority Staff. To the extent the Minority Staff does not have an electronic record review platform, records shall be produced to the Minority Staff in searchable PDF format and shall be produced consistent with the instructions specified in this schedule to the maximum extent practicable.

4. Production media and produced records shall not be encrypted, contain any password protections, or have any limitations that restrict access and use.

5. Records shall be produced to the Committee on one or more CDs, memory sticks, thumb drives, or USB hard drives. Production media shall be labeled with the following information: Case Number, Production Date, Producing Party, Bates Range.

6. Records produced to the Committee shall include an index describing the contents of the production. To the extent that more than one CD, hard drive, memory stick, thumb drive, box, or folder is produced, each CD, hard drive, memory stick, thumb drive, box, or folder shall contain an index describing its contents.

7. All records shall be Bates-stamped sequentially and produced sequentially.

8. When you produce records, you shall identify the paragraph or number in the Committee's Request to which the records respond and add a metadata tag listing that paragraph or number in accordance with **Appendix A**.

9.

    a. All submissions must be organized by custodian unless otherwise instructed.

    b. Productions shall include:

        1. A Concordance Data (.DAT) Load File in accordance with metadata fields as defined in **Appendix A**.

        2. A Standard Format Opticon Image Cross-Reference File (.OPT) to link produced images to the records contained in the .DAT file.

1

3. A file (can be Microsoft Word, Microsoft Excel, or Adobe PDF) defining the fields and character lengths of the load file.

c. The production format shall include images, text, and native electronic files. Electronic files must be produced in their native format, i.e., the format in which they are ordinarily used and maintained during the normal course of business. For example, a Microsoft Excel file must be produced as a Microsoft Excel file rather than an image of a spreadsheet. **NOTE:** An Adobe PDF file representing a printed copy of another file format (such as Word Document or Webpage) is NOT considered a native file unless the record was initially created as a PDF.

1. Image Guidelines:

    1. Single or multi page TIFF files.

    2. All TIFF images must have a unique file name, i.e., Bates Number

    3. Images must be endorsed with sequential Bates numbers in the lower right corner of each image.

2. Text Guidelines:

    1. All text shall be produced as separate text files, not inline within the .DAT file.

    2. Relative paths shall be used to link the associated text file (FIELD: TEXTPATH) to the record contained in the load file.

    3. Associated text files shall be named as the BEGBATES field of each record.

3. Native File Guidelines:

    1. Copies of original email and native file records/attachments must be included for all electronic productions.

    2. Native file records must be named per the BEGBATES field.

    3. Relative paths shall be used to link the associated native file (FIELD: NATIVEFILELINK) to the record contained in the load file.

    4. Associated native files shall be named as the BEGBATES field of each record.

2

d.  All record family groups, *i.e.*, email attachments, embedded files, etc., should be produced together and children files should follow parent files sequentially in the Bates numbering.

e.  Only 1 load file and one Opticon image reference file shall be produced per production volume.

f.  All extracted text shall be produced as separate text files.

g.  Record numbers in the load file should match record Bates numbers and TIFF file names.

h.  All electronic record produced to the Committee should include the fields of metadata listed in **Appendix A**.

# Appendix A

Production Load File Formatting and Delimiters:

- The first line shall be a header row containing field names.
- Load file delimiters shall be in accordance with the following:
  - o  Field Separator: ¶ (20)           Text Qualifier: þ (254)
  - o  Newline: \n (10)                  Multi-Value Separator: ; (59)
  - o  Nested Value Separator: \ (92)
- All Date / Time Data shall be split into two separate fields (see below).
  - o  Date Format: mm/dd/yyyy—*i.e.*, 05/18/2015
  - o  Time Format: hh:mm:ss A—*i.e.*, 08:39:12 AM

Required Metadata Fields

| Field Name | Sample Data | Description |
|---|---|---|
| FIRSTBATES | EDC0000001 | First Bates number of native file record/email |
| LASTBATES | EDC0000001 | Last Bates number of native file record/email<br>**The LASTBATES field should be populated for single page records/emails. |
| ATTACHRANGE | EDC0000001–EDC0000015 | Bates number of the first page of the parent record to the Bates number of the last page of the last attachment "child" record |
| BEGATTACH | EDC0000001 | First Bates number of attachment range |
| ENDATTACH | EDC0000015 | Last Bates number of attachment range |

4

| Field Name | Sample Data | Description |
|---|---|---|
| CUSTODIAN | Smith, John | Email: mailbox where the email resided Attachment: Individual from whom the record originated |
| FROM | John Smith | Email:      Sender<br>Native: Author(s) of record<br>**semi-colon should be used to separate multiple entries |
| TO | Coffman,      Janice; LeeW [mailto:LeeW@MSN.com] | Recipient(s)<br>**semi-colon should be used to separate multiple entries |
| CC | Frank      Thompson [mailto: frank_Thompson@cdt.com] | Carbon copy recipient(s)<br>**semi-colon should be used to separate multiple entries |
| BCC | John Cain | Blind carbon copy recipient(s)<br>**semi-colon should be used to separate multiple entries |
| SUBJECT | Board      Meeting Minutes | Email: Subject line of the email Native: Title of record (if available) |
| DATE_SENT | 10/12/2010 | Email:      Date the email was sent<br>Native: (empty) |
| TIME_SENT/TIME_ZONE | 07:05 PM GMT | Email: Time the email was sent/ Time zone in which the emails were standardized during conversion.<br>Native: (empty)<br>**This data must be a separate field and cannot be combined with the DATE_SENT field |
| TIME_ZONE | GMT | The time zone in which the emails were standardized during conversion.<br>Email: Time zone Native:<br>(empty) |
| NATIVEFILELINK | D:\001\ EDC0000001.msg | Hyperlink to the email or native file record<br>**The linked file must be named per the FIRSTBATES number |
| MIME_TYPE | MSG | The content type of an Email or native file record as identified/extracted from the header |

5

| Field Name | Sample Data | Description |
|---|---|---|
| FILE_EXTEN | MSG | The file type extension representing the Email or native file record; will vary depending on the email format |
| AUTHOR | John Smith | Email:  (empty)<br>Native: Author of the record |
| DATE_CREATED | 10/10/2010 | Email: (empty)<br>Native: Date the record was created |
| TIME_CREATED | 10:25 AM | Email: (empty)<br>Native: Time the record was created<br>**This data must be a separate field and cannot be combined with the DATE_CREATED field |
| DATE_MOD | 10/12/2010 | Email: (empty)<br>Native: Date the record was last modified |
| TIME_MOD | 07:00 PM | Email: (empty)<br>Native: Time the record was last modified<br>**This data must be a separate field and cannot be combined with the DATE_MOD field |
| DATE_ACCESSD | 10/12/2010 | Email: (empty)<br>Native: Date the record was last accessed |
| TIME_ACCESSD | 07:00 PM | Email: (empty)<br>Native: Time the record was last accessed<br>**This data must be a separate field and cannot be combined with the DATE_ACCESSD field |
| PRINTED_DATE | 10/12/2010 | Email: (empty)<br>Native: Date the record was last printed |
| NATIVEFILESIZ E | 5,952 | Size of native file record/email in KB<br>**Use only whole numbers |
| PGCOUNT | 1 | Number of pages in native file record/email |
| PATH | J:\Shared\Smith J\October Agenda.doc | Email: (empty)<br>Native: Path where native file record was stored including original file name |
| INTFILEPATH | Personal Folders\Deleted Items\Board Meeting Minutes.msg | Email: original location of email including original file name<br>Native: (empty) |
| INTMSGID | <000805c2c71b$7 5977050$cb 8306d1@MSN> | Email:  Unique  Message  ID<br>Native: (empty) |

6

| Field Name | Sample Data | Description |
|---|---|---|
| MD5HASH | d131dd02c5e6eec 4693d9a069 8aff95c 2fcab58712467ea b4004583eb 8fb7f89 | MD5 Hash value of the record |
| TEXTPATH | \TEXT\AAA0001 .txt | Path to the record's text file that contains extracted text to be used for processing. Every record has a relative path to its text file in this field. **Note**: These paths may also be fully qualified; and thus do not have to be relative. |
| NATIVEFILEPAT H | \NATIVES\MES SAGE1.msg; \NATIVES\ATT ACHMENT1. doc | Path to the record's native file. Every record has a relative path to its native file in this field. **Note**: These paths may also be fully qualified; and thus do not have to be relative. |
| HANDWRITTEN | YES | Field should be marked "YES" if the record has any handwritten notes or other text that is not contained in the text file |
| REDACTED | YES | Field should be marked "YES" if the record contains any redactions, "NO" otherwise |

Metadata Fields Required Upon Specific Request

| TAGS | FirstPass\Respon sive; FirstPass\ForQC | If requested—a list of tags assigned to the record. Multiple tags are separated by the multi-value separator, for example: "A; B; C", and nested tags are denoted using the nested value separator, for example: "X\Y\Z". Tags for attachments will appear under the custom field "ATTACHMENT_TAGS". |
|---|---|---|
| FOLDERS | JohnDoeDocs\Fir stPass | If requested—a list of folders of which the record is a part. Multiple folders are separated by the multi-value separator, for example: "A; B; C", and nested folders are denoted using the nested value separator, for example: "X\Y\Z". Folders for attachments will appear under the custom field "ATTACHMENT_FOLDERS". |