UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DONALD J. TRUMP, DONALD J. TRUMP
JR., ERIC TRUMP, IVANKA TRUMP,

and

THE DONALD J. TRUMP REVOCABLE
TRUST, THE TRUMP ORGANIZATION,
INC., TRUMP ORGANZATION LLC, DJT
HOLDINGS LLC, DJT HOLDINGS
MANAGING MEMBER LLC, TRUMP
ACQUISITION LLC, and TRUMP
ACQUISITION, CORP.,

                                        Plaintiffs,

                - against -

DEUTSCHE BANK AG and CAPITAL ONE
FINANCIAL CORP.,

                                        Defendants,

and

COMMITTEE ON FINANCIAL SERVICES
OF THE U.S. HOUSE OF
REPRESENTATIVES and PERMANENT
SELECT COMMITTEE ON
INTELLIGENCE OF THE U.S. HOUSE OF
REPRESENTATIVES,

                                        Intervenor-Defendants.

Docket No. 1:19-cv-03826-ER

**REPLY IN SUPPORT OF
PLAINTIFFS' MOTION FOR A
PRELIMINARY INJUNCTION**

## INTRODUCTION

The Committees spend most of their opposition trying to convince the Court that they will prevail on the merits. That approach misses the point. A preliminary injunction should be granted if Plaintiffs have raised "sufficiently serious questions going to the merits to make them a fair ground for … litigation." *In re Leatherstocking Antiques, Inc.*, 2013 WL 5526581, at *4 (S.D.N.Y. Sept. 30, 2013) (Ramos, J.). The "serious questions" standard governs here because the equities heavily favor Plaintiffs, as the D.C. Circuit held in a virtually identical case. *U.S. Servicemen's Fund v. Eastland*, 488 F.3d 1252, 1256-57 (D.C. Cir. 1973).

Plaintiffs have identified several serious questions that warrant preserving the status quo. If the Court accepts the Committees' view of the law, then Congress can issue a subpoena on any matter, at any time, for any reason, to any person, and there is basically nothing a federal court can do about it. Yet, under our Constitution, "[t]he powers of the legislature are defined, and limited." *Marbury v. Madison*, 5 U.S. 137, 176 (1803). Congress' power to investigate is no exception. *See Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 504 n.15 (1975) ("[T]he power to investigate … is not unlimited."); *Barenblatt v. United States*, 360 U.S. 109, 111 (1959) ("[Congress'] power of inquiry … is not … without limitations."); *Watkins v. United States*, 354 U.S. 178, 187 (1957) ("[Congress'] power of inquiry … is not unlimited."); *Quinn v. United States*, 349 U.S. 155, 161 (1955) ("[Congress'] power to investigate … is … subject to recognized limitations."); *McGrain v. Daugherty*, 273 U.S. 135, 173-74 (1927) ("[Congress] is invested … only with [a] limited power of inquiry."). The Supreme Court has recognized limits on Congress' power to investigate: Congress must, among other things, have a legitimate legislative purpose, not exercise law-enforcement authority, not exceed the relevant committee's jurisdiction, and not make overbroad or impertinent requests.

Notwithstanding the Committees' incredible assertion that these subpoenas are part of some innocent effort to conduct a "case study," Opp. 16, the subpoenas to Deutsche Bank and Capital One

(which the Committees have finally allowed Plaintiffs to see) do not comply with the limits on Congress's investigative authority. The subpoenas are impermissibly overbroad: They seek reams of information, often without any limitation on time or place or subject, about countless individuals, including the President's grandchildren. The Capital One subpoena is a transparent attempt to conduct a law-enforcement investigation into whether the President's businesses violated civil or criminal law. And the Deutsche Bank subpoena is not connected to any plausible legislation within the Intelligence Committee's jurisdiction. Further, both subpoenas violate the Right to Financial Privacy Act. The text, context, purpose, and history of the RFPA demonstrate that it applies to Congress—a serious question that this Court will be the first in the country to decide.

For all these reasons, Plaintiffs are entitled to a preliminary injunction. This Court should grant one to maintain the status quo and allow this case to proceed to final judgment in an orderly fashion.[1]

## ARGUMENT

### I.   Plaintiffs are entitled to a preliminary injunction under the "serious questions" standard.

When a plaintiff demonstrates "irreparable harm," he can obtain a preliminary injunction under two separate standards: "either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for the litigation plus a balance of hardships 'tipping decidedly' in [his] favor." *Leatherstocking*, 2013 WL 5526581, at *4. The Committees do not argue otherwise. While they surmise that these standards might lack "any meaningful distinction," Opp. 10 n.28, the Second Circuit disagrees. The serious-questions standard "softens" the traditional likelihood-of-success factor, *Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*,

---

[1] The Court should reject the Committees' request to invoke Rule 65(a)(2) and "consolidate" the preliminary-injunction hearing with a trial on the merits. Opp. 2. The Court cannot conduct a full-blown trial at this early stage of the case—before the Committees have filed responsive pleadings, before Plaintiffs have received any discovery or much time to prepare, and before the parties have fully briefed the merits. If the Committees want to proceed to final judgment, they are free to file a motion to dismiss or motion for summary judgment at any time. Due process requires the Committees to use those procedures, rather than skipping straight to trial. *Gelman v. Maryland*, 538 F.2d 603, 606-07 (4th Cir. 1976).

598 F.3d 30, 37 (2d Cir. 2010); is a "more flexible standard for a preliminary injunction," *id.* at 38; and can be met even when a plaintiff is *not* likely to succeed on the merits, *see, e.g.*, *id.* at 33-34, 39-40.

The serious-questions standard applies here because the equities tip decidedly in Plaintiffs' favor. Denying a preliminary injunction would forever moot this case, foreclose Plaintiffs' right to judicial review, and destroy the confidentiality of their sensitive financial information. Granting a preliminary injunction, on the other hand, would, at most, delay the Committees' receipt of Plaintiffs' information. *See infra* II.B-D; Mot. 6-7, 13-15. This striking imbalance is why the D.C. Circuit applied the "serious … questions" standard in *Eastland* to preliminarily block a congressional subpoena to a third-party bank. 488 F.2d at 1256-57. The "irreparable harm" that the D.C. Circuit found "decisive" in *Eastland*, *id.* at 1256, had nothing to do with the First Amendment. *Contra* Opp. 23-24. It was the "likelihood" that, once the subpoena's due date arrived, the third-party custodian "to whom plaintiffs have entrusted information" would produce it to Congress and "[the] case will be mooted." *Id.* That case-ending risk is precisely what Plaintiffs face here.[2]

Because the balance of equities is so lopsided, Plaintiffs are entitled to a preliminary injunction if they identify "serious questions" on the merits. They have. Whether the RFPA applies to Congress is a question of first impression; this Court will be the first to decide it, and Plaintiffs have presented a host of arguments for why Congress is not exempt from that statute's requirements. *Infra* II.A.ii; Mot. 11-12. As for the subpoenas' constitutionality, this case presents novel and important questions about the outer limits of Congress' power to investigate. *Infra* II.A.i; Mot. 8-10. Never before has Congress used its investigatory powers to rifle through the private financial information of a sitting

---

[2] *Eastland*'s holdings on the propriety of interim relief remain good law, and the Committees do not argue otherwise. While the Supreme Court ultimately reversed the D.C. Circuit's final merits decision, it never reviewed the D.C. Circuit's grants of interim relief. In fact, the Supreme Court *praised* the D.C. Circuit's handling of the preliminary issues in the case. It affirmed individuals' right to challenge a congressional subpoena to a third-party custodian, and it highlighted the risk that "compliance by the third person could frustrate any judicial inquiry" into the subpoena's legality. *Eastland*, 421 U.S. at 501 n.14. The only way to avoid that risk, of course, is to grant interim relief like the D.C. Circuit did in *Eastland* and this Court should do here.

President, his family, and his businesses. This case thus raises serious separation-of-powers concerns that were not present in any of the cases that the Committees rely on in their opposition. *See Comm. on Judiciary of U.S. House of Representatives v. Miers*, 542 F.3d 909, 911 (D.C. Cir. 2008) (staying a congressional subpoena based solely on the "potentially great significance for the balance of power between the Legislative and Executive Branches").

Embracing the Committees' position in this case, moreover, would have massive ramifications going forward. According to the Committees, a single committee chair can obtain a sitting President's entire life's worth of private financial records whenever he wants. The chair simply needs to say that he wants to use the President as a "case study" or search for "potential conflicts of interest," Opp. 16-17—justifications he can *always* raise because he does not need any factual basis to start an investigation, Opp. 12-13, he is not limited to information from the President's time in office, Opp. 16, and the courts cannot question his reasoning, Opp. 18-19. And in Congress' quest for the President's information, it can threaten his bankers, accountants, attorneys, friends, and children with contempt. At a minimum, then, the Committees' position means that nonstop investigations into the personal lives of Presidents (motivated by the hope of finding politically damaging information) will be the new normal whenever the President is from a different political party than the House or Senate.

But the Committees' logic does not stop with the President. If Congress can conduct limitless, suspicion-free, judicially-unquestionable investigations to conduct "case studies" or find "potential conflicts of interest," then it can subpoena *anyone's* private financial records. It could freely comb through the credit-card purchases, accounting documents, banking records, and investment portfolios of Cabinet heads, private companies, fellow Congressmen, political opponents, and even federal judges—as well the records of their families, and their families' families. This Court would do well to pause, and at least receive full briefing and argument on the merits of these serious constitutional questions, before endorsing the Committees' unchecked view of congressional subpoena power.

II.     **The traditional four factors for a preliminary injunction also favor Plaintiffs.**

      A.     **Likelihood of Success on the Merits**

            i.     **The subpoenas lack a legitimate legislative purpose.**

The Committees have finally relented and given Plaintiffs copies of the subpoenas to Deutsche Bank and Capital One. Now that Plaintiffs have reviewed them, it is clear that they exceed Congress's legislative authority. Before explaining why, it is important to make two critical points of law.

First, this Court must review whether the subpoenas exceed Congress's Article I authority. The Committees' suggestion that courts cannot "adjudicate the motivations of the Committees" is confusing, since they acknowledge that the governing legal standard is "whether a legitimate legislative *purpose* is present," *Eastland*, 421 U.S. at 501 n.14 (emphasis added). *See* Opp. 13-19. To apply that standard, "[t]he object of the particular inquiry in question must be examined." *Shelton v. United States*, 404 F.2d 1292, 1297 (D.C. Cir. 1968). Courts do this—without improperly second-guessing legislators—by consulting objective "sources" of purpose, such as the text of the request and "statements of the members of the committee." *Id.*; *see also McGrain*, 273 U.S. at 180 (noting that the case would be different if Congress had "affirmatively" avowed "an inadmissible or unlawful object" for the investigation). Further, courts must examine Congress' purpose and the nature of the request to ensure that a congressional investigation is not being "confused with any of the powers of law enforcement … assigned under our Constitution to the Executive and the Judiciary." *Quinn*, 349 U.S. at 161. Courts are deferential to Congress only after they ensure that it is not using investigations to transgress the separation of powers. *See McGrain*, 273 U.S. at 178 (deferring to Congress only after looking at "the subject-matter" of the investigation and determining that legislation rather than law enforcement "was the real object"); *Barenblatt*, 360 U.S. at 132-33 (stating that courts should defer to

Congress "[s]o long as Congress acts in pursuance of its constitutional power" and checking to see that "'the primary purposes of the inquiry were in aid of legislative processes'").[3]

Second, this Court must investigate whether the subpoenas are pertinent to their supposed legislative purposes, and narrow them if they are overbroad. *Contra* Opp. 12-13. Pertinency "is a jurisdictional concept … drawn from the nature of a congressional committee's source of authority." *Watkins*, 354 U.S. at 206. It is both a defense to contempt and a ground for proactively enjoining a congressional subpoena. *See Bergman v. Senate Special Comm. on Aging*, 389 F. Supp. 1127, 1130 (S.D.N.Y. 1975); *Hearst v. Black*, 87 F.2d 68, 71 (D.C. Cir. 1936). While Congress does not violate the law every time an investigation turns out to be a dead end, courts must ensure that subpoenas are "reasonably relevant" to their legitimate legislative purpose. *McPhaul v. United States*, 364 U.S. 372, 381-82 (1960). And while courts give Congress some leeway to color outside the lines, they do not hesitate to narrow overbroad subpoenas "to the extent" they exceed the committee's statutory or constitutional authority. *Bergman*, 389 F. Supp. at 1130-31. If the law were otherwise, then Congress could easily circumvent the Constitution by bundling illegitimate requests with legitimate ones. That is why "'[t]he burden is on the court to see that the subpoena is good in its entirety.'" *United States v. Patterson*, 206 F.2d 433, 434 (D.C. Cir. 1953).

Given these principles, the Committees' subpoenas to the Banks are invalid and overbroad. While the Committees cite several subject areas that they are generally investigating, *see* Opp. 2-8, they make only two arguments to justify their subpoenas of *Plaintiffs'* records. According to the Committees, the purpose of the Capital One subpoena is to use "Mr. Trump, his family, and his businesses … as a useful case study" to learn about "unsafe lending practices" and "money

---

[3] And, like any litigant, the Committees are subject to the ordinary rules of waiver and forfeiture. *See United States v. Bullock*, 632 F.3d 1004, 1014 n.1 (7th Cir. 2011); *Cissell Mfg. Co. v. U.S. Dep't of Labor*, 101 F.3d 1132, 1143 (6th Cir. 1996). This Court must take this case as it comes, and cannot invoke potential legislative purposes for the subpoenas that the Committees chose not to brief.

laundering." Opp. 16. And the purpose of the Deutsche Bank subpoena is to uncover "financial or other leverage that foreign powers may possess over Mr. Trump, his family, and his business." Opp. 16. These justifications do not satisfy the "legitimate legislative purpose" standard.

**Capital One**: The Capital One subpoena is a blatant attempt by a congressional committee to exercise "the powers of law enforcement." *Quinn*, 349 U.S. at 161. The Financial Services Committee is trying to determine whether the President engaged in business practices that violated civil or criminal law. That is why the subpoena exclusively targets the President's businesses, *see* Dkt. 51-3 at 4, and asks Capital One to reveal whether it or others suspected that Plaintiffs engaged in illegal activity, *see* Dkt. 51-3 at 4-5. Congress cannot justify a law-enforcement investigation into specific individuals by asserting that those individuals are just a "case study" for remedial legislation. Congress could use that reasoning to justify *any* federal law-enforcement investigation into *anyone*— nullifying the separation-of-powers principle that Congress cannot use investigations to exercise the "functions of the executive and judicial departments." *Watkins*, 354 U.S. at 187. Courts do not allow Congress to circumvent the Constitution with this kind of nonfalsifiable, circular logic. *See Shelton*, 404 F.2d at 1297 ("In deciding whether [Congress'] purpose is within the legislative function, the mere assertion of a need to consider 'remedial legislation' may not alone justify an investigation accompanied with compulsory process.").

Even if the Financial Services Committee were truly using Plaintiffs' documents to study "industry-wide risks" that currently affect the banking sector, Opp. 16, the subpoena to Capital One is wildly overbroad. While the subpoena is generally limited to "July 19, 2016 through the present," it imposes "no time limitation" on "account opening, due diligence, or closing" documents. Dkt. 51-3 at 4. But if the Committee is studying *current* problems in the banking sector, there is no justification for this timeless request. The only reason would be to obtain as much sensitive financial information about the President as possible—*i.e.*, "exposure for the sake of exposure." *Watkins*, 354 U.S. at 199.

This is not a "case study" of a well-known individual who frequently uses banks; it is an attempt to collect private information about a political rival in the hopes of politically damaging him by 2020.

**Deutsche Bank**: Like the Capital One subpoena, the Deutsche Bank subpoena is overbroad. While the Intelligence Committee claims it is investigating whether the President has financial ties to *foreign* powers, it seeks several categories of documents "including, *but not limited to*," foreign individuals, entities, or governments. *See* 51-2 at 3 (emphasis added). The Committees never explain (and cannot explain) why wholly domestic transactions are pertinent to their stated purpose. Nor can they explain why, if they are investigating foreign governments' *current* leverage over the President, they seek all of Plaintiffs' "account applications, opening documents, KYC, due diligence, and closing documents" with "no time limitation." Dkt. 51-2 at 2. The request for all financial documents of the President's grandchildren, and other family members of his children, *see* Dkt. 51-2 at 2, are likewise far afield.

Overbreadth aside, the Deutsche Bank subpoena is not related to any existing or hypothetical legislation within the Intelligence Committee's jurisdiction. The Committee is not *itself* an intelligence agency charged with looking into the President's finances, and it does not identify any legislation that it could enact after investigating "financial or other leverage that foreign powers may possess" over Plaintiffs. Opp. 16. Any such legislation would have to fit within the Committee's jurisdiction over "[i]ntelligence and intelligence-related activities." House Rule X.11(b)(1)(B). And it could not run afoul of the Constitution by, for example, attempting to regulate foreign entities outside of U.S. territorial jurisdiction or attempting to dictate the finances and qualifications of a sitting President. *See Quinn*, 349 U.S. at 161 ("[T]he power to investigate" does not "extend to an area in which Congress is forbidden to legislate."). And, of course, any argument that Congress can investigate these matters for the sake of "oversight" or "informing" the public, disconnected from any pending or future legislation, is a nonstarter. *See Watkins*, 354 U.S. at 200 & n.33; *United States v. Rumely*, 345 U.S. 41, 43-44 (1953).

ii.     **The subpoenas likely violate the RFPA.**

Plaintiffs are also likely to succeed on their RFPA claim. As Plaintiffs have explained, the RFPA was enacted to "protect and preserve the confidential relationship between [financial] institutions and their customers and the constitutional rights of those customers." H.R. 9142, 95th Cong., Sec. 2(b) (1977). To that end, it requires any federal "government authority" to follow specific procedures—including notifications and certifications—before obtaining records from a financial institution. 12 U.S.C. §§3402-05. The Committees concede that those steps were not followed here.

The Committees' only defense is that they are above the law because, in their view, "the RFPA does not apply to Congress." Opp. 19-20. The Committees' primary argument for an implied exception to the RFPA's reach rests upon the statute's definition of "government authority," which is "any agency or department of the United States, or any officer, employee, or agent thereof." §3401. The Committees argue that the Court should construe this language narrowly to reach only the executive branch, leaving Congress free among federal authorities to demand the records of any customer. This misconstrues the text, context, and purpose of the RFPA, and would undermine the "serious concern for the privacy interests of individuals in their bank records" that motivated the Act's passage. *Botero-Zea v. United States*, 915 F. Supp. 614, 619 (S.D.N.Y. 1996).

To begin, the Committees ignore the expansive reach of the relevant provision. "Government authority" is a broad term that plainly covers congressional committees when read "in the ordinary sense" of that term. *Cochise Consultancy, Inc. v. U.S. ex rel. Hunt*, ___ S.Ct.. ___, ___ (May 13, 2019); *see, e.g.*, Black's Law Dictionary (rev. 4th 1968) (defining authority "in government law" to mean "the right and power of public officers to require obedience to their orders lawfully issued in the scope of their public duties"). Indeed, in their opposition, the Committees repeatedly invoke their "authority" as members of the duly-elected government. Opp. 10-11, 15, 17. The RFPA's statutory definition of "government authority" is not narrower than the ordinary meaning. The Committees never actually

discuss the text of the relevant provision, which defines "government authority" to "mean[] *any* agency or department of the United States, or any officer, employee, or agent thereof." §3401(3) (emphasis added). And the Committees do not dispute that "any" is a broad term of inclusion, or that the legislative branch is often been referred to as a federal "department." Mot. 12.

Instead, the Committees argue that the definition of "government authority" extends only to the "Executive branch," not "more broadly to Congress." Opp.  20. That reading does not work. To begin, the Committees are asking this Court to read an implied exception into the statutory scheme. Although the RFPA contains a number of specific exemptions, *see, e.g.*, §3413(c) (tax proceedings); §3413(g) (certain law-enforcement inquiries); §3413(i) (grand jury subpoenas), it does not provide a general exemption for congressional subpoenas. "Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent." *United States v. Smith*, 499 U.S. 160, 167 (1991).

Moreover, the statutory context confirms that Congress expected the RFPA to apply beyond the executive branch. Notably, the statute specifically addresses the one circumstance where congressional inquiries are *not* subject to the RFPA's procedures: when the records request is from "a duly authorized committee or subcommittee of Congress" to "any officer or employee of a supervisory agency." §3412(d). If congressional subpoenas were never intended to come within the statute's scope, there would be no reason to include this provision. Thus, it is the Committees' interpretation—not Plaintiffs'—that renders this provision superfluous. Plaintiffs' interpretation gives this provision a logical purpose: When a supervisory agency has already obtained these documents (presumably in compliance with the RFPA's procedures), Congress is not required to go through the RFPA's notice and certification procedures *again*. Of course, the subpoenas here are directed to Banks, not a supervisory agency, so section 3412(d) cannot help the Committees.

Other textual evidence confirms that the RFPA applies to Congress. Consider that only certain requests by the Government Accountability Office are exempted from the RFPA. *See* §3413(j) ("This chapter shall not apply when financial records are sought by the Government Accountability Office pursuant to an authorized proceeding, investigation, examination or audit directed at a government authority"). But the GAO is a *legislative* agency. *See Bowsher v. Synar*, 478 U.S. 714, 731 (1986); *Cause of Action v. NARA*, 753 F.3d 210, 213-14 (D.C. Cir. 2014) (GAO is among the "legislative agencies"). If the Committees were right that the RFPA is limited to the executive branch, then there would be have been no need to provide an exemption for the GAO—let alone a partial one.[4]

The Committees' nearly exclusive reliance on *Hubbard v. United States*, 514 U.S. 695 (1995), is unavailing. *Hubbard* interpreted the word "department" in the context of a criminal statute, 18 U.S.C. §1001, where different interpretive rules apply. More importantly, *Hubbard* itself reiterated that context—*i.e.*, "'the text of the Act of Congress surrounding the word at issue'"—could dictate a different result in a different case. *Id.* at 700-01. Here, unlike §1001, the context surrounding the RFPA indicates that it was meant to extend beyond the executive branch.

Finally, the Committees scoff at the notion that they would ever subject themselves to the processes required by the RFPA. Opp. 21-22. But Congress enacted the RFPA to push back against the Supreme Court's decision in *United States v. Miller*, and "Congress determined that the best way to protect financial records from unwarranted governmental intrusion without crippling legitimate criminal investigations was to regulate the government's access." *Young v. DOJ*, 882 F.2d 633, 636-37 (2d Cir. 1989). Thus, it would be more surprising if the Committees were correct—if Congress, determined to expand customers' privacy rights in their records, meant to provide a wholesale

---

[4] The Committees' reliance on 5 U.S.C. §551(1)(A) only supports Plaintiffs' interpretation. That provision's definition of "agency" plainly captures the entire executive branch. The RFPA's use of "any *department or* agency," then, must be broader than the entire executive branch. Only Plaintiffs' reading prevents "department" from being mere surplusage.

exemption for its own subpoenas, which (as demonstrated here) can be every bit as obtrusive as traditional law-enforcement investigations.

For all these reasons and more, Plaintiffs will likely prevail on the merits. They will likely prove that Congress lacks a legitimate legislative purpose for the subpoenas to one or both Banks, in full or in part. And they will likely prove that Congress is subject to, and concededly violated, the RFPA.

**B.    Irreparable Harm**

The Committees do not even respond to Plaintiffs' main "irreparable harm" if they are denied a preliminary injunction: the self-evident "likelihood" that "the case will become moot" and Plaintiffs will lose their right to judicial review. *Eastland*, 421 U.S. at 498. "[T]he *most compelling* reason in favor of entering a Rule 65(a) order is the need to prevent the judicial process from being rendered futile by defendant's action or refusal to act." 11A Fed. Prac. & Proc. Civ. §2947 (emphasis added); *accord CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.*, 48 F.3d 618, 620 (1st Cir. 1995) ("The purpose of a preliminary injunction is to preserve the status quo, freezing an existing situation so as to permit the trial court, upon full adjudication of the case's merits, more effectively to remedy discerned wrongs.").

The Committees try to downplay Plaintiffs' other irreparable harm—the disclosure of their confidential information, which this Court has called the "quintessential type of irreparable harm." *Airbnb, Inc. v. City of New York*, 2019 WL 91990, at *23 (S.D.N.Y. Jan. 3, 2019) (Engelmayer, J.). The Committees suggest that they would not disclose Plaintiffs' information to the public, Opp. 23, but that is doubtful. *See United States v. AT&T Co.*, 551 F.2d 384, 394-95 (D.C. Cir. 1976) (explaining that courts must assess "the likelihood of a leak" by committees, which "is magnified if the documents are available to 435 Representatives"); S. Hess, *Why the Leaks Won't Stop*, Politico (Feb. 24, 2017), politi.co/2E70FKK ("Capitol Hill is the natural home of the leak."). And it is irrelevant. Even if the information never goes public, disclosure *to Congress* still irreparably harms Plaintiffs. *See NTEU v. DOT*, 838 F. Supp. 631, 640 (D.D.C. 1993) ("[O]nce … highly personal information is disclosed to

the government, the revelation cannot be undone."); *Airbnb*, 2019 WL 91990, at *23-24 (same). It is cold comfort to Plaintiffs that only the House—an institution controlled by the other political party and that is currently investigating every nook and cranny of the President's life—will have their information.

### C.      Balance of the Equities

If a preliminary injunction is denied, Plaintiffs will forever lose the opportunity to litigate to final judgment because their confidential documents will be disclosed to the Committees. But if a preliminary injunction is granted, the Committees will merely have to wait until the Court adjudicates the merits and issues a judgment in their favor to enforce the subpoenas and obtain Plaintiffs' documents. (Or the Committees will lose on the merits, which means they were never entitled to the documents in the first place.) This balance is lopsided for Plaintiffs. Mot. 12-15.

The Committees' counterarguments are unpersuasive. They note that "numerous entities ... routinely" comply with various types of subpoenas, Opp. 24, but that fact offers no insight into the balance of equities *here*. As for the Committees' "interest in obtaining relevant information," Opp. 25, that has nothing to do with the balance of equities. The balance turns not on which party will win in the end, but on which party will be harmed more by failing to preserve the status quo until final judgment. The Committees' interests in enforcing subpoenas and obtaining information will be fully vindicated (or not) at final judgment; whether Plaintiffs received a preliminary injunction will have nothing to do with it. The Committees' suggestion that they need a decision "before the 116th Congress expires," Opp. 25, does nothing to tip the balance in their favor. *See Miers*, 542 F.3d at 911.

Although the Committees note that they are investigating "live threats to the nation's financial system, election system, and security," they do not argue that preliminarily enjoining *these subpoenas* would imperil those investigations. Opp. 24-25. That argument would be false. As the Committees admit, they are conducting "much broader investigations" that "include the issuance of subpoenas

seeking information from other financial institutions about their practices with respect to clients other than the plaintiffs"—something a preliminary injunction for Plaintiffs would not affect. Opp. 2. The Committees have no pressing need for *the President's* business records, which they admit would only be used as a "case study." Opp. 16. And the Committees could still enforce the portions of the Deutsche Bank subpoena that does not pertain to Plaintiffs. Even if Plaintiffs' documents were somehow crucial, there is no urgency to get them: the subpoenas mostly concern documents from years ago, the Committees waited several months into the 116th Congress before issuing them, and the Committees already agreed to delay enforcement until this Court rules on the motion for a preliminary injunction. Thus, the Committees' assertion that their "interest … would be severely harmed by *any* injunctive relief in this case" cannot be taken seriously. Opp. 25 (emphasis added).

Finally, the Banks would benefit from interim relief as well, which further justifies granting Plaintiffs' motion. The Banks face legal jeopardy if they comply with the Committees' subpoenas and then this Court (or an appellate court) later holds that the subpoenas were illegally issued. Mot. 13-14. Notably, the Committees do not even address this important issue. But this Court cannot ignore it. Congress has no power and thus no interest in forcing third-party custodians to comply with a subpoena before its validity is litigated. *See United States v. Deloitte LLP*, 610 F.3d 129, 142 (D.C. Cir. 2010). Granting the preliminary injunction ensures that the Banks can "await a court ruling on [Plaintiffs'] challenge" to the Committees' subpoenas before complying. *United States v. AT&T Co.*, 567 F.2d 121, 129 (D.C. Cir. 1977). The Committees' interests thus pale in comparison to the harms that both Plaintiffs and the Banks will suffer absent interim relief.

### D.     Public Interest

Because the Committees are governmental defendants, the balance of equities and public interest largely merge. The public interest thus favors granting Plaintiffs' motion for the reasons already identified. And the negligible harm to the public from a delay in the subpoenas' enforcement

is not nearly as powerful as the public interests in ensuring that Congress follows the law and in protecting the confidentiality of Plaintiffs' information.

"Applying the law in a way that violates the Constitution is *never* in the public's interest." *Minney v. OPM*, 130 F. Supp. 3d 225, 236 (D.D.C. 2015); *see NTEU*, 838 F. Supp. at 640 ("[T]he public may be deemed to have an overriding interest in assuring that the government remains within the limit of its constitutional authority."); *Verlo v. Martinez*, 820 F.3d 1113, 1127 (10th Cir. 2016) ("'[I]t is always in the public interest to prevent the violation of a party's constitutional rights.'"); *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (same); *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) (same). This case is no exception. No public interest is advanced by allowing the Committees to enforce illegal subpoenas. If anything, ensuring that the Committees follow the law is especially important given the serious separation-of-powers issues that these subpoenas raise.

"The public," moreover, "has an interest in enforcing contractual agreements and ensuring the confidentiality of a private business's information." *Robert Half Int'l Inc. v. Billingham*, 315 F. Supp. 3d 419, 435 (D.D.C. 2018); *accord Human Touch DC, Inc. v. Merriweather*, 2015 WL 12564166, at *5 (D.D.C. May 26, 2015) (similar); *Saini v. Intern. Game Technology*, 434 F. Supp. 2d 913, 925 (D. Nev. 2006) ("[T]here is a public interest in enforcing confidentiality agreements."). These subpoenas seek confidential financial information protected by law. No public interest is served by disclosing the information to the Committees during the pendency of this action. "Although … the public has an interest in ensuring that the [government] can exercise its authority," "Defendants offer no persuasive argument that there is an immediate public interest in enforcing … [now] rather than after a full hearing." *Cigar Ass'n of Am. v. FDA*, 317 F. Supp. 3d 555, 563 (D.D.C. 2018).

## CONCLUSION

Plaintiffs respectfully ask for a preliminary injunction prohibiting Defendants from enforcing or complying with the subpoenas until this Court issues a final judgment.

Respectfully submitted,

Dated: May 15, 2019

 _s/ Patrick Strawbridge_____

Marc L. Mukasey
Mukasey Frenchman & Sklaroff LLP
250 Park Avenue, 7th Floor
New York, NY 10177
347-527-3940
marc.mukasey@mukaseylaw.com

Patrick Strawbridge
CONSOVOY MCCARTHY PARK PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02109
patrick@consovoymccarthy.com

*Counsel for The Donald J. Trump Revocable Trust,*
*The Trump Organization, Inc., Trump Organization*
*LLC, The Trump Corporation, DJT Holdings LLC,*
*DJT Holdings Managing Member LLC, Trump*
*Acquisition LLC, and Trump Acquisition, Corp.*

William S. Consovoy
Cameron T. Norris
CONSOVOY MCCARTHY PARK PLLC
3033 Wilson Blvd., Ste. 700
Arlington, VA 22201
(703) 243-9423
will@consovoymccarthy.com
cam@consovoymccarthy.com

*Counsel for President Donald J. Trump,*
*Donald J. Trump Jr., Eric Trump, and Ivanka Trump*