19-1540-cv
Donald J. Trump v. Deutsche Bank AG

## UNITED STATES COURT OF APPEALS

### FOR THE SECOND CIRCUIT

August Term 2019

Argued:  August 23, 2019          Decided: December 3, 2019

Docket No. 19-1540-cv

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

DONALD J. TRUMP, DONALD J. TRUMP, JR., ERIC
TRUMP, IVANKA TRUMP, DONALD J. TRUMP
REVOCABLE TRUST, TRUMP ORGANIZATION, INC.,
TRUMP ORGANIZATION LLC, DJT HOLDINGS LLC,
DJT HOLDINGS MANAGING MEMBER LLC, TRUMP
ACQUISITION LLC, TRUMP ACQUISITION, CORP.,

Plaintiffs - Appellants,

v.

DEUTSCHE BANK AG, CAPITAL ONE FINANCIAL
CORPORATION,

Defendants - Appellees,

COMMITTEE ON FINANCIAL SERVICES OF THE
UNITED STATES HOUSE OF REPRESENTATIVES,
PERMANENT SELECT COMMITTEE ON
INTELLIGENCE OF THE UNITED STATES HOUSE
OF REPRESENTATIVES,

Intervenor Defendants - Appellees.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Before: NEWMAN, HALL, and LIVINGSTON, *Circuit Judges*.

Expedited interlocutory appeal from the May 22, 2019, order of the District Court for the Southern District of New York (Edgardo Ramos, District Judge) denying Plaintiffs-Appellants' motion for a preliminary injunction to prevent the Defendants-Appellees' compliance with subpoenas issued to them by the Intervenor Defendants-Appellees and denying Plaintiffs-Appellants' motion for a stay pending appeal.

Affirmed in substantial part and remanded in part. Judge Livingston concurs in part and dissents in part with a separate opinion.

> Patrick Strawbridge, Consovoy McCarthy PLLC, Boston, MA (William S. Consovoy, Cameron T. Norris, Consovoy McCarthy PLLC, Arlington, VA, Marc Lee Mukasey, Mukasey Frenchman & Sklaroff LLP, New York, NY, *on the brief*), for Plaintiffs-Appellants Donald J. Trump, Donald J. Trump, Jr., Eric Trump, Ivanka Trump, Donald J. Trump Revocable Trust, Trump Organization, Inc., Trump Organization LLC, DJT Holdings LLC, DJT Holdings Managing Member LLC, Trump Acquisition LLC, Trump Acquisition, Corp.

> Douglas N. Letter, General Counsel, U.S. House of Representatives, Washington, D.C. (Todd B. Tatelman, Dep. General Counsel, Megan

Barbero, Josephine Morse, Assoc. General Counsel, Office of General Counsel, U.S. House of Representatives, Washington, D.C., *on the brief*), for Intervenor Defendants-Appellees Committee on Financial Services and Permanent Select Committee on Intelligence of the United States House of Representatives.

Parvin D. Moyne, Akin Gump Strauss Hauer & Feld LLP, New York, NY (Thomas C. Moyer, Raphael A. Prober, Steven R. Ross, Akin Gump Strauss Hauer & Feld LLP, Washington, D.C.), for Defendant-Appellee Deutsche Bank AG.

James A. Murphy, Murphy & McGonigle, PC, New York, NY (Steven D. Feldman, Murphy & McGonigle, PC, New York, NY), for Defendant-Appellee Capital One Financial Corporation.

(Dennis Fan, Mark R. Freeman, Scott R. McIntosh, Appellate Staff Attys., Joseph H. Hunt, Asst. Atty. General, Hashim M. Mooppan, Dep. Asst. Atty. General, Civil Division, U.S. Dept. of Justice, Washington, D.C., for amicus curiae United States of America.)

(Brianne J. Gorod, Elizabeth B. Wydra, Brian R. Frazelle, Ashwin P. Phatak, Constitutional Accountability Center, Washington, D.C., for amicus curiae Constitutional Accountability Center, in support of Intervenor Defendants-Appellees.)

3

JON O. NEWMAN, Circuit Judge:

This appeal raises an important issue concerning the investigative authority of two committees of the United States House of Representatives and the protection of privacy due the President of the United States suing in his individual, not official, capacity with respect to financial records. The specific issue is the lawfulness of three subpoenas issued by the House Committee on Financial Services and the House Permanent Select Committee on Intelligence (collectively, "Committees" or "Intervenors") to two banks, Deutsche Bank AG and Capital One Financial Corporation ("Capital One") (collectively, "Banks"). The subpoenas issued by each of the Committees to Deutsche Bank ("Deutsche Bank Subpoenas") seek identical records of President Donald J. Trump ("Lead Plaintiff"), members of his family, The Trump Organization, Inc. ("Trump Organization"), and several affiliated entities (collectively, "Plaintiffs" or "Appellants"). The subpoena issued by the Committee on Financial Services to Capital One ("Capital One Subpoena") seeks records of the Trump Organization and several affiliated entities. The Capital One Subpoena does not list the Lead Plaintiff or members of his family by name, but might seek their records in the event they are a principal, director, shareholder, or officer of any of the listed entities.

The issue of the lawfulness of the three subpoenas arises on an expedited interlocutory appeal from the May 22, 2019, Order of the District Court for the Southern District of New York (Edgardo Ramos, District Judge) ("Order") denying Plaintiffs' motion for a preliminary injunction to prevent the Banks' compliance with the subpoenas and denying Plaintiffs' motion for a stay pending appeal.

We affirm the Order in substantial part to the extent that it denied a preliminary injunction and order prompt compliance with the subpoenas, except that the case is remanded to a limited extent for implementation of the procedure set forth in this opinion concerning the nondisclosure of sensitive personal information and a limited opportunity for Appellants to object to disclosure of other specific documents within the coverage of those paragraphs of the Deutsche Bank Subpoenas listed in this opinion. We dismiss as moot the appeal from the Order to the extent that it denied a stay pending appeal because the Committees agreed not to require compliance with the subpoenas pending the appeal, once the appeal was expedited.

In her partial dissent, Judge Livingston prefers a total remand of the case for "creation of a record that is sufficient more closely to examine the serious questions that the Plaintiffs have raised," Part Diss. Op. at 10–11, and to "afford

the parties an opportunity to negotiate," *id*. at 11. We discuss at pages 69–72 of this

opinion not only why such a remand is not warranted but why it would also run

counter to the instruction the Supreme Court has given to courts considering

attempts to have the Judicial Branch interfere with a lawful exercise of the

congressional authority of the Legislative Branch.

Background

*The subpoenas*. The case concerns three subpoenas issued by committees of

the United States House of Representatives. On April 11 of this year, the

Committee on Financial Services and the Permanent Select Committee on

Intelligence each issued identical subpoenas to Deutsche Bank, seeking a broad

range of financial records of Donald J. Trump, members of his family, and

affiliated entities. On the same date, the Committee on Financial Services issued a

subpoena of narrower scope to Capital One Financial Corporation.[1] We detail the

scope of the subpoenas in Part II(C).

*Litigation procedure*. On April 29, Donald J. Trump, his three oldest children,

the Trump Organization, and six entities affiliated with either the Lead Plaintiff or

---

[1] The subpoenas issued by the Committee on Financial Services are not dated, but we were informed at oral argument that they were issued on April 11.

6

the Trump Organization[2] filed a complaint in the District Court seeking a

declaratory judgment that the subpoenas are invalid and an injunction "quashing"

the subpoenas and enjoining compliance with them.[3] On May 3, the Plaintiffs filed

a motion for a preliminary injunction,[4] and the District Court granted the

Committees' joint motion to intervene.[5] The Plaintiffs and the Committees then

agreed to an expedited briefing schedule for the motion for a preliminary

injunction.[6] Deutsche Bank notified the District Court that it took no position on

the Plaintiffs' request for limited expedited discovery,[7] and Capital One notified

the District Court that it took no position on the Plaintiffs' request for an order

requiring the Committees to provide Plaintiffs with copies of the subpoenas.[8]

On May 22, the District Court held a hearing on the Plaintiffs' motion for a

preliminary injunction and denied it, reading into the record an extensive

opinion.[9] On May 24, the Plaintiffs filed a notice of an interlocutory appeal. On

---

[2] They are Donald J. Trump Revocable Trust, Trump Organization LLC, DJT Holdings LLC, DJT Holdings Managing Member LLC, Trump Acquisition LLC, and Trump Acquisition, Corp.

[3] *Trump v. Deutsche Bank*, No. 19-cv-3826 (S.D.N.Y. 2019), Dkt. No. 1 (Apr. 29, 2019).

[4] *Id.*, Dkt. No. 26 (May 3, 2019).

[5] *Id.*, Dkt. No. 31 (May 3, 2019).

[6] *Id.*, Dkt. No. 21 (May 1, 2019).

[7] *Id.*, Dkt. No. 38 (May 7, 2019).

[8] *Id.*, Dkt. No. 40 (May 7, 2019).

[9] *Id.*, Dkt. No. 59 (May 22, 2019).

May 25, the parties submitted a joint motion to stay proceedings in the District Court pending the appeal,[10] which the District Court granted on May 28.[11]

On May 25, the parties jointly moved in this Court for an expedited appeal,[12] which was granted on May 31.[13] Thereafter, the Banks informed us that they take no position with respect to the appeal.[14] Nevertheless, we requested counsel for the Banks to attend the oral argument to be available to respond to any questions the panel might have.[15] We requested the Committees to provide unredacted copies of the Deutsche Bank subpoenas, which we have received under seal. We also inquired of the United States Solicitor General whether the United States would like to submit its view on the issues raised on this appeal.[16] On August 19, the United States submitted a brief as amicus curiae, urging reversal of the District

---

[10] *Id.*, Dkt. No. 61 (May 25, 2019).

[11] *Id.*, Dkt. No. 62 (May 28, 2019).

[12] *Trump v. Deutsche Bank*, No. 19-1540 (2d Cir. 2019), Dkt. No. 5 (May 25, 2019).

[13] *Id.*, Dkt. No. 8 (May 31, 2019). In the parties' joint motion to expedite the appeal, the Committees agreed that if the appeal <u>were</u> expedited, they would suspend compliance with the subpoenas during the pendency of the appeal "except to the extent the subpoenas call for the production of documents unrelated to any person or entity affiliated with Plaintiff-Appellants." J. Mot. to Expedite at 2, *id.*, Dkt. No. 5 (May 25, 2019). Granting the motion to expedite the appeal has therefore rendered moot the appeal from the District Court's order to the extent that it denied a stay pending appeal.

[14] *Id.*, Dkt. Nos. 66 (July 11, 2019), 71 (July 12, 2019).

[15] *Id.*, Dkt. No. 81 (July 17, 2019).

[16] *Id.*, Dkt. No. 80 (July 17, 2019).

Court's order denying a preliminary injunction,[17] to which the Committees and

Appellants responded on August 21.[18] On August 23, we heard oral argument.

The oral argument precipitated letters from the parties to this Court

concerning tax returns sought pursuant to the subpoenas. These letters and

subsequent procedural developments are discussed in Part II(B).

Discussion

We emphasize at the outset that the issues raised by this litigation do not

concern a dispute between the Legislative and Executive Branches. As to such a

dispute, as occurs where the Justice Department, suing on behalf of the United

States, seeks an injunction to prevent a third party from responding to a

congressional committee's subpoena seeking documents of a department or

agency of the Executive Branch, *see*, *e.g.*, *United States v. AT&T*, 567 F.2d 121, 122

(D.C. Cir. 1977) ("*AT&T II*"), the Judicial Branch proceeds with caution, *see id*. at

123 (seeking to "avoid a resolution that might disturb the balance of power

between the two branches"), sometimes encountering issues of justiciability in

advance of the merits, *see United States v. AT&T*, 551 F.2d 384, 390 (D.C. Cir. 1976)

("*AT&T I*"). Although the challenged subpoenas seek financial records of the

---

[17] *Id.*, Dkt. No. 143 (Aug. 19, 2019).
[18] *Id.*, Dkt. Nos. 148, 149 (Aug. 21, 2019).

person who is the President, no documents are sought reflecting any actions taken by Donald J. Trump acting in his official capacity as President. Indeed, the Complaint explicitly states that "President Trump brings this suit solely in his capacity as a private citizen." Complaint ¶ 13. Appellants underscore this point by declining in this Court to assert as barriers to compliance with the subpoenas any privilege that might be available to the President in his official capacity, such as executive privilege. *See Franchise Tax Board v. Hyatt*, 139 S. Ct. 1485, 1499 (2019) (citing *United States v. Nixon*, 418 U.S. 683, 705–06 (1974)). The protection sought is the protection from compelled disclosure alleged to be beyond the constitutional authority of the Committees, a protection that, if validly asserted, would be available to any private individual. *See Barenblatt v. United States*, 360 U.S. 109 (1959); *Watkins v. United States*, 354 U.S. 178 (1957). For this reason, in the remainder of this opinion we will refer to President Trump as the "Lead Plaintiff"; the formal title "President Trump" might mislead some to think that his official records are sought, and the locution "Mr. Trump," sometimes used in this litigation, might seem to some disrespectful.

Also at the outset, we note that there is no dispute that Plaintiffs had standing in the District Court to challenge the lawfulness of the Committees'

subpoenas by seeking injunctive relief against the Banks as custodians of the documents. *See United States Servicemen's Fund v. Eastland*, 488 F.2d 1252, 1260 (D.C. Cir. 1973) ("[T]he plaintiffs have no alternative means to vindicate their rights.") (italics omitted), *rev'd on other grounds without questioning plaintiffs' standing*, 421 U.S. 491 (1975).

We review denial of a preliminary injunction for abuse of discretion, *see*, *e.g.*, *Ragbir v. Homan*, 923 F.3d 53, 62 (2d Cir. 2019), but our review is appropriately more exacting where the action sought to be enjoined concerns the President, even though he is suing in his individual, not official, capacity, in view of "'[t]he high respect that is owed to the office of the Chief Executive'" that "'should inform the conduct of [an] entire proceeding,'" *Cheney v. United States District Court*, 542 U.S. 367, 385 (2004) (first brackets in original) (quoting *Clinton v. Jones*, 520 U.S. 681, 707 (1997)).

## I. Preliminary Injunction Standard

In this Circuit, we have repeatedly said that district courts may grant a preliminary injunction where a plaintiff demonstrates irreparable harm and meets either of two standards: "(a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, and

a balance of hardships tipping decidedly in the movant's favor."[19] *Kelly v.*

*Honeywell International, Inc.*, 933 F.3d 173, 184 (2d Cir. 2019) (quotation marks

---

[19] The first component of the "serious-questions" standard has sometimes been phrased as requiring a party seeking a preliminary injunction to show "sufficiently serious questions going to the merits of its claims to make them fair ground for litigation." *Otoe-Missouria Tribe of Indians v. New York State Dep't of Financial Services*, 769 F.3d 105, 110 (2d Cir. 2014). That formulation raises the question whether the referent of "them" is "claims" or "serious questions." Normally, the referent of a pronoun is the word or phrase immediately preceding it. That would mean that a plaintiff's "claims" must be sufficiently serious to make them a fair ground for litigation. But the *Otoe-Missouria Tribe* formulation could also be read to mean that the "serious questions" must be sufficiently serious to make them a fair ground for litigation.

The origin and evolution of the serious-questions standard indicate that what must be sufficiently serious to be a fair ground of litigation are the questions that the plaintiff's claims raise, not the claims themselves (although the distinction probably makes little, if any, difference in practice). The first version of what has become the first component of the serious-questions standard appears in *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738 (2d Cir. 1953), where we referred to "questions going to the merits so serious, substantial, difficult and doubtful, as to make *them* a fair ground for litigation," *id.* at 740 (emphasis added). This formulation was repeated verbatim later the same year in *Unicon Management Corp. v. Koppers Co.*, 366 F.2d 199, 205 (2d Cir. 1966), and *Dino DeLaurentis Cinematografica, S.p.A. v. D-150, Inc.*, 366 F.2d 373, 376 (2d Cir. 1966). This formulation was substantially repeated three years later in *Checker Motors Corp. v. Chrysler Corp.*, 405 F.2d 319 (2d Cir. 1969), but with omission of the word "doubtful," *id.* at 323. Three years later, in *Stark v. New York Stock Exchange*, 466 F.2d 743 (2d Cir. 1972), we shortened the formulation to just "serious questions going to the merits." *Id.* at 744. The following year, in *Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Co.*, 476 F.2d 687 (2d Cir. 1973), we expanded that short version to "serious questions going to the merits which warrant further investigation for trial." *Id.* at 692. Later that year, in *Sonesta International Hotels Corp. v. Wellington Associates*, 483 F.2d 247 (2d Cir. 1973), there first appeared the current version of the formulation, "sufficiently serious questions going to the merits to make *them* a fair ground for litigation." *Id.* at 250 (emphasis added). This formulation was repeated verbatim in a series of cases. *See Triebwasser & Katz v. American Telephone & Telegraph Co.*, 535 F.2d 1356, 1358 (2d Cir. 1976); *New York v. Nuclear Regulatory Commission*, 550 F.2d 745, 750 (2d Cir. 1977); *Selchow & Richter Co. v. McGraw-Hill Book Co.*, 580 F.2d 25, 27 (2d Cir. 1978); *Caulfield v. Board of Education*, 583 F.2d 605, 610 (2d Cir. 1978); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979); *see also* William H. Mulligan, *Foreword—Preliminary Injunction in the Second Circuit*, 43 Brook. L. Rev. 831 (primarily considering requirement of irreparable injury).

Thereafter, this Court and district courts in this Circuit cited *Jackson Dairy* and its formulation of the serious-questions standard innumerable times, as the citing references collected by Westlaw indicate, until in *Plaza Health Laboratories, Inc. v. Perales*, 878 F.2d 577 (2d Cir. 1989), the formulation was rephrased to "sufficiently serious questions going to the merits of

deleted); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979).

The Committees contend that the likelihood-of-success standard applies;

Appellants contend that the serious-questions standard applies.[20]

With respect to irreparable harm, a factor required under either standard,

Appellants contend that compliance with the subpoenas will cause them such

---

its claims to make them fair ground for litigation." *Id*. at 580. *Plaza Health Laboratories* added the phrase "of its claims," thereby creating the grammatical query considered in this footnote. *Plaza Health Laboratories* cited only *Sperry International Trade, Inc. v. Government of Israel*, 670 F.2d 8 (2d Cir. 1982), and *Jackson Dairy*, but both of those opinions had used the traditional formulation without the phrase "of its claims." *See Sperry International Trade*, 670 F. 2d at 110; *Jackson Dairy*, 598 F.2d at 11. A Westlaw search reveals that the *Plaza Health Laboratories* formulation has been used by this Court just fifteen times, and the *Jackson Dairy* formulation has been used 226 times.

In view of the evolution of, and this Court's clear preference for, the *Jackson Dairy* formulation, we will use it in this opinion, thereby avoiding the grammatical query posed by the *Plaza Health Laboratories* formulation. We will also use the article "a" before "fair ground for litigation," which *Plaza Health Laboratories* and some of the opinions citing it omitted, but which is always included in the opinions using the *Jackson Dairy* formulation.

[20] In their reply brief, Appellants contend that "the Committees conceded [in the District Court] that the serious-questions standard applies." Reply Br. for Appellants at 2. They cite footnote 28 of the Committees' memorandum in opposition to the motion for a preliminary injunction. We normally do not consider an issue raised for the first time in a reply brief. *See McBride v. BIC Consumer Products Manufacturing Co.*, 583 F.3d 92, 96 (2d Cir. 2009). In any event, Appellants' claim is without merit.

The Committees' footnote states, "To the extent there is any meaningful distinction between the *Winter* [*v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008)] standard and the 'serious questions' formulation, that has also been used by the Second Circuit in post-*Winter* cases, *see Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 36–38 (2d Cir. 2010), this Court need not consider that nuance here because Mr. Trump has failed to meet the heavy burden required under either standard." Dist. Ct. Dkt. No. 51, at 10 n.28 (citation omitted) (May 10, 2019). Stating that the Lead Plaintiff had not met either the likelihood-of-success standard or the serious-questions standard is not a concession that the lesser standard applies. Moreover, in the sentence of text to which the footnote is appended, the Committees explicitly contend that the higher standard applies, stating that to obtain a preliminary injunction "a plaintiff 'must establish that he is likely to succeed on the merits.'" *Id*. at 10 (quoting *New York Progress & Protection PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2003)).

13

harm. In the District Court, the Committees took the position that whether compliance would cause Appellants irreparable harm would depend on whether the Committees would make public the documents obtained.[21] The District Court ruled that compliance would cause irreparable harm because "plaintiffs have an interest in keeping their records private from everyone, including congresspersons," and "the committees have not committed one way or the other to keeping plaintiffs' records confidential from the public once received." J. App'x 122–23. We agree.

The issue therefore becomes whether Appellants seeking a preliminary injunction had to meet (1) the more rigorous standard of a likelihood of success on the merits or (2) the less rigorous standard of sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of hardships tipping decidedly in their favor.[22]

---

[21] Counsel for the Committees said to the District Court, "[J]ust because documents are turned over to Congress, that itself is not irreparable injury. The question is if Congress was going to disclose them. So just turning it over to Congress is not irreparable injury." J. App'x 111.

[22] One opinion of this Court noted that "[b]ecause the moving party must not only show that there are 'serious questions' going to the merits, but must additionally establish that 'the balance of hardships tips *decidedly*' in its favor, its overall burden is no lighter than the one it bears under the 'likelihood of success' standard." *Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010) (citation omitted) (emphasis in original). Although that might have been the situation on the facts of that case, there can be no doubt, as we have repeatedly said, that the likelihood-of-success standard is more rigorous than the serious-questions standard. *See, e.g., Central Rabbinical Congress of U.S. & Canada v. New York City Dep't of Health & Mental Hygiene*, 763 F.3d 183, 192 (2d Cir. 2014) (likelihood-of-success

14

With slightly different formulations, we have repeatedly stated that the serious-questions standard cannot be used to preliminarily enjoin governmental action. *See Plaza Health Laboratories, Inc. v. Perales*, 878 F.2d 577, 580 (2d Cir. 1989) (applying more rigorous likelihood-of-success standard in affirming denial of preliminary injunction against "governmental action taken in the public interest pursuant to a statutory or regulatory scheme"); *Union Carbide Agricultural Products Co. v. Costle*, 632 F.2d 1014, 1018 (2d Cir. 1980) (same, with respect to "governmental action that is in the public interest"); *Medical Society of State of New York v. Toia*, 560 F.2d 535, 538 (2d Cir. 1977) (same, where "interim relief [enjoining governmental action] may adversely affect the public interest"); *see also Able v. United States*, 44 F.3d 128, 131 (2d Cir. 1995) ("As long as the action to be enjoined is taken pursuant to a statutory or regulatory scheme, even government action with respect to one litigant requires application of the 'likelihood of success' standard.").

Nevertheless, in two decisions, we have affirmed preliminary injunctions against government action issued using the less rigorous serious-questions

standard "more rigorous"); *Red Earth LLC v. United States*, 657 F.3d 138, 143 (2d Cir. 2011) (same); *Metropolitan Taxicab Board of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010) (same); *County of Nassau v. Leavitt*, 524 F.3d 408, 414 (2d Cir. 2008) (same).

standard. *See Haitian Centers Council, Inc. v. McNary*, 969 F.2d 1326, 1342 (2d Cir. 1992) (officials of the Immigration and Naturalization Service enjoined), *judgment vacated as moot sub nom. Sale v. Haitian Centers Council, Inc.*, 509 U.S. 918 (1993); *Mitchell v. Cuomo*, 748 F.2d 804, 806–08 (2d Cir. 1984) (state prison officials enjoined). We have sometimes affirmed decisions that issued or denied preliminary injunctions against government action using both standards. *See Hudson River Sloop Clearwater, Inc. v. Dep't of Navy*, 836 F.2d 760, 763 (2d Cir. 1988) (preliminary injunction denied under both standards); *Patton v. Dole*, 806 F.2d 24, 28–30 (2d Cir. 1986) (preliminary injunction granted under both standards); *Patchogue Nursing Center v. Bowen*, 797 F.2d 1137, 1141–42 (2d Cir. 1986) (preliminary injunction denied under both standards).

*Haitian Centers* noted that "the 'likelihood of success' prong need not *always* be followed merely because a movant seeks to enjoin government action." 969 F.2d at 1339 (emphasis added). Then, building on the statement in *Plaza Health Laboratories* that the less rigorous standard may not be used to enjoin "governmental action *taken in the public interest* pursuant to a statutory or regulatory scheme," 878 F.2d at 580 (emphasis added), *Haitian Centers* noted that "no party has an exclusive claim on the public interest," 969 F.2d at 1339. That

16

point influenced our later decision in *Time Warner Cable of New York City L.P. v. Bloomberg L.P.*, 118 F.3d 917 (2d Cir. 1997), where, noting that "there are public interest concerns on both sides" of the litigation, *id*. at 923, we said that the serious-questions standard "would be applicable," *id.* at 924, even though we ultimately decided the case under the likelihood-of-success standard, *see id.*

In *Able*, we noted that the government action exception to the use of the serious-questions standard "reflects the idea that governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly," 44 F.3d at 131, and that the likelihood-of-success standard was appropriate in that case "where the full play of the democratic process involving both the legislative and executive branches has produced a policy in the name of the public interest embodied in a statute and implementing regulations," *id*. We also pointed out that *Haitian Centers* had approved use of the serious-questions standard to challenge action taken pursuant to a "policy formulated solely by the executive branch." *Id*. Based on these statements, Appellants contend that only the serious-questions standard applies

17

to challenge any action "taken pursuant to a policy formulated by one branch." Reply Br. for Appellants at 3 (quotation marks and brackets omitted).

We think that argument fails by endeavoring to make a requirement out of the sentences we have quoted from *Able*. The fact that legislation developed by both branches of the federal government is entitled to a higher degree of deference does not mean that *only* such action is entitled to the deference reflected in the likelihood-of-success standard. The Supreme Court has said that a high degree of deference should be accorded to actions taken solely by Congress, *see United States v. Rumely*, 345 U.S. 41, 46 (1953) (admonishing courts to "tread warily" "[w]henever constitutional limits upon the investigative power of Congress have to be drawn"), and we have often approved application of the more rigorous likelihood-of-success standard to enjoin action taken by units of government with far less authority than the combined force of the national Legislative and Executive Branches. For example, we have ruled that the more rigorous likelihood-of-success standard was applicable when a preliminary injunction was sought to prohibit a municipal agency from enforcing a regulation, *see Central Rabbinical Congress of U.S. and Canada v. New York City Dep't of Health & Mental Hygiene*, 763 F.3d 183, 192 (2d Cir. 2014); to prohibit New York City's Taxi & Limousine Commission from

enforcing changes to lease rates, *Metropolitan Taxicab Board of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010); to require one branch of a state legislature to undo its expulsion of a state senator, *see Monserrate v. New York State Senate*, 599 F.3d 148, 154 (2d Cir. 2010); to prohibit a town from hiring police officers and firefighters, *see NAACP v. Town of East Haven*, 70 F.3d 219, 223 (2d Cir. 1995); to prohibit the Metropolitan Transit Authority from implementing a staff reduction plan, *see Molloy v. Metropolitan Transportation Authority*, 94 F.3d 808, 811 (2d Cir. 1996); to prohibit the New York City Transit Authority from increasing subway and bus fares, *see New York Urban League, Inc. v. State of New York*, 71 F.3d 1031, 1036 n.7 (2d Cir. 1995); to prohibit New York State's Department of Social Services from suspending a health–care services provider from participating in the State's medical assistance program, *see Plaza Health Laboratories*, 878 F.2d at 580, and to prohibit two commissioners of New York state agencies from enforcing provisions of state law, *see Medical Society*, 560 F.2d at 538.

In dissent, Judge Livingston questions the significance of decisions such as these on two grounds. First, she suggests that some of them lacked sufficient analysis. *See* Part. Diss. Op. at 44. However, with exceptions not relevant here, panels of this Court are bound by the holdings of prior panels, *see*, *e.g.*, *Lotes Co. v.*

*Hon Hal Precision Industry Co.*, 753 F.3d 395, 405 (2d Cir. 2014); *Gelman v. Ashcroft*, 372 F.3d 495, 499 (2d Cir. 2004), and those holdings are not to be disregarded by any claimed insufficiency of an opinion's analysis. Second, she suggests that we might have used the more rigorous likelihood-of-success standard in these cases because of federalism concerns. *See* Part. Diss. Op. at 45, n.28. However, none of the eight decisions even hints that federalism concerns influenced the use of the likelihood-of-success standard.

We have not previously had occasion to consider whether enforcement of a congressional committee's subpoena qualifies as, or is sufficiently analogous to, "governmental action taken in the public interest pursuant to a statutory or regulatory scheme," *Plaza Health Laboratories*, 878 F.2d at 580, so as to preclude application of the less rigorous serious-questions standard. Facing that issue, we conclude that those seeking to preliminarily enjoin compliance with subpoenas issued by congressional committees exercising, as we conclude in Part II(C), their constitutional and duly authorized power to subpoena documents in aid of both regulatory oversight and consideration of potential legislation must satisfy the more rigorous likelihood-of-success standard. Surely such committees should not be enjoined from accomplishing their tasks under a less rigorous standard than we

applied to plaintiffs seeking to preliminarily enjoin state and local units of government in *Central Rabbinical Congress*, *Metropolitan Taxicab Board of Trade*, *Monserrate*, *Town of East Haven*, *Molloy*, *New York Urban League*, *Plaza Health Medical Society*, discussed above. None of those cases involved implementation of a policy "developed through presumptively reasoned democratic processes" and resulting from "the full play of the democratic process involving both the legislative and executive branches," which were the elements present in *Able*, 44 F.3d at 131. Yet in all eight cases, we applied the likelihood-of-success standard. Indeed, in *Monserrate* we applied the more rigorous standard to a plaintiff seeking to preliminarily enjoin action taken by just one body of a state legislature. We will therefore apply the likelihood-of-success standard to Appellants' motion for a preliminary injunction in this case.

Before leaving the issue of the applicable preliminary injunction standard, we should reckon with the preliminary injunction standard formulated in 2008 by the Supreme Court in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008): "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that

an injunction is in the public interest." *Id.* at 20. This formulation incorporates both the irreparable injury requirement and the likelihood-of-success requirement from the more rigorous standard we have been using, includes from our less rigorous serious-questions standard a balance of equities (similar to hardships) that tips in favor of the plaintiff (although not including the requirement of sufficiently serious questions going to the merits to make them <u>a</u> fair ground for litigation nor the requirement that the balance of hardships tips *decidedly* in the plaintiff's favor), and adds as a fourth requirement that the injunction is in the public interest.

It is not clear whether the Supreme Court intended courts to require these four components of the *Winter* standard in all preliminary injunction cases. *Winter* concerned military operations affecting the national security, testing for submarine detection, and two of the three cases cited to support the *Winter* formulation also concerned national security issues, *Munaf v. Geren*, 553 U.S. 674 (2008) (transferring U.S. military prisoners in a foreign country to that country's government), and *Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982) (training the Navy's bomber pilots). The third case, *Amoco Production Co. v. Village of Gambell*,

480 U.S. 531 (1987), concerned a matter unrelated to national security—drilling for

oil and natural gas.[23]

In any event, two years after the Supreme Court's decision in *Winter*, our

Court explained why we did not believe that the Supreme Court had precluded

our use of the two preliminary injunction standards that we had used for five

decades. *See Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund

Ltd.*, 598 F.3d 30, 35–38 (2d Cir. 2010). However, *Citigroup* shed no light on which

of those standards was applicable to plaintiffs seeking to preliminarily enjoin

governmental action. That case involved a motion by a brokerage firm to

preliminarily enjoin a hedge fund from pursuing an arbitration. S*ee id*. at 32.

---

[23] Uncertainty as to use of the *Winter* formulation for all preliminary injunctions remained after the Supreme Court's decision the next year in *Nken v. Holder*, 556 U.S. 418 (2009). In language similar to that used in *Winter*, the Court identified the four factors applicable to the grant of a stay pending appeal—"(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Id*. at 434 (quotation marks omitted). The Court then stated that "[t]here is substantial overlap between these [four factors] and the factors governing preliminary injunctions," although the two are not "one and the same." *Id*.

In *Winter*, the first factor did not include the words "strong showing," 555 U.S. at 20; the second factor used the word "likely" to modify "suffer irreparable harm, *id*.; the third factor was "the balance of equities tips in [the plaintiff's] favor," *id*.; and the fourth factor was that an injunction "is in the public interest," *id.*  Unlike *Winter*, which had set out four factors that an applicant for a preliminary injunction "must establish," *id*., *Nken* said that the applicable legal principles "have been distilled into *consideration* of four factors." 556 U.S. at 434 (emphasis added).

Although we have concluded that the likelihood-of-success standard applies in this case and have determined that Appellants have established irreparable injury, a requirement common to both of our preliminary injunction standards and the Supreme Court's *Winter* formulation, we will proceed to consider not only whether Appellants have met the governing likelihood-of-success standard but also whether they have satisfied the other requirements in one or more of these three standards: sufficiently serious questions going to the merits of their claims to make them fair ground for litigation, a balance of hardships tipping decidedly in their favor, and the public interest favoring an injunction. We turn first to the merits of their statutory and constitutional claims in order to determine what we regard as the critical issue: likelihood of success.

## II. Likelihood of Success

### A. Statutory Claim—RFPA

Appellants contend that the subpoenas are invalid for failure of the Committees to comply with the Right to Financial Privacy Act ("RFPA" or "Act"), 12 U.S.C. §§ 3401–3423. RFPA prohibits a financial institution's disclosure of a customer's financial records to "any Government authority" except in accordance with the Act's procedural requirements. § 3403(a). The Committees acknowledge

noncompliance with those requirements, but contend that RFPA does not apply to them because they are not a "Government authority" within the meaning of section 3403(a). Because the Act defines "Government authority" to mean "any agency or department of the United States, or any officer, employee, or agent thereof," § 3401(3), the precise statutory issue is whether Congress or one of its committees is an "agency or department of the United States."

We begin with the plain meaning of "agency or department" at the time RFPA was enacted in 1978. Appellants do not argue that "agency" could possibly refer to Congress; the sole dispute is over the word "department." Appellants contend that "department" is used in RFPA to mean any of the three branches of government. The Committees, on the other hand, contend that the word is used to mean some component of the Executive Branch.

Contemporary dictionaries support the Committees' interpretation. *See* Webster's Third New International Dictionary (1971) (defining "department" as "an *administrative* division or branch of a national or municipal government") (emphasis added); Black's Law Dictionary (5th ed. 1979) (defining "department" as "[o]ne of the major *administrative* divisions of the executive branch of the

government usually headed by an officer of cabinet rank; *e.g.*, Department of State") (emphasis added).

Moreover, other contextual clues in RFPA indicate that neither Congress nor its committees are an "agency or department of the United States" within the meaning of RFPA, and therefore Congress did not subject itself or its committees to the Act. Section 3408 permits a "Government authority" to request financial records "pursuant to a formal written request only if . . . the request is authorized by regulations promulgated by the head of the agency or department." § 3408(2). Congress does not promulgate regulations, and its leadership and that of its committees are not considered the "head" of an "agency or department." The Supreme Court has stated that "[t]he term 'head of a Department' means . . . the Secretary in charge of a great division of the [E]xecutive [B]ranch of the government, like the State, Treasury, and War, who is a member of the Cabinet." *Burnap v. United States*, 252 U.S. 512, 515 (1920); *accord Freytag v. Commissioner of Internal Revenue*, 501 U.S. 868, 886 (1991).

The several mechanisms for obtaining financial records all require that the records sought are "relevant to a legitimate law enforcement inquiry,"[24] § 3405(1) (administrative summons or subpoena), § 3407(1) (judicial subpoena), § 3408(3) (formal written request), but, as Appellants correctly point out and the Committees agree, Congress cannot exercise "any of the powers of law enforcement" because "those powers are assigned under our Constitution to the Executive and the Judiciary," *Quinn v. United States*, 349 U.S. 155, 161 (1955).

RFPA directs the Office of Personnel Management ("OPM") to determine whether "disciplinary action is warranted against [an] agent or employee" of "any agency or department" found to have willfully violated the Act. § 3417(b). However, OPM is "the lead personnel agency for civilian employees in the [E]xecutive [B]ranch." *United States Dep't of Air Force v. Federal Labor Relations Authority*, 952 F.2d 446, 448 (D.C. Cir. 1991). It is highly unlikely that Congress would have directed OPM to take disciplinary action against congressional staff.

RFPA provides civil penalties, including punitive damages, for any "agency or department" that violates the Act's requirements. § 3417(a). It is also highly

---

[24] RFPA defines "law enforcement inquiry" as "a lawful investigation or official proceeding inquiring into a violation of, or failure to comply with, any criminal or civil statute or any regulation, rule, or order issued pursuant thereto." 12 U.S.C. § 3401(8).

unlikely that Congress would have subjected itself to such penalties, especially in the absence of a clear indication of an intent to do so.

Although no one of these provisions alone conclusively establishes that RFPA does not apply to Congress, in the aggregate they provide persuasive textual support for that reading of the Act. This conclusion is strongly reinforced by the Act's legislative history. A draft bill submitted by the Departments of Justice and the Treasury would have explicitly covered access to financial records by Congress, and distinguished Congress from "any agency or department of the United States."[25]

---

[25] *Electronic Funds Transfer & Financial Privacy: Hearings on S. 2096, S. 2293, & S. 1460 Before the Subcomm. on Financial Institutions of the S. Comm. on Banking, Housing, & Urban Affairs*, 95th Cong. 397 (1978) (hereinafter "*Hearings*").

*Hearings* includes a draft bill, dated May 17, 1978, and referred to as "Title XI—Right to Financial Privacy," which is identified by a note stating, "This Draft represents the combined views of the Departments of Justice and the Treasury, subject to further revision." *Hearings* at 397 n.*. The definition section of that bill provides:

> "'[G]overnment authority' means *the Congress of the United States*, or any agency or department of the United States or of a State or political subdivision, or any officer, employee or agent of any of the foregoing."

*Hearings* at 397 (emphasis added) (explaining definitional provision, § 1101(3)). This provision not only explicitly made the bill applicable to Congress, but it also reflected the view of Justice and the Treasury that "agency or department of the United States" did not include Congress.

*Hearings* also contains a section-by-section analysis of the Justice-Treasury draft bill submitted on May 17, 1978. *See Hearings* at 365 & n.*. That analysis includes the following explanation of the coverage of the draft bill:

> "The 'government authorities' whose actions are restricted by the bill include any agency or department of the United States or any State or political subdivision, or any of their officers, employees, or agents. *The Congress is also covered*, since it may use financial records in its investigations to which the same privacy rights should adhere."

The rejection of this provision of the Justice-Treasury proposal by omitting Congress from the enacted definition of "government authority" is strong evidence of a deliberate decision by Congress not to apply the Act to itself. Although the failure of Congress to enact is often an unreliable indication of congressional intent, *see Brecht v. Abrahamson*, 507 U.S. 619, 632 (1993) ("As a general matter, we are reluctant to draw inferences from Congress' failure to act.") (quotation marks omitted), the omission of pertinent language from a bill being considered by Congress is far more probative of such intent, especially when the omission is from a draft bill submitted by the Department of Justice, a principal source of proposed legislation.

---

*Hearings* at 366 (emphasis added) (explaining definitional provision).

As explained by then-Deputy Attorney General Benjamin R. Civiletti, "[O]ur proposal would extend these important procedures and privacy rights to cover investigations by the Legislative as well as the Executive Branch." *Hearings* at 189, 194.

*Hearings* also includes an analysis prepared by the Congressional Research Service of the Library of Congress, comparing what is called "Draft Proposed by Justice Dept." with S. 14 and S. 2096. *Hearings* at 161. That analysis points out that the scope of the Justice Department draft protects financial records from unauthorized access "by Congress, Federal or State agents and agencies," whereas S. 14 and S. 2096 protect such records from unauthorized access "by Federal agents or agencies." *Id*.

The draft Justice-Treasury bill, along with its section-by-section analysis, are also in the record of a hearing held by a House of Representatives subcommittee the following week, where Civiletti gave similar testimony. *See Right to Privacy Proposals of the Privacy Protection Study Commission: Hearings on H.R. 10076 Before the Subcomm. on Government Information & Individual Rights of the H. Comm. on Government Operations*, 95th Cong. 256, 274 (1978).

Appellants present two arguments that Congress and its committees are covered by RFPA's definitional phrase "agency or department." First, they point out that in 1955 the Supreme Court ruled a false statement made by a former member of Congress to the Disbursing Office of the House of Representatives was a violation of 18 U.S.C. § 1001 because "department," as used in section 1001, "was meant to describe the executive, *legislative* and judicial branches of the Government." *United States v. Bramblett*, 348 U.S. 503, 509 (1955) (emphasis added).

The Committees respond that an interpretation of "department" in section 1001 is not an authoritative basis for interpreting "department" in RFPA and that the Supreme Court overruled *Bramblett* in *Hubbard v. United States*, 514 U.S. 695, 715 (1995), after characterizing its reading of "department" as "seriously flawed," *id*. at 702. To this latter point, Appellants point out that courts "assume that Congress is aware of existing law when it passes legislation," *Miles v. Apex Marine Corp*., 498 U.S. 19, 32 (1990), and "was aware of . . . the judicial background against which it was legislating," *DeKalb County Pension Fund v. Transocean Ltd*., 817 F.3d 393, 409–10 (2d Cir. 2016) ("*DeKalb*") (brackets and quotation marks omitted), and that the Congress that enacted RFPA in 1978 is assumed to be aware of *Bramblett* and obviously did not legislate in light of *Hubbard*, decided in 1995.

We acknowledge the assumption that Congress legislates with awareness of "existing law," *Miles*, 498 U.S. at 32, and the relevant "judicial background," *DeKalb*, 817 F.3d at 409. The validity of that assumption, however, depends in large part on the context in which it is invoked. *Miles* applied the assumption interpreting the damages provision of the Jones Act, 46 U.S.C. app. § 688. Noting that the Jones Act incorporated the recovery provisions of the older Federal Employers' Liability Act ("FELA"), the Supreme Court was willing to assume that Congress likely intended to adopt for the Jones Act the judicial gloss that the Court had placed on the damages provision of FELA, limiting it to pecuniary loss. *See Miles*, 498 U.S. at 32. "When Congress passed the Jones Act, the [Court's] gloss on FELA, and the hoary tradition behind it, were well established. Incorporating FELA unaltered into the Jones Act, Congress must have intended to incorporate the pecuniary limitation on damages as well." *Id*.

*DeKalb* applied the assumption more elaborately in determining which statute of repose applied to a suit under section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a). We had previously applied a three-year limitations period in *Ceres Partners v. GEL Associates*, 918 F.2d 349 (2d Cir. 1990). Thereafter, Congress enacted the Sarbanes-Oxley Act of 2002, extending to five years the

limitations period for some implied private causes of action, but not the sort of

action implied by section 14(a). *See DeKalb*, 817 F.3d at 398. We concluded:

> Congress must have known that, by extending only the statute of
> repose applicable to private rights of action that involve a claim of
> fraud, deceit, manipulation, or contrivance, the statutes of repose
> applicable to Section 14(a) would remain intact. And from this
> knowledge, we conclude that Congress affirmatively intended to
> preserve them. We therefore hold that the same three-year statutes of
> repose that we applied to Section 14 in *Ceres* . . . still apply to Section
> 14(a) today.

*Id*. at 409–10 (quotation marks, brackets, and footnotes omitted).

We encounter no circumstances comparable to *Miles* or *DeKalb* in the

pending appeal. Whatever force might be given to the assumption that Congress

enacted RFPA with awareness of *Bramblett* is thoroughly undermined by the clear

indicators to the contrary from the text and legislative history we have recounted.[26]

The second argument of Appellants reminds us that in an earlier time, the

word "department" was famously used to refer to what is now called a "branch"

of the federal government. "It is emphatically the province and duty of the judicial

department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177

---

[26] Even if Congress had *Bramblett* in mind, that decision based its interpretation of
"department" on the "development, scope and purpose of" the statute at issue in that case. 348
U.S. at 509. RFPA does not share any of the same historical development as section 1001, and
because the Court's decision was not based on the text of that section, there is no reason to think
that Congress, when enacting RFPA, believed that *Bramblett*'s interpretation would extend to
other uses of the word "department."

(1803) (Little, Brown & Co. 1855);[27] *see also* James Madison, Speech in the First

Congress (June 17, 1789), *in* 5 *The Writings of James Madison* 395, 398 (Gaillard Hunt

ed., 1904) (referring to the "three great departments of Government"). *Hubbard*,

although not known to the Congress enacting RFPA, provides important guidance

for us when the Supreme Court states that "while we have occasionally spoken of

the three branches of our Government, including the Judiciary, as 'departments,'"

*Hubbard*, 514 U.S. at 699 (brackets omitted) (citing *Mississippi v. Johnson*, 71 U.S. (4

Wall.) 475, 500 (1867)), "that locution is not an ordinary one. Far more common is

the use of 'department' to refer to a component of the Executive Branch," *id*.

Considering all of the parties' arguments,[28] we conclude that RFPA does not

apply to Congress.

---

[27] I include the publisher in citations to decisions in the nominative reports because of slight variations among the versions of 19th century publishers. *See* Jon O. Newman, *Citators Beware: Stylistic Variations in Different Publishers' Versions of Early Supreme Court Opinions*, 26 J. Sup. Ct. Hist. 1 (2001).

[28] Each side makes opposing arguments based on section 3412(d) of RFPA, which provides: "Nothing in this chapter shall authorize the withholding of information by any officer or employee of a supervisory agency [defined at section 3401(7)] from a duly authorized committee or subcommittee of the Congress." Appellants contend that "[i]f congressional subpoenas were never intended to come within the statute's scope, there would be no reason to include this provision." Br. for Appellants at 42. The Committees respond that this provision concerns transfers of documents pursuant to section 3412(a), that it makes clear that the requirements applicable when an agency or department  obtains documents from a financial institution also apply to transfers to another agency or department, and that "Congress emphasized, however, that these transfer provisions—like RFPA's other requirements—did not apply to Congress." Br. for Committees at 53.

B. Statutory Claim—26 U.S.C. § 6103

The request for tax returns of named individuals and entities in the Deutsche Bank Subpoenas encounters a possible statutory claim under 26 U.S.C. § 6103. *See* Deutsche Bank Subpoenas ¶ 1(vi)(e)(7), J. App'x 39. Because of that request and because the parties had not said anything about tax returns in their briefs, we asked the Banks at oral argument whether they had in their possession tax returns within the coverage of the subpoenas. The Banks offered reasons why they could not then respond to the question.

On August 26, we ordered the Banks to inform the Court whether either one has in its possession any tax returns of the individuals or entities named in paragraph 1 of the subpoenas received from the Committees.[29] On August 27,

_____

Each side also makes opposing arguments based on section 3413(j) of RFPA, which provides: "This chapter shall not apply when financial records are sought by the Government Accountability Office ['GAO'] pursuant to an authorized proceeding, investigation, examination or audit directed at a government authority." Appellants contend that, because GAO is within the Legislative Branch, "if . . . RFPA is limited to the [E]xecutive [B]ranch, then there was no need to provide any exemption for the GAO." Br. for Appellants at 43. The Committees respond that this provision "differentiates GAO from 'a government authority' and thus supports the opposite conclusion: GAO may obtain financial records in its proceedings or investigations that are '*directed at* a government authority.'" Br. for Committees at 53 n.24 (emphasis in original).

We deem none of these arguments persuasive, especially in light of the textual and legislative history support for our conclusion, explained above, that RFPA does not apply to Congress.

[29] No. 19–1540, Dkt. No. 156 (Aug. 26, 2019). On August 27, we entered an Order informing the Banks that if they filed an unredacted letter under seal, a redacted version of the letter served on the Committees should be served on Appellants and filed on the public docket. *Id.*, Dkt. No. 157 (Aug. 27, 2019).

Deutsche Bank submitted a redacted letter stating that it has in its possession some tax returns responsive to the subpoenas, with the names of the taxpayers redacted,[30] and submitted under seal an unredacted letter identifying the taxpayers.[31] On the same day, Capital One submitted a letter stating that it did not possess any tax returns responsive to the subpoena it received.[32]

Deutsche Bank's filing of an unredacted letter under seal precipitated motions by various news organizations for leave to intervene and to seek unsealing of the unredacted letter.[33] On Sept. 18, we ordered the parties to respond to those motions.[34] On Sept. 27, the parties filed their responses.[35] On Oct. 4, the Media Coalition filed a reply memorandum.[36] On Oct. 10, we granted the motions to intervene and denied the motions to unseal. *See Trump v. Deutsche Bank*, No. 19–1540, 2019 WL 5075948 (2d Cir. Oct. 10, 2019).

Also at oral argument, we asked the Committees whether their subpoenas were in compliance with 26 U.S.C. § 6103(f), which imposes some limits on

---

[30] *Id.*, Dkt. No. 161 (Aug. 27, 2019).

[31] *See* Letter from Raphael A. Prober, counsel for Deutsche Bank, to Clerk of Court, Second Circuit Court of Appeals, No. 19–1540, Dkt. No. 160 (Aug. 27, 2019).

[32] *See* Letter from James A. Murphy, counsel for Capital One, to Clerk of Court, Second Circuit Court of Appeals, No. 19–1540, Dkt. No. 165 (Aug. 27, 2019).

[33] No. 19–1540, Dkt. Nos. 168 (Sept. 11, 2019), 181 (Sept. 18, 2019).

[34] *Id.*, Dkt. No. 180 (Sept. 18, 2019).

[35] *Id.*, Dkt. Nos. 184, 186, 188, 190 (Sept. 27, 2019).

[36] *Id.*, Dkt. No. 193 (Oct. 4, 2019).

disclosure of tax returns. The Committees partially responded and offered to submit a fuller explanation by letter. On August 27, the Committees submitted a letter stating that the application of section 6103 depends on how the Banks obtained the returns.[37] On August 29, Appellants submitted a letter stating, among other things, that the Committees have no authority to request the tax returns.[38]

Section 6103(a) of the Internal Revenue Code provides: "**(a) General rule.**— Returns and return information shall be confidential . . . ." Sections 6103(c)–(o) provide several exceptions to the general requirement of confidentiality. Subsection 6103(f)(3) makes a specific exception for committees of Congress. It provides:

> "**(3) Other committees.**—Pursuant to an action by, and upon written request by the chairman of, a committee of the Senate or the House of Representatives (other than a committee specified in paragraph (1)) specially authorized to inspect any return or return information by a resolution of the Senate or the House of Representatives . . . the Secretary shall furnish such committee, or a duly authorized and designated subcommittee thereof, sitting in closed executive session, with any return or return information which such resolution authorizes the committee or subcommittee to inspect. Any resolution described in this paragraph shall specify the purpose for which the return or return information is to be furnished and that

---

[37] *See* Letter from Douglas N. Letter, General Counsel, U.S. House of Representatives, to Clerk of Court, Second Circuit Court of Appeals, No. 19–1540, Dkt. No. 158 (Aug. 27, 2019).

[38] *See* Letter from Patrick Strawbridge, counsel for President Donald J. Trump, to Clerk of Court, Second Circuit Court of Appeals, No. 19–1540, Dkt. No. 166 (Aug. 29, 2019).

such information cannot reasonably be obtained from any other source."

26 U.S.C. § 6103(f)(3).[39]

Thus, Congress has protected the confidentiality of income tax returns, subject to several exceptions, and specified how such returns may be obtained by a committee of Congress.

Appellants contend that disclosure is prohibited (or, as they phrase it, that the Committees "have no jurisdiction to request tax returns"[40]) because the requirements of the subsection have not been met. They point out that the House has not passed a resolution specifically authorizing the Committees to inspect tax returns, specifying the purpose for which the returns are sought, or specifying that the information cannot reasonably be obtained from other sources. They also suggest that we need not resolve the issue now, but should leave it for resolution on remand.

Because the Deutsche Bank Subpoenas require production of tax returns and the motion for a preliminary injunction to prohibit compliance has been

---

[39] The committees specified in paragraph (1) of section 6103(f) are the House Committee on Ways and Means, the Senate Committee on Finance, and the Joint Committee on Taxation. § 6103(f)(1). The Code defines "Secretary" as "the Secretary of the Treasury or his delegate." § 7701(a)(11)(B).

[40] *See* Letter from Patrick Strawbridge, counsel for President Donald J. Trump, to Clerk of Court, Second Circuit Court of Appeals at 2, No. 19–1540, Dkt. No. 166 (Aug. 29, 2019).

denied by the District Court, the absence of a ruling on production of the returns risks their disclosure to the Committees. We therefore believe that some ruling must be made.

The Committees do not dispute that they have not met the requirements of section 6103(f), but they contend that the provision does not apply to any tax returns in the possession of Deutsche Bank unless the bank obtained them from the IRS.

The text of section 6103 does not unambiguously resolve the dispute. In addition to citing the requirements of section 6103(f), Appellants rely on section 6103(a). It states that tax returns "shall be confidential," and that "except as authorized by [the Internal Revenue Code]" no person within three specified categories "shall disclose any return . . . obtained by him . . . in connection with his service" within any of the three categories. These include employees of the United States, employees of a state or various local agencies, and those who obtained access to a return pursuant to various subsections of section 6103(a). § 6103(a)(1)–(3).

If the introductory clause of section 6103(a) is a blanket protection of the confidentiality of tax returns, then it prohibits disclosure of the returns in the

38

possession of Deutsche Bank. But if that clause is to be read in conjunction with the rest of section 6103(a), then the clause means only that the returns are protected from disclosure by anyone within the three categories, and it does not prohibit disclosure in the pending appeal because Deutsche Bank is not within any of those categories. Arguably limiting the coverage of section 6103(a) is section 6103(b). It defines "return" "[f]or purposes of this section" as a return "which is filed with the Secretary." § 6103(b)(1). That provision could mean either the document or digital file in the possession of the Secretary (including the IRS), which Deutsche Bank does not have, or a copy of a paper or digitized return that has been submitted to the Secretary, which Deutsche Bank does have.

Another provision of section 6103 also creates ambiguity as to its meaning. Section 6103(f) states that a congressional committee may obtain a tax return "from the Secretary" pursuant to a House resolution meeting specified requirements, as set forth above. This provision could mean either that the only way a committee may obtain a tax return is to seek it from the Secretary and comply with the requirements of section 6103(f), or it could mean that those requirements apply only when a committee seeks a return from the Secretary and do not apply when a committee seeks a return from anyone else, such as Deutsche Bank.

39

Case law on these possible interpretations has evoked various rulings and statements. The Seventh Circuit has ruled that the introductory clause of section 6103(a) is not a blanket protection of confidentiality, but protects only against disclosure by those described in subsections 6103(a)(1)–(3). *Hrubec v. National Railroad Passenger Corp.*, 49 F.3d 1269 (7th Cir. 1995). "The ban on disclosure appears in the last, dangling, unnumbered portion of § 6103(a), not in the introductory phrase, and the ban is linked to the scope of identified subsections." *Id*. at 1270–71. *Hrubec* found no violation of section 6103 by Amtrak employees who obtained copies of other employees' tax returns from the IRS, but not as a result of a request covered by any of the categories identified in section 6103(a).[41] The Ninth Circuit has also given a narrow interpretation to section 6103. In *Stokwitz v. United States*, 831 F.2d 893 (9th Cir. 1987), it ruled that "Section 6103 establishes a comprehensive scheme for controlling the release *by the IRS* of information received from taxpayers to discrete identified parties." *Id*. at 895 (emphasis in original); *accord Lomont v. O'Neill*, 285 F.3d 9, 14–15 (D.C. Cir. 2002); *Baskin v. United States*, 135 F.3d 338, 342 (5th Cir. 1998); *Ryan v. United States*, 74 F.3d 1161, 1163 (11th Cir. 1996). *Stokwitz* found no violation of section 6103 where

---

[41] The returns had been obtained by someone's forgery of an application for them. *See Hrubec v. National Railroad Passenger Corp.*, 778 F. Supp. 1431, 1433 (N.D. Ill. 1991).

employees of the United States Navy seized from a taxpayer's files copies of tax

returns, even though the employees were covered by subsection 6103(a)(1). The

Court relied on the definition of "tax return" in section 6103(b), *see id*. at 895–96

("[T]he statutory definitions of 'return' and 'return information' to which the

entire statute relates, confine the statute's coverage to information that is passed

through the IRS."), and noted that implementing "Treasury regulations . . . are

exclusively concerned with disclosure by the IRS," *id.* at 896 (citing Treas. Regs.

§§ 301.6103(a)-1 to (p)(7)-1 (1986)).

Other courts have expressed different views. In *National Treasury Employees*

*Union v. Federal Labor Relations Authority*, 791 F.2d 183 (D.C. Cir. 1986), the D.C.

Circuit referred to section 6103(a) as a "general rule that 'returns and return

information shall be confidential.'" *Id*. at 183 (brackets omitted) (quoting

§ 6103(a)). The Court's main point, however, was that the disclosure, which had

been made by IRS employees, had not been made in compliance with subsection

6103(l)(4)(A), and even that point, as well as the "general rule" statement, were

dicta because the Court's holding was that the employees should not have been

disciplined.

A district court in our Circuit has stated that a board licensing plumbers violated section 6103 by making disclosure of a license applicant's tax forms a condition of obtaining a license. *See Russell v. Board of Plumbing Examiners*, 74 F. Supp. 2d 339 (S.D.N.Y. 1999) ("The Board being unable to get the copies directly from the Treasury should not be permitted to do so indirectly by coercion . . . ."), *aff'd*, 1 F. App'x 38 (2d Cir. 2001). The District Court's view, however, was at most an alternate holding on an issue that the Court acknowledged had not been briefed, *see id*. at 348, and our affirmance in a non-precedential summary order made no reference to the issue, which had not been asserted as a ground for review, *see* Br. & Reply Br. for Appellants, *Russell v. Board of Plumbing Examiners*, 1 F. App'x 38 (2d Cir. 2001) (No. 99-9532).

We agree with the Seventh Circuit that section 6103(a) limits its prohibition against disclosure of tax returns to returns requested from the three categories of persons identified in subsections 6103(a)(1)–(3). There remains the possibility, however, that subsection 6103(f)(3), applicable to requests for tax returns by congressional committees other than those concerned explicitly with taxes, provides the exclusive means for such committees to obtain returns. The text of subsection 6103(f)(3) refers to committee requests "to the Secretary." We agree

with the Ninth Circuit that the plain language of the provision reflects Congress's purpose in enacting section 6103, which "was to curtail loose disclosure practices by the IRS." *Stokwitz*, 831 F.2d at 894. Because there is no claim by Appellants that Deutsche Bank obtained from the IRS any returns requested by the Committees, neither subsection 6103(f)(3), nor section 6103 as a whole, precludes their production to the Committees.

Appellants also contend that production of tax returns is prohibited by the RFPA and the Gramm-Leach-Bliley Act, Pub. L. No. 106-102, 113 Stat. 1338 (1999). As we have ruled, however, RFPA does not apply to Congress. Gramm-Leach-Bliley is also no bar to production of tax returns because it explicitly permits disclosure of personal information "to comply with a . . . subpoena . . . by Federal . . . authorities." 15 U.S.C. § 6802(e)(8).

With respect to tax returns, the oral argument of this appeal precipitated further procedural developments, detailed in *Trump v. Deutsche Bank*, No. 19–1540, 2019 WL 5075948 (2d Cir. Oct. 10, 2019) (order granting news organizations' motions to intervene and denying their motions to unseal). Ultimately, Deutsche

Bank informed us in an August 27, 2019, letter[42] that it had two tax returns within the coverage of the Committees' subpoenas and submitted the names of the two taxpayers under seal.

If any tax returns in the possession of Deutsche Bank were those of the Lead Plaintiff, we would have to consider whether their production to the Committees might encounter the objection that it would distract the Chief Executive in the performance of official duties. That issue need not be resolved, however, because Deutsche Bank informed us, in its response to the motions of news organizations to unseal Deutsche Bank's letter of August 27, that the only tax returns in its possession within the coverage of the subpoenas are not those of the Lead Plaintiff.

Disclosure of tax returns in the possession of Deutsche Bank in response to the Committees' subpoenas will not violate section 6103, and the fact that, when requested by news organizations, we did not unseal the names of the taxpayers whose returns are in the possession of Deutsche Bank is not a reason to exclude those returns from Deutsche Bank's compliance with the subpoenas.

---

[42] *See* Letter from Letter from Raphael A. Prober to Clerk of Court, Second Circuit Court of Appeals, No. 19–1540, Dkt. No. 161 (redacted version) (Aug. 27, 2019); *id*., Dkt. No. 165 (unredacted version filed under seal) (Aug. 27, 2019).

C. Constitutional Claim

Appellants' constitutional claim does not assert any constitutionally based privilege that might protect their financial records from production by the Banks to the Committees, such as the privileges secured in the Bill of Rights. *See Watkins*, 354 U.S. at 198 (recognizing "the restraints of the Bill of Rights upon congressional investigations"). Instead, Appellants contend that the Constitution places limits on the power of Congress to investigate, that the Committees' subpoenas to the Banks exceed those limits, and that they have a right to prevent disclosure of documents in response to subpoenas beyond Congress's power of investigation.

The subpoenas are surely broad in scope. Illustrating the scope, Appellants specifically call our attention to the following requests in the Committees' subpoenas to Deutsche Bank for the following:

> "any document related to account applications, opening documents, KYC [know your customer], due diligence, and closing documents";
> "any monthly or other periodic account statement";
> "any document related to any domestic or international transfer of funds in the amount of $10,000 or more";
> "any summary or analysis of domestic or international account deposits, withdrawals, and transfers";
> "any document related to monitoring for, identifying, or evaluating possible suspicious activity";

> "any document related to any investment, bond offering, line
> of credit, loan, mortgage, syndication, credit or loan restructuring, or
> any other credit arrangement."

Deutsche Bank Subpoenas ¶¶ 1(i)–(vi), J. App'x 37–38.

The documents sought are those of the Lead Plaintiff and his three oldest

children, and "members of their immediate family," defined to include child,

daughter-in-law, and son-in-law, among others, and a number of entities affiliated

with the Lead Plaintiff and the Trump Organization. *Id.* at 37 ¶ 1, 47 ¶ 5. The

documents concern financial transactions of the named individuals and their

affiliated entities. The time frame for which most of the documents are sought is

July 19, 2016, to the present for the Capital One subpoena and January 1, 2010, to

the present for the Deutsche Bank subpoenas, but there is no time limit for two

categories of documents sought by all three subpoenas. *See id*. at 37, intro., 52,

intro. These categories include documents related to account openings, the names

of those with interests in identified accounts, and financial ties between the named

individuals and entities and any foreign individual, entity, or government. *See id*.

at 37 ¶ 1(i), 41–42 ¶ 6(i), 52 ¶¶ 1(i), (ii).

*Constitutional investigative authority of Congress.* An important line of

Supreme Court decisions, usually tracing back to *McGrain v. Daugherty*, 273 U.S.

135 (1927), has recognized a broad power of Congress and its committees to obtain

information in aid of its legislative authority under Article I of the Constitution.

*See Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 504 (1975); *Barenblatt*,

360 U.S. at 111; *Watkins*, 354 U.S. at 187; *Quinn*, 349 U.S. at 160; *Sinclair v. United

States*, 279 U.S. 263, 297 (1929), *overruled on other grounds by United States v. Gaudin*,

515 U.S. 506, 519 (1995). "[T]he power of inquiry—with process to enforce it—is an

essential and appropriate auxiliary to the legislative function." *McGrain*, 273 U.S.

at 174. "The scope of the power of inquiry, in short, is as penetrating and far-

reaching as the potential power to enact and appropriate under the Constitution."

*Barenblatt*, 360 U.S. at 111. "[T]he power to investigate is inherent in the power to

make laws because 'a legislative body cannot legislate wisely or effectively in the

absence of information respecting the conditions which the legislation is intended

to affect or change.'" *Eastland*, 421 U.S. at 504 (brackets omitted) (quoting *McGrain*,

273 U.S. at 175). "The power of the Congress to conduct investigations . . .

encompasses inquiries concerning the administration of existing laws as well as

proposed or possibly needed statutes." *Watkins*, 354 U.S. at 187.[43]

---

[43] Courts have recognized an additional, though less clearly delineated, source of Congress's investigative authority, namely, Congress's "informing function." The Supreme Court has explained that although Congress cannot "expose for the sake of exposure," it has the power "to inquire into and publicize corruption, maladministration or inefficiency in agencies of

As the Committees recognize, however, Congress's constitutional power to investigate is not unlimited. The Supreme Court has identified several limitations. One concerns intrusion into the authority of the other branches of the government. In *Kilbourn v. Thompson*, 103 U.S. 168 (1880), which the Supreme Court has identified as the first case in which the Court considered a challenge to "the use of compulsory process as a legislative device," *Watkins*, 354 U.S. at 193, the Court ruled that Congress's power to compel testimony was unconstitutionally used because the House of Representatives had "assumed a power which could only be properly exercised by another branch of the government," in that case, the Judicial Branch, *Kilbourn*, 103 U.S. at 192.[44]

In *Quinn*, the Supreme Court identified other limits. The power to investigate "must not be confused with any of the powers of law enforcement."

---

the Government" in order to inform the public "concerning the workings of its government." *Watkins*, 354 U.S. at 200 & n.33; *see Rumely*, 345 U.S. at 43 ("'It is the proper duty of a representative body to look diligently into every affair of government and to talk much about what it sees. . . . The informing function of Congress should be preferred even to its legislative function.'") (quoting Woodrow Wilson, *Congressional Government: A Study in American Politics* 303 (1913)). We need not consider this potential source of investigative authority because we conclude that the Committees issued the subpoenas to advance valid legislative purposes.

[44] Kilbourn had been imprisoned by the sergeant-at-arms of the House of Representatives for contempt by refusing to respond to a House committee's inquiries concerning matters that were then pending in a federal bankruptcy court. As the Supreme Court later explained in *McGrain*, the bankruptcy was a matter "in respect to which no valid legislation could be had" because the case was "still pending in the bankruptcy court" and "the United States and other creditors were free to press their claims in that proceeding." 273 U.S. at 171.

349 U.S. at 161. "Nor does it extend to an area in which Congress is forbidden to legislate." *Id*. "Still further limitations on the power to investigate are found in the specific individual guarantees of the Bill of Rights . . . ." *Id.* And, most pertinent to the pending appeal, the power to investigate "cannot be used to inquire into private affairs unrelated to a valid legislative purpose." *Id*.

The principal argument of Appellants is that compliance with the Committees' subpoenas should be preliminarily enjoined because the subpoenas seek information concerning their private affairs. Unquestionably, disclosure of the financial records sought by the Committees will subject Appellants' private business affairs to the Committees' scrutiny. However, inquiry into private affairs is not always beyond the investigative power of Congress. In *Quinn*, the Court was careful to state that the power to investigate "cannot be used to inquire into private affairs *unrelated to a valid legislative purpose*." *Id*. (emphasis added). In *Barenblatt*, the Court stated a similar qualification: "Congress may not constitutionally require an individual to disclose . . . private affairs except in relation to [a valid legislative] purpose." 360 U.S. at 127.

So, although the Court had made clear before *Barenblatt* that there is "no congressional power to expose for the sake of exposure," *Watkins*, 354 U.S. at 200,

it has also stated that inquiry into private affairs is permitted as long as the inquiry is related "to a valid legislative purpose," *Quinn*, 349 U.S. at 161; *see Barenblatt*, 360 U.S. at 127. This potential tension between a permissible legislative purpose and an impermissible inquiry for the sake of exposure requires consideration of the role of motive and purpose in assessing the validity of a congressional inquiry.

The Supreme Court has spoken clearly as to motive with respect to a congressional inquiry. Referring to congressional committee members questioning a witness, the Court said, "[T]heir motives alone would not vitiate an investigation which had been instituted by a House of Congress *if that assembly's legislative purpose is being served*." *Watkins*, 354 U.S. at 200 (emphasis added).[45]

---

[45] *Watkins* cites, 354 U.S. at 200 n.34, among other cases, *Eisler v. United States*, 170 F.2d 273 (D.C. Cir. 1948), in which the D.C. Circuit stated, "[D]efense counsel sought to introduce evidence to show that the Committee's real purpose in summoning appellant was to harass and punish him for his political beliefs and that the Committee acted for ulterior motives not within the scope of its or Congress' powers. The lower court properly refused to admit such evidence, on the ground that the court had no authority to scrutinize the motives of Congress or one of its committees." *Id.* at 278–79 (quotation marks and ellipsis omitted).

In *Tenney v. Brandhove*, 341 U.S. 367 (1951), the Supreme Court provided this caution to courts asked to consider legislators' motives: "In times of political passion, dishonest or vindictive motives are readily attributed to legislative conduct and as readily believed. Courts are not the place for such controversies. Self-discipline and the voters must be the ultimate reliance for discouraging or correcting such abuses. The courts should not go beyond the narrow confines of determining that a committee's inquiry may fairly be deemed within its province." *Id.* at 378 (footnote omitted).

More than 50 years ago, the Supreme Court candidly recognized the

difficulty a court faces in considering how a legislative purpose is to be assessed

when a privacy interest is asserted to prevent a legislative inquiry:

> "Accommodation of the congressional need for particular
> information with the individual and personal interest in privacy is an
> arduous and delicate task for any court. We do not underestimate the
> difficulties that would attend such an undertaking."

*Id*. at 198.

*Requirement of identifying legislative purpose*. The first task for courts

undertaking this "accommodation" is identification of the legislative purpose to

which a congressional investigation is asserted to be related.

> "It is manifest that despite the adverse effects which follow upon
> compelled disclosure of private matters, not all such inquiries are
> barred. *Kilbourn v. Thompson* teaches that such an investigation into
> individual affairs is invalid if unrelated to any legislative purpose."

*Id*. *Watkins* provided further guidance as to how that inquiry as to legislative

purpose should at least begin:

> "An essential premise in this situation is that the House or
> Senate shall have instructed the committee members on what they are
> to do with the power delegated to them. It is the responsibility of the
> Congress, in the first instance, to insure that compulsory process is
> used only in furtherance of a legislative purpose. That requires that
> the instructions to an investigating committee spell out that group's
> jurisdiction and purpose with sufficient particularity. Those

instructions are embodied in the authorizing resolution. That document is the committee's charter."

*Id*. at 201.

It is not clear whether this passage can be satisfied only by the instruction that the House gives to a committee pursuant to a House rule defining a standing committee's continuing jurisdiction, or whether a specific "authorizing resolution" is required for a committee to undertake an investigation on a particular subject within its jurisdiction. During an argument on July 12 of this year in the Court of Appeals for the District of Columbia Circuit in *Trump v. Mazars USA, LLP*, 940 F.3d 710 (D.C. Cir.), *reh'g en banc denied*, 941 F.3d 1180 (D.C. Cir.), *mandate stayed*, No. 19A545, 2019 WL 6328115 (U.S. Nov. 25, 2019) ("*Trump v. Mazars*"), a challenge to a subpoena issued by the House Committee on Oversight and Reform,[46] the *Mazars* appellants, many of whom are Appellants here, contended that a clear statement from the House authorizing a standing

---

[46] The subpoena challenged in *Mazars* seeks four categories of documents somewhat different from those sought by the subpoenas challenged on this appeal, and seeks the documents for purposes significantly different from the Committees' purposes, as we point out *infra*. The categories are: various financial statements and reports compiled by Mazars USA, LLP, engagement agreements for preparation of such statements and reports, supporting documents used in the preparation of such statements and reports, and memoranda, notes, and communication related to the compilation and auditing of such statements and reports. *See* Decl. of William S. Consovoy, Ex. A at 3, *Trump v. Committee on Oversight and Reform of the United States House of Representatives*, 380 F. Supp. 3d 76 (D.D.C. 2019) (No. 19-cv-01136 (APM)), ECF No. 9-2, *aff'd*, *Trump v. Mazars USA, LLP*, 940 F.3d 710 (D.C. Cir. 2019).

committee to investigate not just a particular *subject* but the particular *subpoena* being challenged was required, at least where the subpoena seeks papers of the President. *See* Oral Arg. at 8:35, 1:32:15, 2:03:15, *Trump v. Mazars USA, LLP,* No. 19-5142 (D.C. Cir. July 12, 2019).[47]

Apparently responding to that contention, the House of Representatives on July 24 adopted a resolution that includes the following language:

> "*Resolved*, That the House of Representatives ratifies and affirms all current and future investigations, as well as all subpoenas previously issued or to be issued in the future, by any standing or permanent select committee of the House, pursuant to its jurisdiction as established by the Constitution of the United States and rules X and XI of the Rules of the House of Representatives, concerning or issued directly or indirectly to—
> > (1) the President in his personal or official capacity;
> > (2) his immediate family, business entities, or organizations;
> > . . .
> > (9) any third party seeking information involving, referring, or related to any individual or entity described in paragraphs (1) through (7)."

H.R. Res. 507, 116th Cong. (2019); *see* H.R. Res. 509, 116th Cong. § 3 (2019) ("House Resolution 507 is hereby adopted.").[48] On July 26, the Committees informed us of

---

[47] Appellants have not made that "clear statement" argument in their briefs in this case.

[48] H.R. Res. 507 disclaims the need for its adoption, stating:

> "Whereas the validity of some of [the pending] investigations and subpoenas [relating to the President] has been incorrectly challenged in Federal court on the grounds that the investigations and subpoenas were not authorized

this resolution.[49]

On July 31, counsel for the *Mazars* appellants made two related arguments
to the D.C. Circuit rejecting the significance of Resolution 507.[50] First, he read the
passage from *Watkins*, quoted above, to mean that only the House Rules initially
outlining a committee's jurisdiction can provide a valid source of authority for a
legislative investigation. Second, he contended that two decisions, *United States v.
Rumely*, 345 U.S. 41 (1953), and *Shelton v. United States*, 327 F.2d 601 (D.C. Cir. 1963),
establish that Resolution 507 came "too late." On August 1, counsel for Appellants
in our appeal made the same arguments to our Court.[51]

---

by the full House and lacked a 'clear statement' of intent to include the
President, which the President's personal attorneys have argued in Federal
court is necessary before the committees may seek information related to the
President; and

"Whereas while these arguments are plainly incorrect as a matter of law, it is
nevertheless in the interest of the institution of the House of Representatives
to avoid any doubt on this matter and to unequivocally reject these
challenges presented in ongoing or future litigation."

H.R. Res. 507.

[49] *See* Letter from Douglas N. Letter, General Counsel, U.S. House of Representatives, to
Clerk of Court, Second Circuit Court of Appeals, No. 19–1540, Dkt. No. 106 (July 26, 2019).

[50] *See* Letter from William S. Consovoy, counsel for President Donald J. Trump, to Mark
Langer, Clerk of Court, D.C. Circuit Court of Appeals, *Trump v. Mazars USA, LLP*, No. 19–5142,
Doc. No. 1799866 (D.C. Cir. July 31, 2019).

[51] *See* Letter from Patrick Strawbridge, counsel for President Donald J. Trump, to Clerk of
Court, Second Circuit Court of Appeals, No. 19–1540, Dkt. No. 112 (Aug. 1, 2019).

On August 6, the United States filed in the *Mazars* appeal an amicus curiae brief, making
additional arguments concerning the alleged deficiency of Resolution 507. We need not set forth
those arguments because on August 19 the United States filed an amicus curiae brief in the

Although we agree that there must be sufficient evidence of legislative authorization and purposes to enable meaningful judicial review, Appellants' arguments that seek to limit evidence we may consider are not persuasive. Although *Watkins* examined the authorizing resolutions of the committee whose authority to compel answers to its inquiry was being challenged, *see* 354 U.S. at 201–02 & nn. 35–36, the Supreme Court's opinion reveals that these resolutions are not the only sources to be considered in determining whether a committee's investigation has been validly authorized. As the Court noted, "There are several sources that can outline the 'question under inquiry.'" *Id*. at 209. Among these, the Court mentioned "the remarks of the [committee] chairman or members of the committee, or even the nature of the proceedings themselves." *Id*. Indeed, the Court considered the opening statement of the chairman of the committee before whom the defendant in a criminal contempt proceeding had refused to answer, *see id*. at 209–10, although finding the statement impermissibly vague, *see id*. at 210; *see also Shelton v. United States*, 404 F.2d 1292, 1297 (D.C. Cir. 1968) (statements of committee members relevant to identification of purposes of congressional investigations).

---

pending appeal, making additional arguments concerning Resolution 507 as it relates to the subpoenas in the pending litigation. We consider those arguments *infra*.

Case 19-1540, Document 223-2, 12/03/2019, 2714491, Page56 of 106

*Rumely* does not confine the search for authorization of a valid legislative purpose to a committee's jurisdictional resolution. The Court concluded that the witness's "duty to answer must be judged as of the time of his refusal." *Rumely*, 345 U.S. at 48. Because we regard the time of the Banks' compliance with the subpoenas challenged in this case as the equivalent of the time of the witness's refusal in *Rumely*, that decision is no bar to examining legislative materials existing before such compliance.

Furthermore, the Court's point in *Rumely* was that the scope of the resolution authorizing the committee's investigation could not "be enlarged by subsequent action of Congress." 345 U.S. at 48. In the pending case, the issue with respect to House Resolution 507 is whether this Court, in ascertaining House authorization of the Committees' investigations, can consider evidence that comes after the issuance of the subpoenas. Including House Resolution 507 in our consideration results in no unfairness to the Banks, which have not refused to produce the information requested. Moreover, House Resolution 507 does not suffer from the same "infirmity of *post litem motam*, self-serving declarations" that tainted the *post hoc* debate in *Rumely*, 345 U.S. at 48, because the resolution does not purport to alter either the interpretation of the Committees' jurisdiction or the

stated purposes of the Committees' investigations that existed at the time the subpoenas were issued. Rather, the resolution was passed to eliminate any doubt regarding the support of the House for the Committees' investigations.

The D.C. Circuit's decision in *Shelton* states that the time a contempt witness is entitled to know the purpose of a challenged legislative inquiry is "before the subpoena issued." 327 F.2d at 607. Preliminarily, we note that this assertion is dictum; the holding is that the committee's subpoena was invalid because of procedural irregularity in its issuance.[52] *See id*. More important, that dictum conflicts with what the Supreme Court said in *Watkins*. The Court there made clear that to satisfy the due process objection arising from a contempt imposed for refusing to answer a committee's question insufficiently shown to be related to a valid legislative purpose, the purpose could be identified as late as immediately before the witness was required to answer. "Unless the subject matter has been made to appear with undisputable clarity, it is the duty of the investigative body, upon objection of the witness on grounds of pertinency, to state for the record the

---

[52] The D.C. Circuit explained that the relevant Senate resolution "imposes on the Subcommittee itself" the "function of calling witnesses," and that "the whole function of determining who the witnesses would be was de facto delegated to the Subcommittee counsel." *Shelton*, 327 F.2d at 606.

subject under inquiry at that time and the manner in which the propounded questions are pertinent thereto." *Watkins*, 354 U.S. at 214–15.

We therefore do not confine our search for the Committees' purposes to the House Rules alone, nor do we exclude Resolution 507 from our inquiry.

*Identifying the Committees' legislative purpose.* We next consider the "legislative purpose" to which the Committees assert their investigations are "related" and "the weight to be ascribed to[] the interest of the Congress in demanding disclosures" in order to determine whether "a public need" for such investigation "overbalances any private rights affected." *Id*. at 198.

Our consideration begins with the Constitution, which assigns to each house of Congress authority to "determine the Rules of its Proceedings." U.S. Const. art. I, § 5, cl. 2. In 2019, Congress adopted the Rules of the House of Representatives. *See* H.R. Res. 6, 116th Cong. (2019); Rules of the House of Representatives, 116th Cong. (prepared by Karen L. Haas, Clerk of the House of Representatives, Jan. 11, 2019) (hereinafter "H. Rules"). House Rule X establishes the standing committees of the House, including the Financial Services Committee and the Permanent Select Committee on Intelligence. *See* H. Rules X(2)(h), X(11). Rule X assigns to the Financial Services Committee jurisdiction over bills concerning, among other

58

things, banks and banking, international finance, and money and credit, *see* H.

Rule X(1)(h)(1), (h)(5), (h)(7), and assigns to the Intelligence Committee

jurisdiction over bills concerning, among other things, the Nation's intelligence

agencies and their intelligence and intelligence-related activities, *see* H. Rule

X(11)(b)(1)(A), (B).

Rule X also assigns to all of the standing committees "general oversight

responsibilities . . . to assist the House in its analysis, appraisal, and evaluation of

(A) the application, administration, execution, and effectiveness of Federal laws;

and (B) conditions and circumstances that may indicate the necessity or

desirability of enacting new or additional legislation." H. Rule X(2)(a)(1). In

addition, Rule X assigns to the Intelligence Committee "[s]pecial oversight

functions" to "review and study on a continuing basis laws, programs, and

activities of the intelligence community." H. Rule X(3)(m).

House Rule XI provides: "Each committee may conduct at any time such

investigations and studies as it considers necessary or appropriate in the exercise

of its responsibilities under [R]ule X." H. Rule XI(1)(b)(1). Rule XI also provides:

> "For the purpose of carrying out any of its functions and duties under
> this rule and [R]ule X . . . a committee or subcommittee is authorized
> . . . to require, by subpoena . . . the production of such . . . records . . .
> as it considers necessary."

H. Rule XI(2)(m)(1)(B).

On March 13, 2019, the House of Representatives adopted a resolution stating, among other things, that the House "supports efforts to close loopholes that allow corruption, terrorism, and money laundering to infiltrate our country's financial system." H.R. Res. 206, 116th Cong. (Mar. 13, 2019).

On April 12, 2019, the House Committee on Oversight and Reform issued a report summarizing the subjects that several committees planned to investigate during the 116th Congress. *See* H.R. Rep. No. 116-40 (2019). Because the date of this report is one day after issuance of the subpoenas challenged in this case, we note that the text of the report makes clear that the plans submitted by the committees had been received prior to the date the report was issued.[53]

The plan submitted by the Financial Services Committee includes as its purposes: "examining financial regulators' supervision of the banking, thrift and credit union industries for safety and soundness and compliance with laws and

---

[53] The report explains that under House Rule X, the Oversight Committee "is to review the various plans and, in consultation with the Speaker, the Majority Leader, and the Minority Leader, report to the House the oversight plans along with any recommendations that the House leadership and the Committee may have to ensure effective coordination. Pursuant to this rule, the Committee on Oversight and Reform has reviewed and consulted with House leadership about the oversight plans of the standing House committees for the 116th Congress." H.R. Rep. No. 116-40 at 2.

regulations," *id*. at 78; "the implementation, effectiveness, and enforcement of anti-money laundering/counter-financing of terrorism laws and regulations," *id*. at 84 (abbreviation omitted); and "the risks of money laundering and terrorist financing in the real estate market," *id*. at 85.

The Chair of the Financial Services Committee, Representative Maxine Waters, has identified a principal purpose of that committee's investigation. "The movement of illicit funds throughout the global financial system raises numerous questions regarding the actors who are involved in these money laundering schemes and where the money is going." 165 Cong. Rec. H2697, H2698 (daily ed. Mar. 13, 2019) (statement of Rep. Waters in support of H.R. Res. 206). Linking the Committee's inquiries to Appellants, she explained that her concerns are "precisely why the Financial Services Committee is investigating the questionable financing provided to President Trump and [t]he Trump Organization by banks like Deutsche Bank to finance its real estate properties." *Id*. In her statement, Rep. Waters noted that Deutsche Bank was fined for its role in a $10 billion money-laundering scheme, 165 Cong. Rec. at H2698, and the Committees note in their brief, Br. for Intervenors at 11, that Capital One agreed to pay a fine of $100 million for failing to correct deficiencies in its Bank Secrecy Act and anti-money-

laundering programs, *see Capital One, N.A.*, Enforcement Action No. 2018-080, 2018 WL 5384428, at *1–2 (O.C.C. Oct. 23, 2018).

The Financial Services Committee has held hearings on these matters,[54] and considered bills to combat financial crimes, such as money laundering.[55]

The Chair of the Intelligence Committee has identified several purposes of that committee's investigation. The committee is investigating "[t]he scope and scale of the Russian government's operations to influence the U.S. political process"; "[t]he extent of any links and/or coordination between the Russian government, or related foreign actors, and individuals associated with Donald Trump's campaign, transition, administration, or business interests, in furtherance of the Russian government's interests"; "[w]hether any foreign actor has sought to compromise or holds leverage, financial or otherwise, over Donald Trump, his family, his business, or his associates"; and "[w]hether President Trump, his

---

[54] *Implementation of FinCEN's Customer Due Diligence Rule—Regulator Perspective: Hearing Before the Subcomm. on Terrorism & Illicit Finance of the H. Comm. on Financial Services*, 115th Cong. (2018); *Examining the BSA/AML Regulatory Compliance Regime: Hearing Before the Subcomm. on Financial Institutions & Consumer Credit of the H. Comm. on Financial Services*, 115th Cong. (2017).

[55] *See* Corporate Transparency Act of 2019, H.R. 2513, 116th Cong. (bill to reform corporate beneficial ownership disclosures and increase transparency); COUNTER Act of 2019, H.R. 2514, 116th Cong. (bill to strengthen the Bank Secrecy Act and anti-money-laundering laws); Vladimir Putin Transparency Act, H.R. 1404, 116th Cong. (as passed by House, Mar. 12, 2019) (bill to require Executive Branch agencies to submit assessment to Congress regarding financial holdings of Russian President Vladimir Putin and top Kremlin-connected oligarchs).

family, or his associates are or were at any time at heightened risk of, or vulnerable to, foreign exploitation, inducement, manipulation, pressure, or coercion." Press Release, House Permanent Select Committee on Intelligence, Chairman Schiff Statement on House Intelligence Committee Investigation (Feb. 6, 2019).[56]

Linking these investigations to Appellants, the Committees cite public reports indicating that Deutsche Bank has extended loans to the Lead Plaintiff totaling more than $2 billion[57] and that his 2017 financial disclosure report showed a liability of at least $130 million to Deutsche Bank.[58] At oral argument, counsel for the Committees represented, without contradiction by Appellants, that Deutsche Bank is the only bank willing to lend to the Lead Plaintiff. *See* Oral Arg. Tr. at p. 36, ll. 5–18.

On this appeal, the Committees contend that the Intelligence Committee's investigations "will inform numerous legislative proposals to protect the U.S.

---

[56] https://intelligence.house.gov/news/documentsingle.aspx?DocumentID=447.

[57] David Enrich, *Deutsche Bank and Trump: $2 Billion in Loans and a Wary Board*, N.Y. Times, Mar. 18, 2019, https://www.nytimes.com/2019/03/18/business/deutsche-bank-donald-trump/html.

[58] Donald J. Trump, President, Executive Branch Personnel Public Financial Disclosure Report for 2017 (Office of Government Ethics Form 278e) at 45 (May 15, 2018).

political process from the threat of foreign influence and strengthen national security." Br. for Committees at 18.[59]

All of the foregoing fully identifies "the interest[s] of the Congress in demanding disclosures," as *Watkins* requires. 354 U.S. at 198. The Committees' interests concern national security and the integrity of elections, and, more specifically, enforcement of anti-money-laundering/counter-financing of terrorism laws, terrorist financing, the movement of illicit funds through the global financial system including the real estate market, the scope of the Russian government's operations to influence the U.S. political process, and whether the Lead Plaintiff was vulnerable to foreign exploitation. *Watkins* also requires that a legislative inquiry must in fact be related to a legislative purpose.[60] *See id*. The Committees have fully satisfied the requirements of *Watkins.*

---

[59] The Committees cite as examples the following bills: Duty to Report Act, H.R. 2424, 116th Cong. (2019) (bill to require campaign officials to notify law enforcement if offered assistance by foreign nationals and to report all meetings with foreign agents); KREMLIN Act, H.R. 1617, 116th Cong. (as passed by House, Mar. 12, 2019) (bill to require Director of National Intelligence to submit to Congress intelligence assessments of Russian intentions relating to North Atlantic Treaty Organization and Western allies); Strengthening Elections Through Intelligence Act, H.R. 1474, 116th Cong. (2019) (bill to require an intelligence threat assessment prior to every federal general election); For the People Act of 2019, H.R. 1, 116th Cong. (as passed by House, Mar. 8, 2019) (bill to improve election security and oversight and provide for national strategy and enforcement to combat foreign interference).

[60] The Court had previously said in *Quinn* that the power to investigate "cannot be used to inquire into private affairs *unrelated to a valid legislative purpose*." 349 U.S. at 161 (emphasis added).

We conclude our consideration of the Committees' identification of valid

legislative purposes by noting the significantly different purposes that were

identified by the House Committee on Oversight and Reform in the *Trump v.*

*Mazars* case in the District of Columbia,[61] to which we previously alluded.[62] The

four subject matters being investigated by that committee, set out in the margin,[63]

all explicitly concerned whether the President was in compliance with legal

---

[61] After the D.C. Circuit's decision in *Mazars*, Appellants and the Committees sent letters to this Court, reporting and commenting on that decision. *See* Letter from Patrick Strawbridge, counsel for President Donald J. Trump, to Clerk of Court, Second Circuit Court of Appeals, No. 19–1540, Dkt. No. 202 (Oct. 14, 2019); Letter from Douglas N. Letter, General Counsel, U.S. House of Representatives, to Clerk of Court, Second Circuit Court of Appeals, No. 19–1540, Dkt. No. 201 (Oct. 11, 2019). In view of the D.C. Circuit's ruling affirming the denial of an injunction to prohibit compliance with the subpoena there challenged, Appellants' letter stating that "the *Mazars* majority agreed that the subpoenas here are unconstitutional" presses the limits of advocacy. The Committees' letter states, "This Court should join the D.C. Circuit in upholding the validity of the subpoenas at issue here."

[62] *See* footnote 46, p. 52.

[63] As stated by Chairman Cummings:

"The Committee has full authority to investigate [1] whether the President may have engaged in illegal conduct before and during his tenure in office, [2] to determine whether he has undisclosed conflicts of interest that may impair his ability to make impartial policy decisions, [3] to assess whether he is complying with the Emoluments Clauses of the Constitution, and [4] to review whether he has accurately reported his finances to the Office of Government Ethics and other federal entities. The Committee's interest in these matters informs its review of multiple laws and legislative proposals under our jurisdiction, and to suggest otherwise is both inaccurate and contrary to the core mission of the Committee to serve as an independent check on the Executive Branch."

Memorandum from Elijah E. Cummings, Chairman, House Comm. on Oversight & Reform, to Members of the Comm. on Oversight & Reform 4 (Apr. 12, 2019).

requirements. Nevertheless, Judge Tatel's opinion for the *Mazars* majority concluded that the Oversight Committee, in issuing the challenged subpoena, "was engaged in a 'legitimate legislative investigation,' rather than an impermissible law-enforcement inquiry." *Mazars*, 940 F.3d at 732 (quoting *Hutcheson v. United States*, 369 U.S. 599, 618 (1962)) (citation omitted). On the other hand, Judge Rao's dissent contended that because the Oversight Committee was investigating whether the President violated various laws, its "investigations may be pursued exclusively through impeachment."[64] *Id*. at 751.

In the pending appeal, the Committees are not investigating whether the Lead Plaintiff has violated any law. To the extent that the Committees are looking into unlawful activity such as money laundering, their focus is not on any alleged misconduct of the Lead Plaintiff (they have made no allegation of his misconduct); instead, it is on the existence of such activity in the banking industry, the adequacy of regulation by relevant agencies, and the need for legislation.

*Whether legislative purpose "overbalances" private rights.* The Supreme Court can be understood in *Watkins* to have set out a second requirement for courts considering challenges to legislative inquiries.

---

[64] We note that neither the principal nor the reply brief of Appellants mentions the word "impeachment."

"The critical element is the existence of, and the weight to be ascribed to, the interest of the Congress in demanding disclosures from an unwilling witness. We cannot simply assume, however, that every congressional investigation is justified by *a public need that overbalances any private rights affected*. To do so would be to abdicate the responsibility placed by the Constitution upon the judiciary to insure that the Congress does not unjustifiably encroach upon an individual's right to privacy . . . ."

354 U.S. at 198–99 (emphasis added).

When the Court said that it "cannot simply assume, however, that every congressional investigation is justified by a public need that overbalances any private rights affected," *id*. at 198, the inference is available that courts are to determine whether the importance of the legislative interest outweighs an individual's privacy interests.

Three considerations diminish the force of this possible inference. First, we should be hesitant to conclude that the Supreme Court, always sensitive to separation-of-powers concerns, would want courts to make this sort of balancing determination, the outcome of which might impede the Legislative Branch in pursuing its valid legislative purposes. Second, the Court might simply have meant that courts should not "assume" the existence of a legislative purpose, but that the judicial task is at an end once courts find in congressional materials sufficient identification of the valid legislative purposes that Congress or a

committee is pursuing. Third, the Court later cautioned that "courts should not go beyond the narrow confines of determining that a committee's inquiry may fairly be deemed within its province." *Eastland*, 421 U.S. at 506 (quotation marks omitted). On the other hand, it is not likely that the Court would have described such a minimalist approach as "an arduous and delicate task." *Watkins*, 354 U.S. at 198.

Encountering this uncertainty as to the task that *Watkins* has required courts to undertake, we will assume, for the argument, that we should make at least some inquiry as to whether the "public need" to investigate for the valid legislative purposes we have identified "overbalances any private rights affected." That balancing is similar to the comparison of hardships we make in Part IV, one of the factors relevant to two of the preliminary injunction standards.

We conclude that, even if *Watkins* requires balancing after valid legislative purposes have been identified, the interests of Congress in pursuing the investigations for which the challenged subpoenas were issued substantially "overbalance" the privacy interests invaded by disclosure of financial documents, including the non-official documents of the Lead Plaintiff. "[T]he weight to be ascribed to" the public need for the investigations the Committees are pursuing is

of the highest order. The legislative purposes of the investigations concern national security and the integrity of elections, as detailed above. By contrast, the privacy interests concern private financial documents related to businesses, possibly enhanced by the risk that disclosure might distract the President in the performance of his official duties.

*Whether the subpoenas seek information related to legislative purposes.* The remaining issue is whether the information sought by the subpoenas is sufficiently related to the identified legislative purposes supporting the Committees' investigations, or whether the subpoenas are overbroad, as Appellants contend. Their challenge proceeds along three lines: (1) a procedural objection concerning the District Court, (2) several general substantive objections to the entire scope of the subpoenas, and (3) a more focused substantive objection to several specific categories of information sought by the subpoenas.

*Procedural objection—District Court's not requiring negotiation.* Appellants contend that the District Court erred procedurally by not "send[ing] the parties back to the negotiating table" to attempt to narrow the scope of the subpoenas. Br. for Appellants at 29. Judge Livingston favors that disposition. Part. Diss. Op. at 11, 56. Indeed, that is an additional point of her partial dissent, which takes no

position on the merits of any of Appellants' claims, deferring decision until such negotiation occurs. Judge Livingston also favors a total remand for further development of the record.

Appellants cite two instances where courts have had at least partial success in encouraging such negotiation. *See AT&T II*, 567 F.2d at 124–25; *Bean LLC v. John Doe Bank*, 291 F. Supp. 3d 34, 39–40 (D.D.C. 2018). Both cases arose in significantly different circumstances, and neither one requires a total remand here. The *AT&T* litigation involved what the D.C. Circuit characterized as "a portentous clash between the [E]xecutive and [L]egislative [B]ranches," *AT&T I*, 551 F.2d at 385. In the pending appeal, as we have noted, the Lead Plaintiff is suing only in his individual capacity, not as President, and no official documents are sought. The only Executive Branch interest implicated is the possible distraction of the President in the performance of his duties, which we consider at pages 90–91. Furthermore, *AT&T I* concerned national security wiretaps, Executive Branch official documents of obvious sensitivity. Finally, the D.C. Circuit's advice in *AT&T I* was offered after the parties had already "negotiated extensively and came close to agreement." *Id*. at 394. The Court simply urged the parties to continue the process they had successfully begun and "requested" the parties "to attempt to

negotiate a settlement," *id*. at 395, because the "precise details of the [earlier] negotiations . . . demonstrate[d] the proximity of the parties to a workable compromise," *id*. at 386. The *Bean* litigation concerned a subpoena challenged as violative of the First Amendment. *See* 291 F. Supp. 3d at 37.

To the extent that the request for judicial assistance in narrowing the scope of the subpoenas is analogous to the role of district court judges managing pretrial discovery, they have broad discretion to determine the extent to which they should intervene, *see, e.g.*, *In re Fitch, Inc.*, 330 F.3d 104, 108 (2d Cir. 2003), and Judge Ramos did not exceed such discretion in this case by leaving any negotiation in the hands of experienced counsel prior to his ruling. In favoring a total remand, Judge Livingston does not consider our limited standard of review of the District Court's decision not to require the parties to negotiate, nor does she suggest that the District Court's discretion was exceeded. Moreover, Appellants have not identified a single category of documents sought or even a single document within a category that they might be willing to have the Banks produce if a negotiation had been required. Finally, we note the likely futility of ordering a total remand for negotiation, as Judge Livingston prefers,[65] in view of the fact that the White

---

[65] Judge Livingston reports that at oral argument the Committees "affirmed a willingness to negotiate on an expedited basis, if requested by this Court." Part. Diss. Op. at 11. The colloquy

House has prohibited members of the Administration from even appearing in response to congressional subpoenas and has informed Congress that "President Trump and his Administration cannot participate" in congressional inquiries.[66]

Judge Livingston suggests that a total remand would be useful to afford the parties an opportunity for further development of the record. However, Appellants have given no indication of what additional materials they would seek to add to the record, and the existing record fully suffices for disposition of this appeal.

---

to which Judge Livingston refers arose in response to a hypothetical inquiry from the Court as to whether certain sensitive documents such as a check for medical services should be excluded from disclosure. Counsel for the Committees responded that as to any documents "that have nothing to do with Mr. Trump and his family and these other businesses, his various businesses, have nothing to do with their real financial activities, we will direct Deutsche Bank not to produce those." Oral Arg. Tr. at p. 41, ll. 11–15. When the Court inquired further about the Committees' position if the Court were to insist on exclusion of such documents, counsel for the Committees responded, "[I]f this Court orders 'these subpoenas are enforceable but' — and drew this exception, consistent with the hypothetical your Honor has raised, we would have no problem with that." *Id*. at p. 41, ll. 22–25. Obviously, the Committees' willingness to comply with an order from this Court concerning exclusion of sensitive documents like a check for payment of medical expenses does not affirm the Committees' willingness to engage in negotiation. Later, the Committees said that "[i]f this court thinks there should be negotiation, . . . make it really, really fast," *id* at p. 46, ll. 8–10, and added, "Mr. Trump and the various other people have given no indication whatsoever that they actually would be willing to negotiate over — in any way that is serious." *Id*. at p. 46, ll. 17–19. Again, there is no expression of a willingness to negotiate.

   In any event, the limited remand we order provides an opportunity for exemption from disclosure of more documents than even those we have labeled "sensitive."

   [66] *See* Letter from Pat A. Cippolone, Counsel to the President, the Speaker of the House of Representatives, and three House committee chairmen (Oct. 8, 2019), https://www.nytimes.com/interactive/2019/10/08/us/politics/white-house-letter-impeachment. html. One recipient of this letter, Congressman Adam Schiff, is the chairman of one of the committees that issued subpoenas in this litigation.

A total remand would simply further delay production of documents in response to subpoenas that were issued seven months ago and would run directly counter to the Supreme Court's instruction that motions to enjoin a congressional subpoena should "be given the most expeditious treatment by district courts because one branch of Government is being asked to halt the functions of a coordinate branch." *Eastland*, 421 U.S. at 511 n.17.

*General substantive objections to scope of subpoenas*. One broad substantive challenge to the scope of the subpoenas is that they focus on the Lead Plaintiff.[67] This point is made in support of the broader argument that the subpoenas were issued with the expectation that some of the documents sought would embarrass

---

[67] In the District Court, the Committees stated, "Because of his prominence, much is already known about Mr. Trump, his family, and his business, and this public record establishes that they serve as a useful case study for the broader problems being examined by the Committee." Opposition of Intervenors to Plaintiffs' Motion for a Preliminary Injunction at 16, Dist. Ct. Dkt. No. 51 (May 10, 2019). Appellants repeatedly point to the phrase "case study" to argue that the Committees are not only focusing on the Lead Plaintiff but also doing so for law enforcement purposes. Br. for Appellants at 5, 11, 15, 31, 33, 50. However, as long as valid legislative purposes are duly authorized and being pursued by use of the challenged subpoenas, the fact that relevant information obtained also serves as a useful "case study" does not detract from the lawfulness of the subpoenas. Furthermore, congressional examination of whether regulatory agencies are properly monitoring a bank's practices does not convert an inquiry into impermissible law enforcement, and neither committee has made any allegation that the Lead Plaintiff or any of the Appellants has violated the law.

Moreover, when a borrower can obtain loans from only one bank, that bank has already lent the borrower $130 million, and that bank has been fined in connection with a $10 billion money laundering scheme, that situation is appropriate for a case study of such circumstances by a congressional committee authorized to monitor how well banking regulators are discharging their responsibilities and whether new legislation is needed.

the President, rather than advance a legitimate legislative purpose. One answer to the complaint about targeting the Lead Plaintiff and his family is that the Committees have represented that the three subpoenas at issue in this litigation are among a group of subpoenas "to seven other financial institutions, the majority of which do not request documents specific to" the Lead Plaintiff. Br. for Committees at 9.[68] In fact, the Deutsche Bank Subpoenas themselves seek documents from entities not related to Appellants. *See* Deutsche Bank Subpoenas ¶¶ 2–6, J. App'x 40–42. Another answer to the targeting objection is the significant relationship between Deutsche Bank and the Lead Plaintiff. The Committees have relied on information (not disputed by Appellants) indicating that when no other bank would extend credit to the Lead Plaintiff, Deutsche Bank loaned him or his affiliated entities at least $130 million dollars. That unusual circumstance adequately supports requests for information to determine whether proper banking procedures have been followed.

---

[68] Replying to this assertion by the Committees, the amicus brief of the United States says, "The bare fact that a 'majority' of *other* subpoenas may not be confined to the President's information hardly suggests that the *present* subpoenas are part of a general inquiry into reforms of the financial system, in which the President and his family have been caught up merely by chance . . . ." Br. for Amicus United States at 21 (emphases in original). The Committees make no claim that the subpoenas seek financial records of the Lead Plaintiff, his family, and his business entities "by chance." As we have recounted, the Committees have explicitly set out the circumstances that make the financial records of the Lead Plaintiff and affiliated persons and business entities appropriate subjects for legislative inquiry.

To whatever extent the targeting objection is really a claim that part of the motive of some members of the Committees for issuing the three subpoenas was to embarrass the Lead Plaintiff, the Supreme Court has made it clear that in determining the lawfulness of a congressional inquiry, courts "do not look to the motives alleged to have prompted it." *Eastland*, 421 U.S. at 508. The Court had earlier said, "So long as Congress acts in pursuance of its constitutional power, the Judiciary lacks authority to intervene on the basis of the motives which spurred the exercise of that power." *Barenblatt*, 360 U.S. at 132 (citations omitted).

In this respect, the guiding principle is the same as that applicable when an arrest supported by probable cause is ruled valid despite the arresting officer's motive to retaliate against a suspect for exercising a First Amendment right. *See Nieves v. Bartlett*, 139 S. Ct. 1715, 1725 (2019); *see also Hartman v. Moore*, 547 U.S. 250, 265–66 (2006) (absence of probable cause required for valid claim of initiating prosecution to retaliate against a defendant for exercising a First Amendment right).

But Appellants disclaim any objection based on inquiry into motive. "No aspect of this inquiry involves a search for Congress's hidden 'motives.'" Br. for Appellants at 26. Their point is that various statements of some members of

Congress reveal that the *purpose* of the investigations is to embarrass the President, not merely that such embarrassment was the *motive* for the investigations. In this context (as in some others[69]), the distinction between motive, *i.e.*, the reason for acting, and purpose, *i.e.*, the result sought, becomes somewhat blurred. We do not doubt that some members of the Committees, even as they pursued investigations for valid legislative purposes, hoped that the results of their inquiries would embarrass the President.[70] But as long as the valid legislative purposes that the Committees have identified are being pursued and are not artificial pretexts for ill-motivated maneuvers, the Committees have not exceeded their constitutional authority. The Supreme Court has stated that there is a "presumption" that the stated legislative purposes are the "real object" of the Committees' investigation. *McGrain*, 273 U.S. at 178. We need not rely on that presumption where we have

---

[69] *See, e.g., Mobile v. Bolden*, 446 U.S. 55, 62 (1980) ("Our decisions, moreover, have made clear that action by a State that is racially neutral on its face violates the Fifteenth Amendment only if motivated by a discriminatory purpose."); *see generally* Andrew Verstein, *The Jurisprudence of Mixed Motives*, 127 Yale L.J. 1106 (2018).

[70] The Complaint in this case alleges the following remarks of some members of Congress. Rep. Waters, Chair of the Financial Services Committee, said, "I have the gavel—and subpoena power—and I am not afraid to use it." Complaint ¶ 37. Another member of Congress "stated that the new House majority would be 'brutal' for President Trump" and that "[w]e're going to have to build an air traffic control tower to keep track of all the subpoenas flying from here to the White House." *Id*. Others "were busy preparing a 'subpoena cannon' to fire at President Trump." *Id*. Others, "according to news outlets that interviewed party leaders," issued statements that "meant that they were going to spend the next two years launching a 'fusillade' of subpoenas in order to 'drown Trump with investigations,' 'turn Trump's life upside down,' and 'make Trump's life a living hell.'" *Id*. ¶ 36.

evidence that valid legislative purposes are being pursued and "the purpose[s] asserted [are] supported by references to specific problems which in the past have been or which in the future could be the subjects of appropriate legislation." *Shelton*, 404 F.2d at 1297.

Appellants object to the extensive time frame covered by the subpoenas, especially the absence of any time limitations on requests relating to account applications and the identity of those holding interests in accounts. Appellants also object to disclosure of financial records in the names of family members, including the Lead Plaintiff's grandchildren. However, such information, including documents dating back to when accounts were opened, is reasonably related to an investigation about money laundering.

Appellants contend that the subpoenas exceed any valid legislative purpose because, in their view, the subpoenas are intended to discover evidence of crimes, thereby indicating that the Committees are pursuing a law enforcement objective, which is beyond the power of Congress. *See Quinn*, 349 U.S. at 161. But, as Appellants themselves recognize, "a permissible legislative investigation does not become impermissible because it might reveal evidence of a crime." Br. for Appellants at 22. Any investigation into the effectiveness of the relevant agencies'

existing efforts to combat money laundering or the need for new legislation to render such efforts more effective can be expected to discover evidence of crimes, and such discovery would not detract from the legitimacy of the legislative purpose in undertaking the investigation. The Supreme Court long ago rejected Appellants' argument: "Nor do we think it a valid objection to the investigation that it might possibly disclose crime or wrongdoing on [an executive branch official's] part." *McGrain*, 273 U.S. at 179–80. *See Sinclair*, 279 U.S. at 295 ("[T]he authority of [Congress], directly or through its committees, to require pertinent disclosures in aid of its own constitutional power is not abridged because the information sought to be elicited may also be of use in [criminal prosecutions].").

Appellants fault Judge Ramos, who, they contend, "asserted that Congress has an independent 'informing function' that allows it to . . . 'publicize corruption . . . in agencies of the Government,' even absent a connection to 'contemplated legislation in the form of a bill or statute.'" Br. for Appellants at 23 (quoting District Court opinion, J. App'x 127). Although the phrases quoted from the Court's opinion are accurate, the brief's addition of the words "independent" and "absent a connection" is a mischaracterization of what Judge Ramos said. He was not asserting an independent informing function or investigative power *absent* a

connection to a legislative purpose. He was careful to state that Congress's legislative authority "*includes* a more general informing function." J. App'x 127 (emphasis added). This reflected the Supreme Court's statement in *Hutchinson v. Proxmire*, 443 U.S. 111, 132–33 (1979), that "congressional efforts to inform itself through committee hearings are part of the legislative function."[71]

However, some of the Court's statements in *Watkins* create uncertainty as to whether, and in what circumstances, an informing function permits public disclosure of information obtained as part of a valid legislative inquiry. On the one hand, the Court said, "We have no doubt that there is no congressional power to expose for the sake of exposure." 354 U.S. at 200. On the other hand, the Court also said, "The public is, of course, entitled to be informed concerning the workings of its government."[72] *Id*. And, in cautioning that the public's right to be informed about its government "cannot be inflated into a general power to expose," *id*., the Court added in the same sentence, "where the *predominant result* can *only* be an

---

[71] To whatever extent Judge Ramos might be understood as treating the informing function as an additional source of Congress's power, he did not rely on that source of authority, mentioning it only as part of a general overview of Congress's powers.

[72] In *Hutchinson*, the Supreme Court arguably contradicted this statement when it said, "[T]he transmittal of . . . information by individual Members in order to inform the public [about their activities in Congress] is not a part of the legislative function or the deliberations that make up the legislative process." 443 U.S. at 133. However, the Court's next sentence makes the limited context clear: "As a result, transmittal of such information by press releases and newsletters is not protected by the Speech or Debate Clause." *Id*.

invasion of the private rights of individuals," *id.* (emphases added). The Court also noted that it was "not concerned with the power of the Congress to inquire into and publicize corruption, maladministration or inefficiency in agencies of the Government." *Id.* at 200 n.33. These latter statements make clear that Congress can obtain information in an investigation as long as the information is collected in furtherance of valid legislative purposes. In the pending appeal, the high significance of the valid legislative purposes demonstrates that the "predominant purpose" of the Committees' inquiries cannot be said to be "only" to invade private rights.

*Specific substantive objections to scope of subpoenas.* We next consider Appellants' specific challenges to the scope of the subpoenas. Of the three subpoenas, the two identical subpoenas to Deutsche Bank have the broadest scope. These subpoenas fill six single-spaced pages describing eight categories of documents, subdivided into 52 paragraphs, many of which request several types of items. If such extensive document requests were made during discovery in ordinary civil litigation, an initial response would likely be that the requests are too burdensome. In this case, however, the Banks have made no claim that compiling the requested documents imposes an excessive burden on them. It is

Appellants whose privacy is claimed to be unlawfully impaired by the Banks'
compliance with the subpoenas who challenge the breadth of the requests. To
consider that challenge we examine the subpoenas in detail.

We note that of the eight categories of documents sought by the two
Deutsche Bank Subpoenas, only categories 1, 7, and 8 request documents
belonging to, or likely to reveal information concerning, Appellants or entities they
control or in which they are alleged to have interests. The Committees confirmed
this fact during oral argument, without dispute from Appellants. The first
category of documents includes, with respect to the individuals (including
members of their immediate families) and entities named: documents reflecting
applications to open accounts, due diligence, and related items, ¶ 1(i); account
statements, ¶ 1(ii); transfers of amounts in excess of $10,000, ¶ 1(iii); summaries or
analyses of account activity including the destination of checks (without limitation
as to amount), ¶ 1(iv); suspicious activity, ¶ 1(v); investment, mortgage, and credit
arrangements and related items, ¶ 1(vi), including appraisals of assets, ¶ 1(vi)(d),
and financial information provided by borrowers, ¶ 1(vi)(e), such as tax returns, ¶
1(vi)(e)(7), and bankruptcy records, ¶ 1(vi)(e)(8); information supplied pursuant
to §§ 314(a) or 314(b) of the PATRIOT Act, Pub. L. No. 107-56, ¶ 1(vii); records

generated by named bank employees, ¶ 1(viii); documents not kept in customary record-keeping systems related to the named individuals and entities, ¶ 1(ix); and matters discussed with Deutsche Bank's boards, ¶ 1(x).

The seventh category covers documents reflecting periodic reviews of the identified individuals and entities. ¶ 7. The eighth category covers any communications by named employees of the Banks concerning the identified individuals and entities. ¶ 8. Many of the paragraphs in categories 1, 7, and 8 seek documents "including, but not limited to, those involving any foreign individual, entity, or government" or similar language. *E.g.*, ¶ 1(vi), ¶ 1(vi)(k).

The subpoena from the Financial Services Committee to Capital One is less extensive, filling one and one-half single-spaced pages describing one category of documents, subdivided into fifteen paragraphs, two of which request several items. This category includes, with respect to accounts held by the entities named and their principals, directors, etc.: documents related to applications to open accounts and due diligence, ¶ 1(i); documents identifying those with interests in the accounts, ¶ 1(ii); documents identifying any account manager, ¶ 1(iii); monthly statements and cancelled checks in excess of $5,000, ¶ 1(iv); summaries or analyses of account activity including the destination of checks (without limitation as to

amount), ¶ 1(v); transfers in excess of $10,000, ¶ 1(vi); documents concerning suspicious activity, ¶ 1(vii); reviews of accounts pursuant to Capital One's procedures related to Bank Secrecy Act, anti-money-laundering, and compliance with guidance on "Politically Exposed Persons," ¶ 1(viii); documents not kept in customary record-keeping systems related to any loan provided to the named entities, ¶ 1(ix); documents related to real estate transactions, ¶ 1(x); documents provided in response to any subpoena or request from any U.S. Federal or state agency, ¶ 1(xi)(a); notices of administrative, civil, or criminal actions, ¶ 1(xi)(b); requests pursuant to §§ 314(a) or 314(b) of the PATRIOT Act, ¶ 1(xi)(c); and requests for information to or from a third party, ¶ 1(xi)(d).

*Sensitive personal information.* A specific item in the subpoenas that raises serious concerns as to whether even valid legislative purposes permit exposure of matters entitled to privacy protection is the request for "analyses of . . . transfers, including . . . the destination of the transfers . . ., including *any . . . check . . . .*" Deutsche Bank Subpoenas, ¶ 1(iv); Capital One Subpoena, ¶ 1(v) (emphasis added). These items have no dollar limitations, even though other provisions limit transfer information to checks above specified amounts. Deutsche Bank Subpoenas, ¶ 1(iii) ($10,000); Capital One Subpoena, ¶ 1(iv) ($5,000). In addition

83

to "analyses" of all checks, the Deutsche Bank Subpoenas seek "monthly or other periodic account statements" including "outgoing funds transfers," ¶ 1(ii), which might reveal the recipients of at least some checks.

These provisions create a risk that some of the checks sought might reveal sensitive personal details having no relationship to the Committees' legislative purposes. For example, if one of the entities decided to pay for medical services rendered to an employee, the check, and any similar document disclosing sensitive personal information unrelated to business transactions, should not be disclosed. The same would be true of any check reflecting payment for anyone's medical services. The Committees have advanced no reason why the legislative purposes they are pursuing require disclosure of such sensitive personal information. Indeed, counsel for the Committees at oral argument appeared to recognize that such sensitive personal information need not be disclosed. Oral Arg. Tr. at p. 41, ll. 8–18. We have not located any decision that has considered whether Congress is entitled to require disclosure of sensitive personal information that might be swept up in a collection of business-related financial documents legitimately sought in aid of legislative purposes. At least in the absence of a compelling reason for such disclosure, we decline to permit it in this case.

*Other possibly excludable documents.* In addition to what we have described as "sensitive documents," we recognize that there might be a few documents within the coverage of the subpoenas that have such an attenuated relationship to the Committees' legislative purposes that they need not be disclosed.

We have concluded that the coverage of the following paragraphs of the Deutsche Bank Subpoenas might include some documents warranting exclusion: paragraphs 1(ii), 1(iv), 1(vi)(e), 1(viii), and 8. We reach the same conclusion as to the following paragraphs of the Capital One subpoena: paragraphs 1(iv), 1(v), 1(x), and 1(xi)(d). We have no such concerns with the coverage of any of the other paragraphs of the subpoenas. All the documents within the coverage of these other paragraphs are sufficiently likely to be relevant to legislative purposes.[73] Even if within the coverage of these other paragraphs are some documents that turn out not to advance the Committees' investigations, that would not be a valid reason for excluding such documents from production. As the Supreme Court has observed with reference to another challenge to a congressional subpoena seeking

---

[73] For example, paragraph 1(v) of the Deutsche Bank subpoenas calls for production of "any document related to monitoring for . . . possible suspicious activity," and paragraph 1(vii) calls for production of "any document related to any request for information issued or received by Deutsche Bank AG pursuant to Sections 314(a) or 314(b) of the USA PATRIOT Act," provisions that concern money laundering.

private banking records, "The very nature of the investigative function—like any research—is that it takes the searchers up some 'blind alleys' and into nonproductive enterprises. To be a valid legislative inquiry there need be no predictable end result." *Eastland*, 421 U.S. at 509.

Any attempt to identify for exclusion from disclosure documents within the listed paragraphs must be done with awareness that a principal legislative purpose of the Committees is to seek information about the adequacy of banking regulators' steps to prevent money laundering, a practice that typically disguises illegal transactions to appear lawful. Many documents facially appearing to reflect normal business dealings will therefore warrant disclosure for examination and analysis by skilled investigators assisting the Committees to determine the effectiveness of current regulation and the possible need for improved legislation.

*Procedure for exclusion of specific documents.* To facilitate exclusion of sensitive documents and those few documents that should be excluded from the coverage of the listed paragraphs, we instruct the District Court on remand to implement the following procedure:[74] (1) after each of the Banks has promptly, and in no event beyond 30 days, assembled all documents within the coverage of paragraphs 1(ii),

---

[74] *See* 28 U.S.C. § 2106 (appellate court "may remand the cause and . . . require such further proceedings to be had as may be just under the circumstances.").

1(iv), 1(vi)(e), 1(viii), and 8 of the Deutsche Bank Subpoenas and paragraphs 1(iv), 1(v), 1(x), and 1(xi)(d) of the Capital One Subpoena, counsel for Appellants shall have 14 days to identify to the District Court all sensitive documents and any documents (or portions of documents) within the coverage of the listed paragraphs that they contend should be withheld from disclosure, under the limited standard discussed above; (2) counsel for the Committees shall have seven days to object to the nondisclosure of such documents; (3) the District Court shall rule promptly on the Committees' objections; (4) Appellants and the Committees shall have seven days to seek review in this Court of the District Court's ruling with respect to disclosure or nondisclosure of documents pursuant to this procedure.[75] Any appeal of such a ruling will be referred to this panel.

The abbreviated timetable of this procedure is set in recognition of the Supreme Court's instruction that motions to enjoin a congressional subpoena should "be given the most expeditious treatment by district courts because one branch of Government is being asked to halt the functions of a coordinate branch." *Eastland*, 421 U.S. at 511 n.17.

---

[75] Review may be initiated by a letter to the Clerk of this Court, referencing the existing docket number, without the need to file a notice of appeal.

*All other documents.* All documents within the coverage of the paragraphs not listed and those documents not excluded pursuant to the procedure outlined above shall be promptly transmitted to the Committees in daily batches as they are assembled, beginning seven days from the date of this opinion.

Except as provided above, all three subpoenas seek documents that the Committees are entitled to believe will disclose information pertinent to legitimate topics within the Committees' authorized investigative authority, especially money laundering, inappropriate foreign financial relationships with the named individuals and entities, and Russian operations to influence the U.S. political process. As the Supreme Court has observed, documents subpoenaed by a congressional committee need only be "not plainly incompetent or irrelevant to any lawful purpose [of a committee] in the discharge of its duties." *McPhaul v. United States*, 364 U.S. 372, 381 (1960) (quotation marks and brackets omitted). The documents sought by the three subpoenas easily pass that test. The subpoenas are reasonably framed to aid the Committees in fulfilling their responsibilities to conduct oversight as to the effectiveness of agencies administering statutes within the Committees' jurisdiction and to obtain information appropriate for consideration of the need for new legislation.

*Objections of the United States as amicus curiae*. The United States makes several additional arguments in its amicus curiae brief. The amicus brief contends that "the possibility that a subpoena might transgress separation-of-powers limits . . . mandates that the House clearly authorize a subpoena directed at [the President's] records." Br. for Amicus United States at 10 (citing *Franklin v. Massachusetts*, 505 U.S. 788, 800–01 (1992), and *Armstrong v. Bush*, 924 F.2d 282, 289 (D.C. Cir. 1991)). First, this case does not concern separation of powers. The Lead Plaintiff is not suing in his official capacity, no action is sought against him in his official capacity, no official documents of the Executive Branch are at issue, Congress has not arrogated to itself any authority of the Executive Branch, and Congress has not sought to limit any authority of the Executive Branch.

Second, the cited cases, *Franklin* and *Armstrong*, do not concern congressional requests for information. Both require a clear statement from Congress when a statute is claimed to limit presidential power. In all of the numerous decisions concerning congressional subpoenas for information from Executive Branch officials, including the President, there is not even a hint, much less a ruling, that the House (or Senate) is required to authorize a specific subpoena issued by one of its committees. In any event, the materials cited above provide

sufficient clarity, in light of Supreme Court decisions concerning congressional investigations, to authorize subpoenas for the Lead Plaintiff's unofficial business records in aid of valid legislative purposes.

The amicus brief argues that a President is "entitled to special solicitude in discovery," Br. for Amicus United States at 6 (citing *Cheney*, 542 U.S. at 385, and *In re Trump*, 928 F.3d 360, 371–72 (4th Cir. 2019)), "even in suits solely related to his private conduct," *id*. (citing *Jones*, 520 U.S. at 707). As a general proposition, we agree and have endeavored to recognize that point in the special procedure we have directed the District Court to follow on a limited remand. We note, however, that in *Cheney* the Supreme Court was careful to point out that "special considerations control when the Executive Branch's interests in maintaining the autonomy of its office and safeguarding the confidentiality of its communications are implicated." *Cheney*, 542 U.S. at 385. In the pending appeal, the Lead Plaintiff is suing in his individual capacity, no confidentiality of any official documents is asserted, and any concern arising from the risk of distraction in the performance of the Lead Plaintiff's official duties is minimal in light of the Supreme Court's decision in *Clinton v. Jones*, and, in any event, far less substantial than the importance of achieving the legislative purposes identified by Congress. In *Jones*,

the claimed distraction was that attending a deposition and being subjected to a civil trial would divert some of the President's time from performance of his official duties; in the pending case, there is no claim of any diversion of any time from official duties. *Jones*, although expressing concern with "the high respect that is owed to the office of the Chief Executive," not only permitted discovery directed to the President but also obliged him to be subjected to a civil trial. 520 U.S. at 707.[76]

*In re Trump*, 928 F.3d at 379–80, concerned a petition for mandamus directing a District Court to dismiss for lack of standing a complaint alleging violation of the Foreign and Domestic Emoluments Clauses, U.S. Const. art I, § 9, cl. 8, art II, § 1, cl. 7.

---

[76] Judge Livingston seeks to minimize the significance of *Clinton v. Jones* on several grounds. First, she attempts to refute our point that this case does not involve separation-of-powers concerns, Part. Diss. Op. at 15–16, but in doing so, she accords little significance to the major reason for that point: the Lead Plaintiff is suing in his individual, not his official, capacity. She then seeks to relegate *Jones* to near insignificance by referring to "longstanding interbranch practice," *id*. at 17, again ignoring the fact that this litigation is not a conflict between branches of the Government. The fact that the United States filed only an amicus curiae brief, rather than intervene to assert the interests of the United States or those of the office of the President, underscores the absence of a true interbranch conflict. The point that compliance with the subpoenas will not have an impact on the Lead Plaintiff's time sufficient to bar compliance arises from a comparison with *Clinton v. Jones*, in which the Supreme Court required a President to be available for a deposition and be subject to a civil trial. The so-called distraction of the Lead Plaintiff is of far less significance than what the Supreme Court permitted with respect to President Clinton. In sum, Judge Livingston offers no reason to think that compliance with the subpoenas will distract the Lead Plaintiff from the performance of official duties to a greater extent than the Supreme Court permitted in *Clinton v. Jones*.

The amicus brief not only repeats Appellants' argument that the House must identify a legitimate legislative purpose for seeking the President's information, but adds that it must do so "with sufficient particularity that courts can concretely review the validity of any potential legislation and determine whether the information requested is pertinent and necessary to Congress's consideration of such legislation." Br. for Amicus United States at 11. The meaning of this sentence is not clear. If it means that legislative purpose must be sufficiently identified to enable a court now to consider the validity of any legislation that might be enacted in the future, it would encounter the prohibition on advisory opinions. *See Flast v. Cohen*, 392 U.S. 83, 96 (1968) ("[T]he rule against advisory opinions implements the separation of powers prescribed by the Constitution and confines federal courts to the role assigned them by Article III."). On the other hand, if the sentence means that legislative purpose must be sufficiently identified so that it will serve as an aid in interpreting legislation that might be enacted in the future, there is no requirement that legislative purpose sufficient to support a congressional subpoena must also suffice to aid a court in interpreting some statute yet to be enacted. In any event, the legislative purposes of the Committees' subpoenas have been sufficiently identified.

92

Refining Appellants' argument that the Committees' valid legislative purposes have not been adequately identified, the amicus brief argues that "courts must assess 'the connective reasoning whereby the precise questions asked relate to' the legitimate legislative purpose." Br. for Amicus United States at 14 (quoting *Watkins*, 354 U.S. at 215). This quotation from *Watkins* is difficult to square with the Supreme Court's later statement in *McPhaul* that subpoenaed documents need only be "not plainly incompetent or irrelevant to any lawful purpose [of a committee] in the discharge of its duties." *McPhaul*, 364 U.S. at 381 (quotation marks and brackets omitted). It would appear that the "connective reasoning" phrase of *Watkins*, if still valid at all, is limited to the context in which it was said–a committee witness's objection to a specific question–and not to a subpoena for adequately described categories of documents that are relevant to adequately identified valid legislative purposes of investigation.

The amicus brief argues that subpoenaed information "not 'demonstrably critical' should be deemed insufficiently pertinent when directed at the President's records." Br. for Amicus United States at 15 (quoting *Senate Select Committee on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 731 (D.C. Cir. 1974) (in banc)). The D.C. Circuit used the phrase "demonstrably critical" as a standard for

overcoming a claim of executive privilege. *See Nixon*, 498 F.2d at 727. President

Nixon had asserted that tape recordings of his conversations with senior staff

"cannot be made public consistent with the confidentiality essential to the

functioning of the Office of the President." *Id*. (internal quotation marks omitted).

In the pending appeal, no claim of executive privilege has been made, much less a

claim that withholding the subpoenaed documents is "essential to the functioning

of the Office of the President." *Id*.

The amicus brief asserts that "[c]ourts may require the Committees first 'to

narrow the scope of the subpoenas' to first seek critical information in light of the

President's constitutional interests," Br. for Amicus United States at 17 (ellipsis

omitted) (quoting *Cheney*, 542 U.S. at 390), and that "[c]ourts may require Congress

first to determine whether records relevant to a legitimate legislative purpose are

not, in fact, available from other sources that would not impinge on constitutional

interests," *id*. (citing *Watkins*, 354 U.S. at 206). That argument has no application to

the many documents that were generated by the Banks. Moreover, the District

Court was not required to do what it "may" do,[77] and the President's

---

[77] The amicus brief asserts that the District Court "assumed that it had no authority to deal with the overbroad character of the congressional subpoenas here." Br. for Amicus United States at 25 (citing J. App'x 138). We see no indication that the District Court made such an assumption, either at the cited reference to the District Court's opinion or elsewhere in that opinion.

"constitutional interests" are implicated when *official* documents are sought, as in *Cheney*, precipitating "a conflict between the [L]egislative and [E]xecutive [B]ranches," *AT&T I*, 551 F.2d at 390.

The amicus brief contends that H.R. 507 is insufficient authorization for the subpoenas to the extent that it authorizes not only current subpoenas to the named persons and entities but also future subpoenas to them. Br. for Amicus United States at 18. Because the pending appeal concerns denial of a preliminary injunction to prevent compliance with issued subpoenas, we make no determination with respect to future subpoenas.

In an overarching argument endeavoring to strengthen and make decisive many of the arguments just considered, the amicus brief urges the principle of constitutional avoidance. Confronting a constitutional challenge to a statute of uncertain meaning, courts sometimes interpret the statute so that it clearly comports with the Constitution. *See, e.g., Crowell v. Benson*, 285 U.S. 22, 62 (1932). Enlisting the principle of constitutional avoidance in the pending appeal, the amicus brief contends that the principle should persuade this Court to require the Committees to "'explore other avenues'" for obtaining the information, Br. for Amicus United States at 3 (quoting *Cheney*, 542 U.S. at 390); to require the District

Court "to proceed in a more tailored manner," *id*. at 5; to approach "with the

utmost caution" the task of "balanc[ing] Congress's interest in the information

against any constitutional interests of the party withholding it," *id*. at 16; and to

require the District Court "to attempt to avoid a conflict between constitutional

interests before it can 'intervene responsibly,'" *id*. at 17–18 (quoting *AT&T II*, 567

F.2d at 131). The amicus brief also reminds us of the Supreme Court's statement in

*Rumely* suggesting "abstention from adjudication unless no choice is left." 345 U.S.

at 46.

In the circumstances of this case, we do not believe that constitutional

avoidance adds persuasive force to the arguments in the amicus brief. First, we

question whether constitutional avoidance applies beyond the context of

interpreting ambiguous statutes that are challenged as unconstitutional. The

Supreme Court considered that question in an analogous situation in *FCC v. Fox*

*Television Stations, Inc.*, 556 U.S. 502 (2009). Broadcasters urged the Court to apply

to the FCC a more stringent arbitrary-and-capricious standard of review of agency

actions that implicate constitutional liberties. *See id*. at 516. In declining to do so,

the Court said, "We know of no precedent for applying [the principle of

constitutional avoidance] to limit the scope of authorized executive action." *Id*. ~~at~~

516. Similarly, it is at least doubtful whether the principle should be enlisted to limit the scope of authorized congressional action.

Second, to the extent that decisions like *Cheney* and *Rumely* advised courts to proceed with caution, they did so in contexts quite different from the pending appeal. *Cheney* involved a real confrontation between the Legislative and Executive Branches; *Rumely* involved a "limitation imposed by the First Amendment," 345 U.S. at 44. By contrast, the pending appeal involves solely private financial documents, and the Lead Plaintiff sues only in his individual capacity. The only defense even implicating the office of the presidency is the possibility that document disclosure might distract the Lead Plaintiff in the performance of his official duties, a risk we have concluded, in light of Supreme Court precedent, *Clinton v. Jones,* is minimal at best. Appellants make no claim that Congress or its committees are purporting to curb in any way the powers of the Executive Branch.

For all of these reasons, we see no reason to permit constitutional avoidance to provide added strength to the arguments of the amicus or Appellants themselves.

Having considered Appellants' statutory and constitutional claims, we conclude that they have not shown a likelihood of success on any of them. In reaching this conclusion, we recognize that we are essentially ruling on the ultimate merits of Appellants' claims. But, as the Supreme Court has pointed out, "Adjudication of the merits is most appropriate if the injunction rests on a question of law and it is plain that the plaintiff cannot prevail." *MuFnaf v. Geren*, 553 U.S. 674, 691 (2008). That is the situation here.

## III. Sufficiently Serious Questions to Make Them a Fair Ground for Litigation

In considering the less rigorous serious-questions standard for a preliminary injunction, it is important to recognize that the first component of this standard, in addition to a balance of hardships tipping decidedly in favor of the moving party, is "sufficiently serious questions going to the merits *to make them a fair ground for litigation*." *Kelly*, 933 F.3d at 184 (emphasis added); *Jackson Dairy*, 596 F.2d at 72. The meaning of this emphasized phrase rarely receives explicit consideration. Two interpretations are possible.

The phrase could mean that the questions raised have sufficiently serious *legal* merit to be open to reasonable debate. That view of the phrase would be especially appropriate in those cases where the need for preliminary relief

precipitously arose just prior to some impending event and the party seeking temporary relief has not had an adequate opportunity to fully develop its legal arguments. Alternatively, or in addition, the phrase could mean that the questions raised have sufficiently serious *factual* merit to warrant further investigation in discovery and, if summary judgment is not warranted, at trial.

In the pending appeal, the District Court stated, "The word 'serious' relates to a question that is both serious and open to reasonable debate." J. App'x 150. But Judge Ramos declined to accept Appellants' claim that just raising a constitutional objection to the subpoenas sufficed to render the claim serious. As he observed, if that sufficed, "every complaint challenging the power of one of the three coordinate branches of government would result in preliminary relief, regardless of whether established law renders the complaint unmeritorious." *Id*.

Our case law indicates that the phrase "make them fair ground for litigation" often refers to those *factual* disputes that can be resolved at trial only after investigation of the facts. We have stated that the questions raised by a plaintiff's claims must be "so serious, substantial, difficult and doubtful as to make them a fair ground for litigation *and thus for more deliberate investigation*." *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953) (emphasis added).

The emphasized words appear to have originated in *Hamilton Watch*, but have been frequently repeated by this Court. *See Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Co.*, 476 F.2d 687, 692, 93 (2d Cir. 1973); *Checker Motors Corp. v. Chrysler Corp.*, 405 F.2d 319, 323 (2d Cir. 1969); *Unicon Management Corp. v. Koppers Co.*, 366 F.2d 199, 205 (2d Cir. 1966). More recently, we pointed out in *Citigroup Global Markets* that a virtue of the serious-questions standard is "that it permits the entry of an injunction in cases where *a factual dispute* renders a fully reliable assessment of the merits impossible." 598 F.3d at 36 (emphasis added). For example, in *Jacobson & Co. v. Armstrong Cork Co.*, 548 F.2d 438 (2d Cir. 1977), we affirmed a preliminary injunction under the serious-questions standard because the plaintiff had presented affidavits, depositions, and exhibits sufficient to contest the factual issue of the reason for an employee's termination, *see id.* at 444.

We need not choose between these meanings of "fair ground for litigation." Appellants are not entitled to a preliminary injunction under the serious-questions standard because (1) that standard, as we have discussed, *see* Part I, does not apply to preliminary injunctive relief sought to prevent governmental action, and (2) even if applicable, the standard requires a balance of hardships that tips decidedly to the plaintiff, a requirement not met in this case, *see* Point IV. We also point out

that, to the extent that the serious-questions standard furnishes an opportunity to develop legal arguments concerning a reasonably debatable question, Appellants have fully developed their positions in the 95 pages of briefs they have submitted. To the extent that the serious-questions standard is available for factual development of an issue, Appellants have not identified a single factual issue that might warrant a trial or a single witness or document that might add substance to their claims at a trial.

Furthermore, both their statutory and constitutional claims, though serious in at least some sense, lack merit, and, because they both involve solely issues of law, are properly rejected at this stage of the litigation, s*ee Munaf*, 553 U.S. at 691–92, except for the limited remand we have ordered.

## IV. Balance of Hardships/Equities

The hardship for Appellants if a preliminary injunction is denied would result from the loss of privacy for their financial documents. We have recognized that this loss of privacy is irreparable. In assessing the seriousness of that loss for purposes of determining the balance of hardships, we note that the loss will be somewhat mitigated to the extent that sensitive personal information and some documents will not be disclosed pursuant to the procedure we have ordered upon

remand. The seriousness of the hardship arising from disclosure of the information called for by the subpoenas should be assessed in light of the fact that the Lead Plaintiff is already required to expose for public scrutiny a considerable amount of personal financial information pursuant to the financial disclosure requirement of the Ethics in Government Act, 5 U.S.C. app. §§ 101–111, although considerably more financial information is required to be disclosed by the subpoenas.

The hardship for the Committees if a preliminary injunction is granted would result from the loss of time to consider and act upon the material disclosed pursuant to their subpoenas, which will expire at the end of the 116th Congress. This loss is also irreparable. In assessing the seriousness of that loss for purposes of determining the balance of hardships, we note that the Committees have already been delayed in the receipt of the subpoenaed material since April 11 when the subpoenas were issued. They need the remaining time to analyze the material, hold hearings, and draft bills for possible enactment.

Even if the balance of these hardships/equities tips in favor of Appellants, which is debatable, it does not do so "decidedly," *Kelly*, 933 F.3d at 184; *Jackson Dairy*, 956 F.2d at 72, as our serious-questions standard requires.

V. Public Interest

The public interest in vindicating the Committees' constitutional authority is clear and substantial. It is the interest of two congressional committees, functioning under the authority of a resolution of the House of Representatives authorizing the subpoenas at issue, to obtain information on enforcement of anti-money-laundering/counter-financing of terrorism laws, terrorist financing, the movement of illicit funds through the global financial system including the real estate market, the scope of the Russian government's operations to influence the U.S. political process, and whether the Lead Plaintiff was vulnerable to foreign exploitation. The opposing interests of Appellants, suing only in their private capacity, are primarily their private interests in nondisclosure of financial documents concerning their businesses, rather than intimate details of someone's personal life or information the disclosure of which might, as in *Watkins*, 354 U.S. at 197–99, chill someone's freedom of expression.

We recognize, however, that the privacy interests supporting nondisclosure of documents reflecting financial transactions of the Lead Plaintiff should be accorded more significance than those of an ordinary citizen because the Lead Plaintiff is the President. Although the documents are not official records of the

Executive Branch, the Lead Plaintiff is not suing in his official capacity, and no executive privilege has been asserted, disclosure of the subpoenaed documents can be expected to risk at least some distraction of the Nation's Chief Executive in the performance of his official duties. *See Nixon v. Fitzgerald*, 457 U.S. 731, 753 (1982) (noting risk of distraction as one reason for establishing immunity of President from civil liability for official actions). That concern, we note, did not dissuade the Supreme Court from requiring President Nixon to comply with a district court's subpoena to produce tape recordings of conversations with senior staff, *see United States v. Nixon*, 418 U.S. 683 (1974), or requiring President Clinton to submit to discovery, including a deposition, in civil litigation involving pre-presidential conduct, *see Jones*, 520 U.S. at 697–706.[78] *See also Trump v. Vance*, 941 F.3d 631, 641 n. 12 (2d Cir. 2019) (concluding that "the disclosure of personal financial information, standing alone, is unlikely to impair the President in

---

[78] In *Jones*, the Supreme Court stated, "The fact that a federal court's exercise of its traditional Article III jurisdiction may significantly burden the time and attention of the Chief Executive is not sufficient to establish a violation of the Constitution." 520 U.S. at 703. The same can be said as to Congress's exercise of its traditional Article I jurisdiction. One court has discounted concern that compliance with document requests might distract the President in the performance of official duties by noting that "the President himself appears to have had little reluctance to pursue personal litigation despite the supposed distractions it imposes upon his office." *District of Columbia v. Trump*, 344 F. Supp. 3d 828, 843 (D. Md. 2018) (collecting examples), *rev'd on other grounds (lack of standing)*, *In re Trump*, 928 F.3d 360 (4th Cir. 2019).

performing the duties of his office"), *petition for cert. filed*, No. 19-635 (U.S. Nov. 14, 2019).

The Committees' interests in pursuing their constitutional legislative function is a far more significant public interest than whatever public interest inheres in avoiding the risk of a Chief Executive's distraction arising from disclosure of documents reflecting his private financial transactions.

Conclusion

For all of these reasons, we conclude that under the applicable likelihood-of-success standard, Appellants' motion for a preliminary injunction was properly denied, except as to disclosure of any documents that might be determined to be appropriate for withholding from disclosure pursuant to our limited remand. The serious-questions standard is inapplicable, the balance of hardships does not tip decidedly in favor of Appellants, and the public interest favors denial of a preliminary injunction.

We affirm the District Court's order in substantial part to the extent that it denied a preliminary injunction and order prompt compliance with the subpoenas, except that the case is remanded to a limited extent for implementation of the procedure set forth in this opinion concerning the nondisclosure of sensitive

personal information and a limited opportunity for Appellants to object to disclosure of other specific documents within the coverage of those paragraphs of the subpoenas listed in this opinion. The mandate shall issue forthwith, but compliance with the three subpoenas and the procedure to be implemented on remand is stayed for seven days to afford Appellants an opportunity to apply to the Supreme Court or a Justice thereof for an extension of the stay.